# EXHIBIT E

JEFFREY L. HOGUE (SBN 234557)
TYLER J. BELONG (SBN 234543)
STEPHANIE A. SANDLER (SBN 315165)
**HOGUE & BELONG**
170 Laurel Street
San Diego, CA 92101
Tel.: (619) 238-4720
Fax: (619) 238-5260

Attorneys for Plaintiff

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

### FOR THE COUNTY OF SAN DIEGO—CENTRAL

| | |
|---|---|
| BRYANT FONSECA, an individual, on behalf of himself and all others similarly situated, and on behalf of the general public,<br><br>Plaintiff,<br><br>vs.<br><br>HEWLETT-PACKARD COMPANY, a Delaware Corporation; HP ENTERPRISE SERVICES, LLC, a Delaware Limited Liability Company; HP, Inc., a Delaware corporation; and DOES 1-100, inclusive.<br><br>Defendants. | CASE NO.: 37-2017-00045630-CU-WT-CTL<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES**<br><br>1) **DISPARATE TREATMENT – CALIFORNIA GOVERNMENT CODE § 12940(a)**<br>2) **DISPARATE IMPACT – CALIFORNIA GOVERNMENT CODE §§ 12940(A), 12941;**<br>3) **WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY;**<br>4) **FAILURE TO PREVENT DISCIMINATION;**<br>5) **VIOLATION OF THE CARTWRIGHT ACT – CALIFORNIA BUSINESS AND PROFESSIONS CODE §§ 16270, *et seq.***<br>6) **VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS Code §§ 16600 *et seq.***<br>7) **UNFAIR COMPETITION – CALIFORNIA BUSINESS & PROFESSIONS CODE §§ 17200, *et seq.***<br><br>**DEMAND FOR JURY TRIAL** |

-1-
SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

Bryant Fonseca ("Fonseca" or "Plaintiff"), individually and on behalf of all others similarly situated, alleges the following:

### INTRODUCTION

1.      This class action is brought by Plaintiff, on behalf of himself, and on behalf of all others similarly situated, and on behalf of the general public against Hewlett-Packard Company, a Delaware corporation and its successors, HP Enterprise Services, LLC, a Delaware Limited Liability Company, and HP Inc., a Delaware corporation (collectively, "HP").  Plaintiff alleges on information and belief, except for information on personal knowledge, as follows.

2.      Plaintiff petitions this Court to allow him to represent and prosecute claims against HP in class action proceedings on behalf of all those similarly situated who are residing in the State of California.

### THE PARTIES

3.      At all material times, Mr. Fonseca was a resident of the County of San Diego in the State of California.  At all material times, Mr. Fonseca was the employee of HP within the meaning of California Government Code section 12940.

4.      At all material times, HP conducted business within the County of San Diego. HP's headquarters and principal place of business are located in the city of Palo Alto, California.  Palo Alto is the location where HP directs, controls, and coordinates its business operations.

5.      HP has gone through significant corporate restructuring.  Below is an organizational chart of that restructuring:



SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

EXHIBIT E -  76

HP Enterprise Services, LLC

DXC Tech.

6.      All the aforementioned entities share a unity of interest and all are co-conspirators for the acts described below.

7.      The true names and capacities, whether individual, corporate, partnership, associate or otherwise of defendants DOES 1 through 100, inclusive, are unknown to Plaintiff who therefore sues these defendants by such fictitious names under California Code of Civil Procedure section 474.  Plaintiff will either seek leave to amend this Class Action Complaint or file a DOE statement to allege the true names and capacities of DOES 1 through 100, inclusive, when the same are ascertained.  The DOE defendants together with HP are collectively referred to herein as "Defendants."

8.      Plaintiff is informed and believes, and thereon alleges, that Defendants are each responsible in some manner for one or more of the events and happenings that proximately caused the injuries and damages hereinafter alleged.

9.      Plaintiff is informed and believes, and thereon alleges, that Defendants knowingly and willfully acted in concert, conspired together and agreed among themselves to enter into a combination and systemized campaign of activity to cause the injuries and damages hereinafter alleged, and to otherwise consciously and or recklessly act in derogation of the rights of Plaintiff, the Age Discrimination Class (defined below), and the Antitrust Class (defined below).  Defendants further violated the trust reposed by Plaintiff, the Age Discrimination Class, and the Antitrust Class by their negligent and or intentional actions.  Said conspiracy, and Defendants' concerted actions, were such that, on information and belief, and to all appearances, Defendants represented a unified body so that the actions of one defendant was accomplished in concert with, and with knowledge, ratification, authorization and approval

-3-
SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

1   of each and every other defendant.

2       10.     Plaintiff is informed and believes and thereon alleges, that each and every

3   defendant named in this Class Action Complaint, including DOES 1 through 100, inclusive, is,

4   and at all times mentioned herein was, the agent, servant, alter ego, and or employee of each of

5   the other defendants and that each defendant was acting within the course of scope of his, her or

6   its authority as the agent, servant and or employee of each of the other defendants.

7   Consequently, each and every defendant is jointly and severally liable to Plaintiff, the Age

8   Discrimination Class, and the Antitrust Class for the damages sustained as a proximate result of

9   their conduct.

10      11.     At all times herein mentioned, the Defendants, and each of them, were members

11  of, and engaged in, a joint venture, partnership and common enterprise, and acted within the

12  course and scope of said agency, employment, and enterprise.  Defendants operate as a single

13  enterprise to transact their business through unified operation and common control.  At all times

14  herein mentioned, the acts and omissions of various Defendants, and each of them, concurrently

15  contributed to the various acts and omissions of each and every one of the other Defendants in

16  proximately causing the wrongful conduct, harm, and damages alleged here

17      12.     At all times herein mentioned, Defendants, and each of them, approved,

18  condoned and/or otherwise ratified each and every one of the acts or omissions complained of

19  herein.  At all times herein mentioned, the Defendants, and each of them, aided and abetted the

20  acts and omissions of each and every one of the other Defendants, thereby proximately causing

21  the damages as herein alleged.

22                          **JURISDICTION AND VENUE**

23      13.     This Court has subject matter jurisdiction over this action pursuant to the

24  California Constitution, Article VI, section 10, which grants the Superior Court, "Original

25  Jurisdiction in all causes except those given by statute to other courts."  The causes of action

26  alleged herein are not reserved for any court other than the Superior Court of California.

27  Additionally, the statutes under which this action is brought do not specify any other basis for

28  jurisdiction.

14.     This Court has jurisdiction over each of the defendants because upon information and belief, each defendant is either a citizen of California, has sufficient minimum contacts in California, or otherwise intentionally avails itself of the California market so as to render the exercise of jurisdiction over it by the California courts consistent with traditional notions of fair play and substantial justice.

15.     Venue as to HP is proper in this judicial district under California Code of Civil Procedure sections 395(a) and 395.5 as a portion of the acts complained of herein occurred in the County of San Diego.  The injuries to Plaintiff occurred in the County of San Diego.  HP either owns, maintains offices, transacts business, has an agent or agents within the County of San Diego, or otherwise is found within the County of San Diego.  Further, Plaintiff was employed by HP in the County of San Diego.

**ADMINISTRATIVE PREREQUISITES**

16.     On November 3, 2017, Mr. Fonseca filed a charge against HP with the Department of Fair Employment and Housing ("DFEH") concerning HP's policy that targeted himself and other employees aged 40 years and older through a pattern and practice of unlawful terminations.  The DFEH issued Mr. Fonseca an immediate right-to-sue letter. (*See* Exhibit A.)

**FACTUAL ALLEGATIONS**

**Bryant Fonseca was a Talented and Experienced Employee that had Loyally Served HP for More Than 35 Years.**

17.     Mr. Fonseca was 55 years old at the time he filed his complaint.

18.     Mr. Fonseca was employed by HP for nearly 36 years.  He worked out of HP's San Diego site, located in Rancho Bernardo.

19.     Mr. Fonseca first worked for HP as a part of a summer program while he was in high school in 1978.  For most of his career, Mr. Fonseca worked in the "CHIL" work group, where his title was "Procurement Ops Associate V."  The CHIL group conducted research and development related to HP's all-in-one printers.  Mr. Fonseca would work with vendors in order to obtain all supplies that the group required.

SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

20.     Over time, Mr. Fonseca's responsibilities began to increase dramatically.  Mr. Fonseca became an expert at using the SAP program – a business software program that makes a business's purchasing department run more efficiently.  Mr. Fonseca later became classified as a "SAP Super User."

21.     In approximately August 2016, the CHIL work group was dissolved, and Mr. Fonseca began to work in an engineering support group.

**HP's Employees Were Older, More Experienced, and Therefore More Expensive Than the Employees at HP's Competitors.**

22.     In 2012, the median age of HP's workforce was 39 years old, the oldest in the tech industry.  With one-half of its workforce over the age of 39, HP's labor costs were higher than other tech companies.  HP employees with 10-19 years of experience are paid an average of just over $97,000 annually while employees with 20 or more years of experience are paid an average of just over $110,000 annually.  By contrast, HP employees with less than 1 year of experience are paid an average of just over $64,000 while employees with 1-4 years of experience are paid an average of just over $65,000.

**HP's Workforce Reduction Plan Sought to Replace Older, Experienced Employees with Younger, Cheaper Ones.**

23.     On or about early 2012, HP implemented its "2012 U.S. Workforce Reduction Plan" ("Workforce Reduction Plan"), which was a scheme to terminate its older, higher paid employees and replace them with younger, lower paid employees.  HP's Workforce Reduction Plan involuntarily terminates employees on a rolling basis.  Although HP's Workforce Reduction Plan purports to lay off employees on a neutral basis, it actually is a companywide practice that disproportionately targets employees who are 40 years of age or older – a protected class – for termination.

24.     HP has stated that its purpose in instituting the Workforce Reduction Plan was to realign its "organization to further stabilize the business and create more financial capacity to invest in innovation, but it's not enough.  If [HP is] to position [itself] as the industry leader for

SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

the future, then [HP] must take additional actions that, while tough, are necessary to move [its] business forward.  These actions include a reduction in [HP's] global workforce."

On October 9, 2013, HP's then-CEO Meg Whitman described HP's staffing objectives at the company's "Hewlett-Packard Securities Analyst Meeting".  **Whitman explained that HP was aggressively seeking to *replace* older employees with younger employees**.  On this topic, some of Whitman's comments include, but are not limited to:

- ". . . a question that is actually completely relevant for all large-cap IT companies, which is how do you keep up with this next generation of IT and how do you bring people into this company for whom it isn't something they have to learn, it is what they know."

- ". . . we need to return to a labor pyramid that really looks like a triangle where you have a lot of early career people who bring a lot of knowledge who you're training to move up through your organization, and then people fall out either from a performance perspective or whatever."

- "And over the years, our labor pyramid . . . [has] become a bit more of a diamond.  And we are working very hard to recalibrate and reshape our labor pyramid so that it looks like the more classical pyramid that you should have in any company and particularly in ES.  If you don't have a whole host of young people who are learning how to do delivery or learning how to do these kinds of things, you will be in real challenges."

- "So, this has a couple of things.  One is we get the new style of IT strength and skills.  It also helps us from a cost perspective . . . if your labor pyramid isn't the right shape, you're carrying a lot of extra cost.  The truth is we're still carrying a fair amount of extra costs across this company because the overall labor pyramid doesn't look the way it should."

- "Now, that's not something that changes like that.  Changing the shape of your labor pyramid takes a couple of years, but we are on it, and we're amping up our early career hiring, our college hiring.  And we put in place an informal rule to some extent which is, listen, when you are replacing someone, really think about the new style of IT skills."

25.     HP's CFO Cathie Lesjak ("Lesjak") explained the scheme as a way to proactively shift the makeup of HP's workforce towards low-level recent graduates:

> "And the way I think about the restructuring charge . . ., it's basically catching up.  It's actually dealing with the sins of the past in which we have not been maniacally focused on getting the attrition out

SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

1
2
3
4

> and then just agreeing to replace anyway and not thinking through it
> carefully and thinking through what types of folks we hire as replacements
> . . . We hire at a higher level than what we really need to do. And the
> smarter thing to do would be to prime the pipeline, bring in fresh new
> grads, and kind of promote from within as opposed to hiring a really
> experienced person that is going to be much more expensive."

5
6
7
8

26.     HP's Manager of Employee Relations for the Americas, Sheri Bowman,

explained that it was critical for some HP organizations to reduce expenses, and one way they

had done so was by changing the composition of their workforce:

9
10
11
12
13
14

> The focus within the different organizations has evolved a lot over the
> past four or five years because of the turnaround that we have been
> trying to achieve within the organization. And so there is a
> tremendous focus on increasing revenue, increasing client satisfaction
> to help increase revenue and reducing, you know, overall expenses.
> So that has just resulted in some organizations modifying their
> workforce to try to get to the right labor pyramid to achieve their
> business goals.

15
16

**HP Executed the Workforce Reduction Plan That Targeted Older Employees.**

17
18
19
20

27.     In November 2015, HP was still persistently eliminating the jobs of older, age-

protected employees, like Mr. Fonseca, and actively replacing them with younger employees.

Ms. Whitman confirmed as much in her public statements intended to reach the ears of HP

investors:

21
22
23
24

> "That should be it. I mean, that will allow us to right size our
> enterprise services business to get the right onshore/offshore mix, to
> make sure that we have a labor pyramid with lots of young people
> coming in right out of college and graduate school and early in their
> careers. That's an important part of the future of the company . . .
> This will take another couple of years and then we should be done."

25
26
27
28

28.     Consistent with HP's strategy to eliminate the older members of its workforce in

favor of younger workers, when selecting which employee to terminate under its Workforce

Reduction Plan, HP's goal is to single out those workers who it thinks "will not fit the bill long

term in [the] team growing to [an advisory] position."

29.     Although purportedly neutral on their face, HP's terminations under its Workforce Reduction Plan are actually targeted to eliminate older, age-protected workers in grossly disproportionate numbers.  As of October 2015, a total of 1,765 out of 2,076 California-based employees who were terminated under HP's Workforce Reduction Plan (or over 85%) are 40 years of age, or older.

30.     HP's Workforce Reduction Plan is implemented on a rolling basis.  That is, it does not terminate HP's employees all at once.  But, it serves as a mechanism for HP to terminate members of a protected class of employees whenever it wants.  Plaintiff is informed and believes that HP is *still* engaged in the systematic elimination of its age protected class of employees.

31.     Also, HP implements its Workforce Reduction Plan to carefully avoid triggering a Workforce Adjustment and Retraining Notification ("WARN") event.  A WARN Act event is triggered when a covered establishment terminates 50 employees in the same geographic region at any one time.  If a WARN Act event is triggered, the company must provide terminated employees with at least 60 days' notice of his or her termination, and pay them for 60 days' worth of pay.  HP actively evades these requirements by not terminating 50 or more employees at any one time in the same geographic area.

**HP's "Fake" Measures that Purportedly Helped Terminated Employees to Retain Employment in a Different Capacity were Illusory and Restricted Competition.**

32.     Theoretically, HP employees terminated under the Workforce Reduction Plan are encouraged to apply for other jobs at HP through HP's 60-day "Preferential Rehire Period."  A termination is cancelled for any HP employee who is hired during this "Preferential Rehire Period."  While the Preferential Rehire Period is supposed to be neutral in its application, it is not applied neutrally because it adversely impacts disproportionate numbers of age protected employees.  In fact, during the Preferential Rehire Period, HP's older employees are almost never rehired.  If an older employees are even offered a job, the job is rarely, if at all, comparable to the one that employee held before he or she was terminated.

33.     From the time that the Workforce Reduction Plan was implemented in 2012 until approximately 2014, a terminated employee that was not rehired during the "Preferential Rehire

SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

Period" became ineligible for 12 months following termination – according to HP's written policy. Beginning in August 2014, employees terminated under the workforce reduction plan were made completely ineligible for rehire despite continuing to be told that they could take advantage of the Preferential Rehire Period.  Simply put, the Preferential Rehire Period is a façade that masks the systematic terminations of Defendants' older employees by making it appear as though HP was interested in retaining these individuals.

34.     Since August 2013, HP's Human Resources has incorporated written guidelines that require HP to hire mostly younger employees.  Specifically, those guidelines state: "New corporate requisition policy requires 75% of all External hire requisitions be 'Graduate' or 'Early Career' employees."  Thus, age-protected employees who were terminated under the Workforce Reduction Plan and who sought rehiring under the Preferential Rehiring Period, were fighting an uphill battle against HP's inherent prerogative to hire a disproportionate percentage of younger "early career" and "recent graduates".[1]

35.     Thus, available job postings included discriminatory language that made clear that HP was looking for a "younger" employee to fill those available jobs.  Accordingly, age-protected employees were rejected for rehiring under the Preferential Rehire Period provision of the Workforce Reduction Plan in disparately greater numbers than their younger peers who applied either externally or pursuant to the Preferential Rehire Period provision.

36.     HP also implemented an early retirement program in which employees of a certain age and tenure are eligible to "voluntarily" retire early.  If the employee does not choose voluntary early retirement he or she may soon be unemployed.  This retirement program presents age-protected employees with a Hobson's choice: either participate in the voluntary retirement program or risk being terminated under the Workforce Reduction Plan.  The aforementioned dilemma works to HP's advantage.

_____

[1] Notably, the Equal Employment Opportunity Commission views the use of "new grad" and "recent grad" in job notices to be illegal because it discourages older applicants from applying.

SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

37.      The Workforce Reduction Plan also deters the recipient from looking for jobs from third party employers.  Specifically, the Workforce Reduction Plan requires the employee to notify his or her manager "immediately" upon acceptance of employment with a "competitor" of HP, and the Workforce Reduction Plan further states: "If you accept a position with a competitor during the WFR Redeployment Period, you will terminate your Plan participation at that point you will not be eligible for the Cash Severance Pay."  Thus, the Workforce Reduction Plan was also used as a mechanism to support HP's agreements with competitors such as 3D Systems not to compete by poaching each other's employees, as described in greater detail below.

**HP Has Deliberately Avoided Confronting the Reality that Its Policies Disproportionately Impact Age Protected Employees.**

38.      Older employees were well aware of the fact that many of their age-protected peers had been selected for termination under the Workforce Reduction Plan.  In the engineering support group, older employees would advise each other not to disclose their age or how long they had worked at HP in order to avoid being selected for termination under the Workforce Reduction Program.

39.      HP has an "Adverse Impact Team" that evaluates various HP employment practices to determine whether or not those practices impact a significant number or percentage of a particular protected class of employees.  Although HP has an "Adverse Impact Team," for unknown reasons, it does not investigate the facts related to whether or not the Workforce Reduction Plan adversely affects a class of *age* protected employees disproportionately.

40.      According to its "HP 2016 Sustainability Report," HP provides workforce data regarding its diversity in the United States, but tellingly provides no facts about its age-protected workforce data.

41.      On or about February 2017, HP set forth a "diversity mandate" when it hires outside attorneys to defend it from lawsuits.  If a law firm does not fit HP's selective "diversity" requirements then it can withhold ten percent (10%) of the firm's attorneys' fees.  Tellingly,

1  "age" is not one of the criteria or factors included in this "diversity mandate."  This omission

2  further evidences HP's devaluation of age-protected class of persons.

3       42.      Consequently, since July 2012 there have been approximately *forty* age

4  discrimination charges filed against HP with the Department of Fair Employment & Housing

5  ("DFEH") and California Superior Court.

6       43.      According to a January – February 2017 article published by AARP, HP has

7  received more allegations of age discrimination than *any* other technology company in recent

8  years.

9

10  **Mr. Fonseca was Terminated under the Workforce Reduction Plan, and Was Not**
   **Rehired During Either the Redeployment Period or the Preferential Rehire Period**

11  **Because He Was Replaced by Somebody Younger and Cheaper.**

12       44.      On May 8, 2017, Mr. Fonseca was notified by his manager that his employment

13  was being terminated pursuant to the Workforce Reduction Plan, and that his termination date

14  would be May 19, 2017.  In a letter, Mr. Fonseca was informed that "your position has been

15  eliminated."  He was never given any further details regarding why he had been selected for

16  termination under the Workforce Reduction Plan.

17       45.      Mr. Fonseca was informed that he would have two weeks as part of his

18  "redeployment period" to find another job with HP.  If he was able to successfully find another

19  position during that time, then he would be allowed to continue to work without interruption.  If

20  he was not able to find another position at HP within the redeployment period, then he would be

21  terminated and the 60-day "Preferential Rehire Period" would commence.  During that time,

22  Mr. Fonseca would be allowed to apply for jobs within HP, and if he was selected then he

23  would be re-hired without having to undertake the approval process normally required for a

24  rehire.

25       46.      At the time that Mr. Fonseca was terminated, he was the oldest person in his

26  work group.  He had previously worked with other individuals that were older than him,

27  however, they had already been terminated pursuant to the Workforce Reduction Plan.

28

-12-
SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

47.     Mr. Fonseca received excellent performance reviews.  In his most recent performance review, his manager stated that he was one of the employees who "consistently achieve[s] their goals and demonstrate[s] HP's Leader Attributes and Behaviors in achieving these goals.  [His] contributions have a positive impact to the team, organization, and HP." That review praised a number of Mr. Fonseca's achievements, including work that he did with other labs and sites beyond what was required of his position.  After listing the many contributions to HP that Mr. Fonseca had made during the period, his manager summarized, "That is an impressive list of accomplishments.  Bryant, you've really stepped up with your additional responsibilities and done a great job."

48.     Mr. Fonseca also received numerous performance related awards within his department.

49.     After his termination, Mr. Fonseca sought to be rehired by HP.  Mr. Fonseca applied to two different positions within the company, both of which he was incredibly qualified.  One position was located in Corvallis, Oregon.  He did not receive any response whatsoever with regard to that position.  The other position was in Vancouver, Washington.  He visited Vancouver in order to interview for this job.  Ultimately, high-level management denied him this position without giving any explanation.  As a result, Mr. Fonseca was not rehired by HP.

50.     As part of his benefits package under the Workforce Reduction Plan, HP paid for Mr. Fonseca to receive a four-month career transition program from Lee, Hecht, Henderson - a firm focusing career counseling.  Mr. Fonseca participated in this program, however, he found it to be largely ineffective because the career counselor was largely unavailable, and her advice was more or less, "Applying for jobs is worthless," and getting a job is all about "Who you know."

51.     HP subsequently hired a new employee who was younger and less expensive than Mr. Fonseca to perform the tasks that he previously did.  Despite submitting multiple job applications every day since his termination, Mr. Fonseca has yet to find gainful employment.

52.	As a result of his unlawful termination, Mr. Fonseca has had to resort to government assisted welfare and food stamps in order to support his family and their three foster children.[2]  Mr. Fonseca's foster children have lost their medical care providers as well because his family was kicked off HP's health insurance plan.

**HP and 3D Systems, Inc.'s Conspiracy to Limit Competition.**

53.	In 2014, Ebay, through its former Chief Executive Officer ("CEO"), Meg Whitman, entered into a settlement with the Department of Justice ("DOJ") regarding a "no poach" agreement that HP entered into with Intuit.  Meg Whitman was either the CEO, on the Board of Directors, or both of HP during the time period from 2011 through 2018.  The no-poach agreement between HP and 3D Systems also occurred during Meg Whitman's watch.

54.	On or about November 2015, HP split their operations into two parts – one that focused on computers and printers, and one that focused on, among other things, servers, software, and consulting services.  HP's two entities (HP, Inc. & Hewlett Packard Enterprise Co.) came to a no-poach agreement with one another for a period of approximately 10 months.

55.	In 2016, HP expanded its 3-dimentional ("3D") printing operations and made substantial investment in that operation and technology.  HP's research and development budget increased in 2016, in the area of 3D printing.

56.	The 3D printing industry is highly competitive.  Two major competitors are HP and 3D Systems – who builds various 3D printer products and equipment.  In order to remain competitive and keep pace with the technological advancement of the printing industry, HP had to look for ways to reduce competition with other competitors.

57.	Technology employees, such as the employees who work for 3D Systems and HP, are frequently in high demand due to their specialized technology skills and ability.  As HP began engaging in more business in the 3D printing market space, 3D Systems began

_____

[2] Mr. Fonseca has fostered approximately 35 children over the course of his life and has been the recipient of the Foster Parent of the Year award.

1   aggressively poaching (i.e., hiring-away) HP's talent – starting with HP's top printing

2   executives and working its way down through managers and other talent.

3       58.     For example, in approximately early 2016, 3D Systems hired Vyomesh Joshi,

4   HP's Executive Vice President of Imaging and Printing at HP Inc. to be 3D System's new CEO.

5   Mr. Joshi was "a former HP executive with significant connections to HP." (Engineering.com

6   (April 28, 2016.)  "So HP Won't Be Buying 3D Systems?")  Prior to becoming 3D System's

7   new CEO, Joshi had a "30 year career at HP, where he served as the Executive Vice President of

8   the Imaging and Printing Group." (TechCrunch.com (2016) 3D Systems Outlines Plans to Shift

9   3D Printing from Prototype to Production.)

10      59.     In his first few months as CEO of 3D Systems the former HP executive began

11  "revealing some *major changes* for 3D Systems."  In fact, almost immediately after Mr. Joshi was

12  hired by 3D Systems, 3D Systems' management began to aggressively poach HP's top talent –

13  including, without limitation, executives, managers and engineers.  After arriving at 3D Systems,

14  3D's new CEO himself stated "I am reorganizing.  I'm augmenting the management team I have

15  with exceptional people that helped me to grow and scale HP's printing business.  I'm hiring

16  regional managers.  I've already hired a CFO.  I already hired a supply chain manager."  In fact,

17  Joshi immediately hired away approximately six high-level HP employees to 3D Systems'

18  management team.   Given the normally increasing value of top-level workers in the printing

19  and technology space, unsurprisingly 3D Systems began aggressively hiring many top-level HP

20  employees away from HP – especially at a time when 3D Systems had just hired its CEO from

21  HP and was in need of improving its own stock value.

22      60.     When Joshi was HP's VP of Imaging and Printing (before he became 3D

23  Systems' CEO), he developed a close business relationship with a number of top-level executives

24  at HP, including, without limitation, Stephen Nigro – who, on information and belief, was

25  promoted to President of HP's 3D Printing unit once Joshi became the CEO of 3D Systems.

26      61.     Accordingly, soon after Joshi began executing 3D System's campaign of poaching

27  away top talent from HP, HP's executives and 3D System's executives entered into a "cease-fire",

28  in the form of an no-poach agreement – an agreement whereby each of HP and 3D Systems

SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

1   would take necessary measures to refrain from soliciting the hiring of one another's employees

2   through, for example cold calling, and to dissuade their own current employees from applying for

3   work at the other company.  And, in or around 2016, both 3D Systems and HP ceased cold-

4   calling each other's employees in furtherance of the conspiracy.

5       62.     Further, HP and 3D Systems also ceased hiring one another's employees through

6   third party recruiting firms in furtherance of the conspiracy.

7       63.     Additionally, HP and 3D Systems also shared pay scales with one another to

8   assure that they would not be in a bidding war with one another.  This conduct was in furtherance

9   of the conspiracy with the intended effect to suppress wages of its employees, and restraining

10  trade; thus, causing injury to Plaintiff and the Antitrust Class (defined below).

11      64.     As a result of this deal both companies gained renewed confidence in their respective

12  abilities to retain top talent while minimizing operational costs – i.e., payroll costs.  Joshi himself

13  openly stated that he was confident he could boost 3D Systems' earnings by ***fixing and improving***

14  ***operational efficiency***, […] ***even while end-market demand remains subdued***." (Investor's

15  Business Daily (April 2016) "As 3D Systems, Stratasys Jump, Is 3D Printer Market Set to

16  Rebound?")

17      65.     As a result, by approximately August 2016, soon after HP's CHIL group had been

18  dissolved and 3D Systems had poached a significant number of talented HP employees, the no-

19  poach agreement between the two companies began to take effect.  Managerial level HP

20  employees began holding meetings with their subordinate employees to try to carry out HP's side

21  of the bargain under the no-poach agreement.  For example, in approximately August 2016, the

22  managers of the team at HP where Mr. Fonseca was employed called a meeting during which

23  hundreds of HP employees were informed that they were required to immediately notify HP if

24  they were offered a position with 3D Systems.  They were further informed that any HP employee

25  that was offered a position with 3D Systems would not be allowed to receive the severance check

26  that he or she would otherwise be entitled to under the Workforce Reduction Plan's release

27  agreement, according to the individuals conducting the meeting.  As a result, outgoing employees,

28  including Plaintiff, stopped seeking employment with 3D Systems after this meeting; thus, causing

-16-

SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

1   Plaintiff and the Antitrust Class injury

2        66.     Additionally, HP acted consistent with the terms of a no-poach agreement with

3   3D Systems by taking action against its own employees who violated the directives designed to

4   dissuade them from applying for work with 3D Systems.  For instance, during at least one work

5   group meeting Mr. Fonseca and other employees were informed that one of their coworkers had

6   "interviewed with 3D Systems" and "that is why HP terminated him."  Likewise, other

7   managers informed Mr. Fonseca and hundreds of other employees that "if you are being laid

8   off, we will help you with job searches, but, if you are applying to or talking with 3D Systems, I

9   don't want to know about it, because if I or my managers know about it, you will get 'escorted-

10   out'" – meaning you will be "immediately terminated and forfeit your right to any of the

11   benefits of the severance package" you otherwise would have been given. That manager went

12   on to inform the large room full of HP employees that he has even witnessed other employees

13   be escorted out of HP because of interviewing with 3D Systems.  This chilled HP employees

14   from interviewing or applying to 3D Systems furthering the anticompetitive goals of HP's and

15   3D Systems' no-poach agreement.

16        67.     Upon Plaintiff's information and belief, HP's conspiracy and agreement with 3D

17   Systems stopped or greatly limited 3D Systems from attempting to hire outgoing HP

18   employees, and vice versa, and the companies' respective implementation of the agreement

19   caused Mr. Fonseca and other employees to refrain from applying (or delay in applying) to the

20   other company.

21        68.     Furthermore, on information and belief, the no-poach agreement between 3D

22   Systems and HP resulted in the suppression of 3D Systems' hiring current and outgoing

23   employees from HP, including Mr. Fonseca.

24        69.     In fact, in 2017, at the time that Mr. Fonseca's employment with HP ended, he

25   applied to 3D Systems.  Mr. Fonseca would have applied sooner but for the directives from HP

26   management informing him of repercussions if he applied to 3D Systems.  Nevertheless in

27   2017, at the time Mr. Fonseca eventually applied to 3D Systems, he also specifically inquired

28   about his job applications and open positions at 3D Systems by reaching out to at least two

1    hiring managers at 3D Systems, Dave Tribolet and Shawn Nielson.  In response to his

2    submitted application and his separate and concurrent inquiries, 3D Systems did not hire Mr.

3    Fonseca.  Nor did 3D Systems even offer Mr. Fonseca an interview for any of the open

4    positions for which he was well qualified.   Other than informing him that there was no other

5    place for him to submit an application other than 3D Systems' main website, Mr. Fonseca did

6    not receive any additional feedback or response from 3D Systems.  The intended and actual

7    effect of this "no poach" conspiracy was that it restricted recruitment, fixed and suppressed

8    employee compensation, and imposed unlawful restrictions on employee mobility.  Thus,

9    Plaintiff as well as the Class suffered injury.

10          70.      In October 2016, the DOJ's Antitrust Division released its "Antitrust Guidance

11    for Human Resource Professionals." (Ex. B.)  The publication regarded the issue of "no poach"

12    agreements.  The Antitrust Division recommended that companies "implement safeguards to

13    prevent inappropriate discussions or agreements with other firms seeking to hire the same

14    employees."  Despite its history entering into "no poach" agreements, HP did not have any

15    safeguards in place that would prevent companies from agreeing not to actively hire each

16    other's employees.  On information and belief, 3D Systems likewise had no safeguards in place

17    that would prevent it from agreeing not to hire away another company's employees.

18          71.      Also, in the DOJ's memorandum, it stated that "[i]t is _unlawful_ for competitors

19    to expressly or _implicitly_ agree not to compete with one another, even if they are motivated by a

20    desire to reduce costs," and that "[i]t does not matter whether the agreement is informal or

21    formal, written or unwritten, spoken or unspoken."  And, also stated, "[e]ven if an individual

22    does not agree orally or in writing to limit employee compensation or recruiting, other

23    circumstances – such as evidence of discussions and parallel behavior – may lead to an

24    inference that an individual has agreed to do so."

25          72.      The DOJ memorandum went on to state, "no-poaching agreements among

26    employers, whether entered into directly or through a third-party intermediary, are **_per se_** illegal

27    under the antitrust laws.  That means that if the agreement is separate from or not reasonably

28    necessary to a larger legitimate collaboration between the employers, the agreement is deemed

illegal ***without any inquiry into its competitive effects*** ."  HP and 3D Systems did not have any such legitimate joint venture or collaborative agreements.  Rather, the arrangement was a naked agreement not to poach or hire each others' employees.  Thus, the illegal nature of the agreement is established without any inquiry into its competitive effects per the DOJ guidelines.

73.     Given the DOJ's prohibition of no poach agreements, combined with the fact that HP desperately needed to maintain a competitive workforce, HP entered into the above described anti-poach agreement with 3D Systems, while concealing that agreement from investors and the public.  In HP's SEC 2016 – 10K filing it admits that its ability to remain competitive relied heavily on maintaining a competitive workforce.  Nevertheless, HP concealed the fact that it entered into the no-poach agreement with 3D Systems.  HP's 2016 – 10K filing stated the following:

> **Risk Factors.**  The process of developing new high-technology products and services and enhancing existing products and services is complex, costly and uncertain, and any failure by us to anticipate customers' changing needs and emerging technological trends accurately could significantly harm our market share, results of operations and financial condition. For example, to offset industry declines in some of our businesses, we must successfully grow in adjacencies such as copier printers, maintain our strong position in graphics, develop and introduce 3D printers and execute on our strategy to grow commercial mobility by providing specialized products and services to address the needs of our customers. We must make long-term investments, develop or acquire and protect appropriate intellectual property, and commit significant research and development and other resources before knowing whether our predictions will accurately reflect customer demand for our products and services. Any failure to accurately predict technological and business trends, control research and development costs or execute our innovation strategy could harm our business and financial performance. **Our research and development initiatives may not be successful in whole or in part, including research and development projects which we have prioritized with respect to funding and/or personnel.**
>
> Our industry is subject to rapid and substantial innovation and technological change. Even if we successfully develop new products and technologies, future products and technologies may eventually supplant ours if we are unable to keep pace with technological advances and end-user requirements and preferences and timely enhance our existing products and technologies or develop new ones. Our competitors may also create products that replace ours. As a result, any of our products and technologies may be rendered obsolete or uneconomical.

74.     HP also put a premium on the "*hiring* and *retention of key employees*," and thus the poaching of employees in their printing unit was cause for concern.

SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

75.     In its 2017 and 2018 10-K filings, HP also placed an emphasis on "expanding our footprint in the 3D printing marketplace" and "accelerating growth in Graphics solutions and 3D printing."  And, having 3D printing became more and more profitable and became necessary to offset revenue losses elsewhere.  In its 2017 10-K filing, HP stated, "to offset industry declines in some of our businesses, we must successfully grow in adjacencies such as copier printers, maintain our strong position in graphics, ***develop and introduce 3D printers***."

76.     On July 15, 2019, a group of State Attorney Generals, including California, issued a 15 page letter ("Letter"), in response to the Federal Trade Commissions request for comments on Competition and Consumer Protection in the 21st Century. (Ex. C.)  Significant focus was placed on the problem of "no-poach" agreements between competing companies, and that was one of the reasons that "workers have suffered a decline in relative income."

77.     The Letter stated, "horizontal agreements between competing employers, including no-poach agreements, have been characterized as restraints of trade that have no purpose other than to restrain competition, and thus are ***per se*** illegal under antitrust law."  And, further, "[t]hese types of agreements are ***per se*** illegal under antitrust law and enforcement in these cases is relatively straightforward," and, "increased judicial experience with [no-poach agreement] arrangements will likely lead to that outcome."

78.     HP's conspiracy and agreements restrained trade and the overarching conspiracy is *per se* unlawful under California and federal law.  Plaintiff and the Antitrust Class seek injunctive relief and damages for violations of the Cartwright Act (Cal. Bus. and Code §§ 16720, et seq.), California Business and Professions Code sections 16600 and 17200, *et seq.*, and Sherman Act (15 U.S.C. § 1.)

79.     In a lawfully competitive labor market, HP would have needed to consider the risk that a particular competitor would hire one of its employees when deciding whether to terminate that employee.  The risk that an employee might begin working for a competitor also would have been prominent for HP in deciding how much it was willing to pay in order to retain that employee.  Because of HP's agreement with 3D Systems, some of HP's employees became artificially disposable as their value to competitors was instantly eliminated.  This

allowed HP to terminate employees that it would not otherwise terminate because they did not have to worry about whether the competitive labor market would drive their former employee to a competitor.  HP and each of its co-participants would also have competed against each other for employees and would have hired employees according to the needs of their business and the going market rates for employee wages.  And, in such a lawfully competitive labor market, the participants of the secret "no poach" agreements would have engaged in such employee hiring in direct competition with one another, resulting in employees accepting offers from the company who makes the most favorable offer of employment.

80.     Additionally, in a lawfully competitive labor market, an outgoing employee would have the ability to apply to all possible employers and then accept a position with the employer that offered him or her the highest salary.  Employers would be incentivized to offer higher salaries to more valuable prospective employees in order to ensure that they were not outbid.  Because of the agreement in this case (1) outgoing employees (including Mr. Fonseca) were restricted from seeking employment with 3D Systems, and were denied any salary offer that they might have made and (2) HP and other potential employers were not pressured to outbid 3D Systems for outgoing employees' services, thus paid below-market rates for their employees' services.

81.     The competitive marketplace helps to ensure that companies can benefit by taking advantage of rivals' efforts expended soliciting, interviewing, and training skilled employees – provided they pay salaries sufficient to lure employees away from competitors. The competitive marketplace also benefits the public by fostering the flow of new non-proprietary information, skills, and technologies across competing industry leaders.  And, for obvious reasons, this competitive process benefits our country's work force by compensating employees for the fair market value of their skills, knowledge, and experience.

82.     For these reasons, competitive hiring serves as a critical role, particularly in the high technology industry where companies benefit from obtaining employees with advanced skills and abilities.  By restricting hiring, employee salaries at competing companies are restricted and depressed, decreasing the pressure of an employee's current employer to match a

-21-

1   rival's offer and vice versa.  Restrictions on hiring also limit an employee's leverage when

2   negotiating his or her salary with his or her current employer.  Furthermore, when companies

3   restrict hiring of rival companies' employees the wages of those employees are suppressed

4   because companies are not bidding against each other.  As a result, the effects of hiring

5   restrictions impact all employees of participating companies, namely HP and 3D Systems, so

6   that competition between the two companies was injured.

7       83.     Plaintiff and each member of the Antitrust Class was harmed and injured by this

8   secretive no-poach arrangement.  HP and 3D Systems purposefully destroyed competition.  HP

9   and 3D, through the secretive no-poach agreement, eliminated competition, suppressed

10  compensation, and restricted mobility all which had a negative cumulative effect on the

11  Antitrust class members' wages; thus, inflicting injury.

12

13                      **CLASS ALLEGATIONS**

14      84.     This class action is properly brought under the provisions of California Code of

15  Civil Procedure section 382, and, to the extent applicable, the procedural provisions of Rule 23

16  of the Federal Rules of Civil Procedure, which have been adopted by the California Supreme

17  Court for use by the trial courts of this State.  Plaintiff brings this class action on behalf of

18  himself and all others similarly situated, with Plaintiff proceeding as the representative member

19  of the following classes defined as:

20

21          All current, former, or prospective employees who worked for HP in the
            State of California between April 22, 2012, and present who were at
22          least 40 years old at the time HP selected them for termination under
            HP's Workforce Reduction Plan. ("Age Discrimination Class").

23          All natural persons employed by HP in the United States on a salaried basis
24          at any time from January 1, 2016 to the present (the "Class Period").
            ("Antitrust Class").
25

26      85.     To the extent equitable tolling applies to toll claims by the above-referenced

27  Class' against Defendants, the class period should be adjusted accordingly.

28

-22-
SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

86.     This action has been brought and may properly be maintained as a class action, under California Code of Civil Procedure section 382 because a well-defined community of interest in the litigation exists and because the proposed class is easily ascertainable, and for the other reasons explained in this Class Action Complaint.

87.     Numerosity:  The persons who comprise Age Discrimination Class and the Antitrust Class (collectively, the "Plaintiff Classes") are so numerous that joinder of all such persons would be unfeasible and impracticable.  The membership of Plaintiff Classes is unknown to Plaintiff at this time; however, the Age Discrimination Class alone is at least one thousand seven hundred individuals, whose identities are readily ascertainable by inspection of HP's payroll records.

88.     Commonality:  Common questions of fact or law arising from HP's conduct exist, as described in this Complaint, as to all members of Plaintiff Classes, which predominate over any questions solely affecting individual members of the proposed class, including but not limited to:

- Whether HP's policies or practices relating to the Workforce Reduction Plan were based on discriminatory intent towards employees over 40 who were otherwise qualified for those positions;

- Whether HP's Workforce Reduction Plan had a disproportionate adverse impact on its California employees aged 40 or older;

- Whether HP's policy of selecting employees to terminate under its Workforce Reduction Plan had a disproportionate adverse effect on those California employees aged 40 or older;

- Whether HP's termination selection policy (i.e., the Workforce Reduction Plan) was a substantial factor in causing the Class member terminations (i.e., harm);

- Whether HP failed to adequately investigate, respond to, and/or appropriately resolve instances of age discrimination in the workplace;

- Whether HP failed to implement policies and practices to prevent discrimination against older employees.

- Whether HP's Workforce Reduction Plan was an unfair, unlawful, deceptive, and or fraudulent business practice;

- Whether an alternative or modification to the Workforce Reduction Plan existed

that would have had less of an adverse impact on employees aged 40 years and older;

- Whether HP's anti-competitive conspiracies, associated agreements, and practices violated the Cartwright Act;

- Whether HP's anti-competitive conspiracies, associated agreements, and practices restrained trade, commerce, or competition violated Business and Professions Code section 16600, *et seq.*;

- Whether HP's anti-competitive conspiracies, associated agreements, and practices constituted unlawful or unfair business acts or practices in violation of California Business and Professions Code section 17220; and

- Whether HP's anti-competitive conspiracies, associated agreements, and practices caused antitrust injury;

89.     HP's defenses, to the extent that any such defense is applied, are applicable generally to Plaintiff Classes and are not distinguishable to any degree relevant or necessary to defeat predominance in this case.

90.     <u>Typicality:</u>  Plaintiff's claims are typical of the claims for the members of the Age Discrimination Class and Antitrust Class as a whole, all of whom have sustained and/or will sustain injuries, including irreparable harm, as a legal (proximate) result of HP's common course of conduct as complained of in this operative complaint.  Plaintiff's class claims are typical of the claims of the Age Discrimination Class and Antitrust Class because HP used its policies and practices (i.e., its Workforce Reduction Plan, accompanying Preferential Rehire Period, and anti-competitive practices) to subject Plaintiff and each member of the Age Discrimination Class and Antitrust Class to identical unfair, unlawful, deceptive, and/or fraudulent business practices, acts, and/or omissions.

91.     <u>Adequacy:</u>  Plaintiff, on behalf of all others similarly situated, will fairly and adequately protect the interests of all members of the Age Discrimination Class and Antitrust Class in connection with which they have retained competent attorneys.  Plaintiff is able to fairly and adequately protect the interests of all members of the aforementioned Classes because it is in Plaintiff's best interests to prosecute the claims alleged herein to obtain full compensation due to them.  Plaintiff does not have a conflict with either the Age Discrimination

-24-

1   Class nor the Antitrust Class, and his interests are not antagonistic to either of those Classes.

2   Plaintiff has retained counsel who are competent and experienced in representing employees in

3   complex class action litigation

4        92.    <u>Superiority:</u>  Under the facts and circumstances set forth above, class action

5   proceedings are superior to any other methods available for both fair and efficient adjudication

6   of the controversy.  A class action is particularly superior because the rights of each member of

7   the Age Discrimination Class or Antitrust Class, inasmuch as joinder of individual members of

8   either Class is not practical and, if the same were practical, said members of the Age

9   Discrimination Class or the Antitrust Class could not individually afford the litigation, such that

10  individual litigation would be inappropriately burdensome, not only to said citizens, but also to

11  the courts of the State of California.

12       93.    Litigation of these claims in one forum is efficient as it involves a single

13  decision or set of decisions that affects the rights of thousands of employees.  In addition, class

14  certification is superior because it will obviate the need for unduly duplicative litigation that

15  might result in inconsistent judgment concerning HP's practices.

16       94.    To process individual cases would increase both the expenses and the delay not

17  only to members of the Age Discrimination Class, but also to HP and the Court.  In contrast, a

18  class action of this matter will avoid case management difficulties and provide multiple benefits

19  to the litigating parties, including efficiency, economy of scale, unitary adjudication with

20  consistent results and equal protection of the rights of each member of the Age Discrimination

21  Class and Antitrust Class, all by way of the comprehensive and efficient supervision of the

22  litigation by a single court.

23       95.    This case is eminently manageable as a class.  Defendants' computerized

24  records, including meticulous payroll and personnel data, provide an accurate and efficient

25  means to obtain information on the effect and administration of the Workforce Reduction Plan

26  *en masse*, including class-wide damages, meaning class treatment would significantly reduce

27  the discovery costs to all parties.

28       96.    In particular, since HP is obfuscating the import of its Workforce Reduction

SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

EXHIBIT E -  99

1  Plan, misleading its employees, suppressing their wages and mobility, the Age Discrimination

2  Class and Antitrust Class are neither sophisticated nor legally knowledgeable enough be able to

3  obtain effective and economic legal redress unless the action is maintained as a class action.

4  Given the unlikelihood that many injured class members will discover, let alone endeavor to

5  vindicate, their claims, class action is a superior method of resolving those claims.

6      97.      There is a community of interest in obtaining appropriate legal and equitable

7  relief for the common law and statutory violations and other improprieties, and in obtaining

8  adequate compensation for the damages and injuries which HP's actions have inflicted upon

9  Plaintiff and the Age Discrimination Class or the Antitrust Class.

10     98.      There is also a community of interest in ensuring that the combined assets and

11 available insurance of HP are sufficient to adequately compensate the members of the Age

12 Discrimination Class or Antitrust Class for the injuries sustained.

13     99.      Notice of the pendency and any result or resolution of the litigation can be

14 provided to members of the Age Discrimination Class or the Antitrust Class by the usual forms

15 of publication, sending out to members a notice at their current addresses, establishing a

16 website where members can choose to opt-out, or such other methods of notice as deemed

17 appropriate by the Court.

18     100.     Without class certification, the prosecution of separate actions by individual

19 members of the Plaintiff Classes would create a risk of: (1) inconsistent or varying

20 adjudications with respect to individual members of Age Discrimination Class and Antitrust

21 Class that would establish incompatible standards of conduct for HP; or (2) adjudications with

22 respect to the individual members of Age Discrimination Class and Antitrust Class that would,

23 as a practical matter, be disparities of the interests of the other members not parties to the

24 adjudication, or would substantially impair or impede their ability to protect their interest.

25

26

27

28

SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES
EXHIBIT E - 100

**FIRST CAUSE OF ACTION**

**Age Discrimination: Disparate Treatment – Cal. Govt. Code § 12900** *et seq.*

**(Plaintiff Bryant Fonseca, on Behalf of Himself and the Age Discrimination Class Against Defendants)**

101.    Mr. Fonseca, on behalf of himself and the Age Discrimination Class, re-alleges and incorporates by reference, as though fully set forth herein, all of the preceding paragraphs.

102.    Under the Fair Employment & Housing Act ("FEHA"), it is unlawful for an employer to use its employee's age as a basis to terminate or lay off, refuse to hire, re-hire, or re-instate, or discriminate in compensation or in terms, conditions, or privileges of employment. (Cal. Govt. Code § 12940(a).)

103.    The FEHA protects employees over the age of 40. (Cal. Govt. Code §§ 12926(b), 12941(a).)  Mr. Fonseca was an employee of HP over the age of 40—when HP fired Mr. Fonseca, he was 55 years old.  Thus, because Mr. Fonseca was an employee over the age of 40 at the time of his firing, he is in a class of persons protected by the FEHA.  Likewise, all members of the Age Discrimination Class were aged 40 or over at the time of their termination pursuant to the Workforce Reduction Plan and are thus protected by the FEHA.

104.    The FEHA covers "employers" who are "regularly employing five or more persons." (Cal. Gov't Code § 12926(d).)  HP employs more than five persons and is therefore an employer under the FEHA.

105.    As referenced above, Mr. Fonseca filed timely charges with the DFEH against Hewlett-Packard Company, HP Enterprise Services, LLC, and HP Inc. and received an immediate right to sue notice.  Mr. Fonseca served the charge and right-to-sue letter upon Hewlett-Packard Company, HP Enterprise Services, LLC, and HP Inc.

106.    Defendants' terminating or laying off Mr. Fonseca and the members of the Age Discrimination Class because of their age constitutes willful, knowing, intentional, and unlawful discrimination in violation of the FEHA.

107.    Defendants' not re-hiring, re-instating, or hiring Mr. Fonseca and the members of the Age Discrimination Class, especially in comparable positions, because of their age constitutes willful, knowing, intentional, and unlawful discrimination in violation of the FEHA.

-27-
SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

108.     Defendants denying Mr. Fonseca and the members of the Age Discrimination Class the benefits of their employment with Defendants because of their age constitutes willful, knowing, intentional, and unlawful discrimination in violation of the FEHA.

109.     Mr. Fonseca is informed and believes, and based thereon alleges, that his and the members of the Age Discrimination Class's years of age was the substantial motivating factor in Defendants' decision to terminate Plaintiff and the members of the Age Discrimination Class.

110.     In addition to the conduct described above, Defendants have failed to prevent, respond to, adequately investigate, and/or appropriately resolve instances of age discrimination in the workplace.

111.     As a direct and proximate result of Defendants' willful, knowing, and intentional discrimination against Mr. Fonseca and the members of the Age Discrimination Class, Mr. Fonseca and the members of the Age Discrimination Class have suffered and will continue to suffer pain and suffering, and extreme and severe mental anguish and emotional distress.  Mr. Fonseca and the members of the Age Discrimination Class are therefore entitled to general and compensatory damages in an amount to be proven at trial.

112.     As a direct and proximate result of Defendants' willful, knowing, and intentional discrimination against Mr. Fonseca and the members of the Age Discrimination Class, Mr. Fonseca and the members of the Age Discrimination Class have incurred and will continue to incur a loss of earnings and other employment benefits and job opportunities.  Mr. Fonseca and the members of the Age Discrimination Class are therefore entitled to general and compensatory damages in amounts to be proven at trial.

113.     Mr. Fonseca is informed and believes, and based thereon alleges, that Defendants' outrageous conduct directed at Mr. Fonseca and the members of the Age Discrimination Class described above, was done with malice, fraud, or oppression and with conscious and/or reckless disregard for the rights of Mr. Fonseca and the members of the Age Discrimination Class, and with the intent, design, and purpose of injuring them.  Defendants, through their officers, managing agents, and or their supervisors, authorized, condoned, and or ratified the unlawful of all of the other defendants.  Thus, Mr. Fonseca and the members of the Age Discrimination Class are entitled

SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

1   to exemplary or punitive damages from Defendants in amounts to be determined according to proof

2   at trial.

3       114.    As a further direct and proximate result of Defendants' actions, Mr. Fonseca and the

4   members of the Age Discrimination Class are entitled to and seek their attorney fees and costs. (*See*

5   Cal. Govt. Code § 12965(b).)

6       115.    Mr. Fonseca and the members of the Age Discrimination Class also seek the

7   "affirmative relief" or "prospective relief" afforded them under California Government Code

8   section 12926(a).

9                          **SECOND CAUSE OF ACTION**

10

11  **Age Discrimination: Disparate Impact – Cal. Govt. Code §§ 12940(a), 12941**

    **(Plaintiff Bryant Fonseca, on Behalf of Himself and the Age Discrimination Class Against**
12                              **Defendants)**

13      116.    Mr. Fonseca, on behalf of himself and the Age Discrimination Class, re-alleges and

14  incorporates by reference, as though fully set forth herein, all of the preceding paragraphs.

15      117.    The FEHA protects employees over the age of 40. (Cal. Govt. Code §§ 12926(b),

16  12941(a).)  Mr. Fonseca was an employee of HP over the age of 40—when HP fired Mr. Fonseca,

17  he was 55 years old.  Thus, because Mr. Fonseca was an employee over the age of 40 at the time of

18  his firing, he is in a class of persons protected by the FEHA.  Likewise, all members of the Age

19  Discrimination Class were aged 40 or over at the time of their termination pursuant to the

20  Workforce Reduction Plan and are thus protected by the FEHA.

21      118.    When Mr. Fonseca and the members of the Age Discrimination Class applied for

22  other positions within HP and HP refused to select them for comparable positions within HP, Mr.

23  Fonseca and the members of the Age Discrimination Class were aged 40 or over and were therefore

24  in a class of persons the FEHA protects.

25      119.    The FEHA covers "employers" who are "regularly employing five or more persons."

26  (Cal. Govt. Code § 12926(d).)  HP employs more than five persons and is therefore an employer

27  under the FEHA.

28      120.    As part of its reduction in workforce, HP implemented its Workforce Reduction

1   Plan.

2       121.    HP's Workforce Reduction Plan disproportionately selected for termination HP's

3   employees aged at least 40 years.  Further, HP's Workforce Reduction Plan disproportionately

4   terminated the employment of HP's employees aged at least 40 years.  For example, among all

5   those terminated under the Workforce Reduction Plan, over 85% were at least 40 years old.  In

6   other words, out of a total of 2,076 employees laid off under the Workforce Reduction Plan, 1,765

7   were 40 years old or older.  HP's Workforce Reduction Plan adversely affected Mr. Fonseca and

8   the members of the Age Discrimination Class through HP selecting and terminating them.  Mr.

9   Fonseca and the members of the Age Discrimination Class were also adversely affected by

10  Defendants not re-hiring, re-instating, or hiring Mr. Fonseca and the members of the Age

11  Discrimination Class, especially in comparable positions.

12      122.    HP's implementation of the Workforce Reduction Plan was a substantial factor in

13  directly and proximately causing harm to Mr. Fonseca and the members of the Age Discrimination

14  Class.

15      123.    In addition to the conduct described above, Defendants have failed to prevent,

16  respond to, adequately investigate, and/or appropriately resolve instances of age discrimination in

17  the workplace.

18      124.    As a substantial direct and proximate result of HP implementing the Workforce

19  Reduction Plan to terminate Mr. Fonseca and the members of the Age Discrimination Class, Mr.

20  Fonseca and the members of the Age Discrimination Class have suffered and will continue to suffer

21  pain and suffering, and extreme and severe mental anguish and emotional distress. Mr. Fonseca and

22  the members of the Age Discrimination Class are therefore entitled to general and compensatory

23  damages in an amount to be proven at trial.

24      125.    As a substantial direct and proximate result of HP implementing the Workforce

25  Reduction Plan against Mr. Fonseca and the members of the Age Discrimination Class, Mr.

26  Fonseca and the members of the Age Discrimination Class have incurred and will continue to incur

27  a loss of earnings and other employment benefits and job opportunities.  Mr. Fonseca and the

28  members of the Age Discrimination Class are therefore entitled to general and compensatory

SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

1  damages in amounts to be proven at trial.

2  126.  Mr. Fonseca is informed and believes, and based thereon alleges, that Defendants'

3  outrageous conduct directed at Mr. Fonseca and the members of the Age Discrimination Class

4  described above, was done with malice, fraud, or oppression and with conscious and/or reckless

5  disregard for the rights of Mr. Fonseca and the members of the Age Discrimination Class, and with

6  the intent, design, and purpose of injuring them.  Defendants, through their officers, managing

7  agents, and or their supervisors, authorized, condoned, and or ratified the unlawful of all of the

8  other defendants.  Thus, Mr. Fonseca and the members of the Age Discrimination Class are entitled

9  to exemplary or punitive damages from Defendants in amounts to be determined according to proof

10  at trial.

11  127.  As a further direct and proximate result of Defendants' actions, Mr. Fonseca and the

12  members of the Age Discrimination Class are entitled to and seek their attorneys' fees and costs.

13  (*See* Cal. Govt. Code § 12965(b).)

14  128.  Mr. Fonseca and the members of the Age Discrimination Class also seek the

15  "affirmative relief" or "prospective relief" afforded them under California Government Code

16  section 12926(a).

17
18  **THIRD CAUSE OF ACTION**

**Wrongful Termination in Violation of Public Policy**

19
20  **(Plaintiff Bryant Fonseca, on Behalf of Himself and the Age Discrimination Class Against Defendants)**

21  129.  Mr. Fonseca, on behalf of himself and the Age Discrimination Class, re-alleges and

22  incorporates by reference, as though fully set forth herein, all of the preceding paragraphs.

23  130.  It is the public policy of the State of California, as expressed in the FEHA (Cal.

24  Gov't Code § 12940, *et seq.*) and Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e, *et*

25  *seq.*) that employers shall not subject employees to age discrimination and terminate employees

26  because of age.  This public policy of the State of California is one that benefits the public at large

27  and guarantees the rights of employees to perform their work free from discrimination.  Further

28  public policy support for the wrongful termination claims of Mr. Fonseca and the members of the

-31-

1    Age Discrimination Class is also found in California Labor Code sections 6300, 6400, and the

2    California Constitution Article I, section 8.

3         131.    As a direct and proximate result of Defendants' willful, knowing, and intentional

4    discriminatory termination against Mr. Fonseca and the members of the Age Discrimination Class,

5    Mr. Fonseca and the members of the Age Discrimination Class have suffered and will continue to

6    suffer pain and suffering and extreme and severe mental anguish and emotional distress.  Mr.

7    Fonseca and the members of the Age Discrimination Class are thereby entitled to general and

8    compensatory damages in amounts to be proven at trial.

9         132.    As a direct and proximate result of Defendants' willful, knowing, and intentional

10   discriminatory termination against Mr. Fonseca and the members of the Age Discrimination Class,

11   Mr. Fonseca and the members of the Age Discrimination Class have incurred and will continue to

12   incur a loss of earnings and other employment benefits and job opportunities.  Mr. Fonseca and the

13   members of the Age Discrimination Class are thereby entitled to general and compensatory

14   damages in amounts to be proven at trial.

15        133.    Mr. Fonseca is informed and believes, and based thereon alleges, that Defendants

16   directed the outrageous conduct directed at Mr. Fonseca and the members of the Age

17   Discrimination Class, as described above, with malice, fraud, and or oppression and with conscious

18   disregard for the rights of Mr. Fonseca and the members of the Age Discrimination Class and with

19   the intent, design, and purpose of injuring them.  Defendants, through their officers, managing

20   agents and or their supervisors, authorized, condoned and or ratified the unlawful conduct of all of

21   the other defendants.  Thus, Mr. Fonseca and the members of the Age Discrimination Class are

22   entitled to punitive or exemplary damages in a sum according to proof at trial.

23        134.    Plaintiff is entitled to an award of attorneys' fees and costs in prosecuting this action

24   against Defendants under California Code of Civil Procedure section 1021.5 and other applicable

25   law.  A successful outcome in this action will confer on the general public and a large class of

26   persons (the Age Discrimination Class) both a pecuniary and nonpecuniary benefit and will result in

27   the enforcement of important rights affecting the public interest.  The necessity and financial burden

28   of private enforcement furthermore make such an award appropriate.

SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

**FOURTH CAUSE OF ACTION**

**Failure to Prevent Discrimination – Cal. Govt. Code §§ 12900,** *et seq***.**

**(Plaintiff Bryant Fonseca on Behalf of Himself and the Age Discrimination Class Against Defendants)**

135.    Mr. Fonseca, on behalf of himself and the Age Discrimination Class, re-alleges and incorporates by reference, as though fully set forth herein, all of the preceding paragraphs.

136.    The FEHA protects employees over the age of 40. (Cal. Gov't Code §§ 12926(b), 12941(a).)  Mr. Fonseca was an employee of HP over the age of 40—when HP fired Mr. Fonseca, he was 55 years old.  Thus, because Mr. Fonseca was an employee over the age of 40 at the time of his firing, he is in a class of persons protected by the FEHA.  Likewise, all members of the Age Discrimination Class were aged 40 or over at the time of their termination pursuant to the Workforce Reduction Plan and are thus protected by the FEHA.

137.    The FEHA covers "employers" who are "regularly employing five or more persons." (Cal. Govt. Code § 12926(d).)  HP employs more than five persons and is therefore an employer under the FEHA.

138.    HP subjected Mr. Fonseca and the members of the Age Discrimination Class to discrimination when HP selected Mr. Fonseca and the members of the Age Discrimination Class for termination under HP's Workforce Reduction Plan.  In addition, HP subjected Mr. Fonseca and the members of the Age Discrimination Class to discrimination when HP terminated Mr. Fonseca and the members of the Age Discrimination Class under the Workforce Reduction Plan.  Mr. Fonseca and the members of the Age Discrimination Class were also subjected to discrimination by Defendants not re-hiring, re-instating, or hiring Mr. Fonseca and the members of the Age Discrimination Class, especially in comparable positions.

139.    HP failed to take all reasonable steps to prevent Mr. Fonseca and the members of the Age Discrimination Class's discriminatory selection and termination under HP's Workforce Reduction Plan.  HP's failure to take reasonable steps to prevent Mr. Fonseca and the members of the Age Discrimination Class's discriminatory termination under HP's Workforce Reduction Plan was a substantial factor in causing harm to Mr. Fonseca and the members of the Age Discrimination Class.

SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES
EXHIBIT E -  107

140.     As a substantial direct and proximate result of Defendants willfully, knowingly, and intentionally discriminating against Mr. Fonseca and the members of the Age Discrimination Class, Mr. Fonseca and the members of the Age Discrimination Class have suffered and will continue to suffer pain and suffering and extreme and severe mental anguish and emotional distress.  Thus, Mr. Fonseca and the members of the Age Discrimination Class are entitled to general and compensatory damages in an amount to be proven at trial.

141.     As a substantial direct and proximate result of Defendants' willful, knowing, and intentional discrimination against Mr. Fonseca and the members of the Age Discrimination Class, Mr. Fonseca and the members of the Age Discrimination Class have incurred and will continue to incur a loss of earnings and other employment benefits and job opportunities.  Mr. Fonseca and the members of the Age Discrimination Class are therefore entitled to general and compensatory damages in amounts to be proven at trial.

142.     Mr. Fonseca is informed and believes, and based thereon alleges, that Defendants' outrageous conduct directed at Mr. Fonseca and the members of the Age Discrimination Class described above, was done with malice, fraud, or oppression and with conscious and/or reckless disregard for the rights of Mr. Fonseca and the members of the Age Discrimination Class, and with the intent, design, and purpose of injuring them. Defendants, through their officers, managing agents, and or their supervisors, authorized, condoned, and or ratified the unlawful of all of the other defendants.  Thus, Mr. Fonseca and the members of the Age Discrimination Class are entitled to exemplary or punitive damages from Defendants in amounts to be determined according to proof at trial.

143.     As a further direct and proximate result of Defendants' actions, Mr. Fonseca and the members of the Age Discrimination Class are entitled to and seek their attorney fees and costs. (See Cal. Govt. Code § 12965(b).)

144.     Mr. Fonseca and the members of the Age Discrimination Class also seek the "affirmative relief" or "prospective relief" afforded them under California Government Code section 12926(a).

-34-

**FIFTH CAUSE OF ACTION**

**Violation of the Cartwright Act – California Business and Professions Code §§ 16720 *et seq.***

**(Plaintiff Bryant Fonseca, on Behalf of Himself and the Antitrust Class Against Defendants)**

145.   Mr. Fonseca, on behalf of himself and the Antitrust Class, re-allege and incorporate by reference, as though fully set forth herein, all of the preceding paragraphs.

146.   Except as expressly provided in California Business and Professions Code sections 16720 *et seq.*, every trust is unlawful, against public policy, and void.  A trust is a combination of capital, skill, or acts by two or more persons for any of the following purposes:

        a.   To create or carry out restrictions in trade or commerce.

        b.   To limit or reduce the production, or increase the price of merchandise or of any commodity.

        c.   To prevent competition in manufacturing, making, transportation, sale or purchase of merchandise, produce or any commodity.

        d.   To fix at any standard or figure, whereby its price to the public or consumer shall be in any manner controlled or established, any article or commodity of merchandise, produce or commerce intended for sale, barter, use or consumption in this State.

147.   HP, by and through its officers, directors, employees, agents or other representatives, has entered into an unlawful agreement, combination, and conspiracy in restraint of trade, in violation of California Business and Professions Code section 16720.

148.   HP conspired with 3D Systems and entered into an unlawful trust agreement in restraint of trade and commerce by, among other things, restricting and limiting, to a substantial degree, competition among these defendants' skilled labor, and fixing the wages and salary ranges for said class members, all with the purpose and effect of suppressing class members' compensation and restraining competition in the market for services of members of the Antitrust Class.

149.   As a direct and proximate result of HP's conduct members of the Antitrust Class were also injured by incurring suppressed compensation to levels lower than the members otherwise would have incurred in the absence of HP's unlawful trust, all in an amount to be proven at trial.

-35-

SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

150.     HP, Plaintiff, and other members the Antitrust Class are "persons" within the meaning of the Cartwright Act as defined in California Business and Professions Code section 16702.

151.     HP's practices and associated agreements are *per se* violations of the Cartwright Act, and their conduct violates the Cartwright Act.

152.     As a result of the above violations, Plaintiff and the Antitrust Class have been damaged in an amount according to proof.

## SIXTH CAUSE OF ACTION

**Violation of California Business and Professions Code §§ 16600 *et seq.***

**(Plaintiff Bryant Fonseca, on Behalf of Himself and the Antitrust Class Against Defendants)**

153.     Mr. Fonseca, on behalf of himself and the Antitrust Class, re-allege and incorporate by reference, as though fully set forth herein, all of the preceding paragraphs.

154.     Under California Business and Professions Code section 16600, *et seq.*, except as expressly provided for by section 16600, et seq., every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void.

155.     HP entered into, implemented, enforced agreements, and engaged in practices that are unlawful and void under Section 16600.

156.     HP's practices, agreements, and conspiracy have included concerted action and undertakings among the Defendant and others with the purpose and effect of: (a) reducing open competition among Defendant and other companies for skilled labor; (b) reducing employee mobility; (c) reducing or eliminating opportunities for employees to pursue lawful employment of their choice; and (d) limiting employee professional betterment.

157.     HP's practices, agreements, and conspiracy are contrary to California's settled legislative policy in favor of open competition and employee mobility, and are therefore void and unlawful.

158.     HP's practices, agreements, and conspiracy were not intended to protect and were not limited to protecting any legitimate proprietary interest of Defendant.

-36-
SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

159.     HP's practices, agreements, and conspiracy do not fall within any statutory exception to Section 16600, *et seq.*

160.     The acts done by HP and each of the parties to the anti-competitive practices and agreements as part of, and in furtherance of, their contracts, combinations or conspiracies were authorized, ordered, or done by their respective officers, directors, agents, employees, or representatives while actively engaged in the management of each defendant's affairs

161.     Accordingly, Plaintiff and members of Antitrust Class seek a judicial declaration that Defendant's agreements and conspiracy are void as a matter of law under Section 16600, and a permanent injunction enjoining HP from ever again entering into similar agreements in violation of Section 16600.

162.     Although Plaintiff is unaware of the exact date that this conspiracy began, Plaintiff alleges upon information and belief that this cause of action accrued within the last four years, as described in detail above.

## SEVENTH CAUSE OF ACTION

**Unfair Competition – California Business and Professions Code §§ 17200, *et seq*.**

**(Plaintiff Bryant Fonseca on Behalf of Himself and the Age Discrimination Class and Antitrust Class Against Defendants)**

163.     Mr. Fonseca, on behalf of himself and the Age Discrimination Class and Antitrust Class, re-allege and incorporate by reference, as though fully set forth herein, all of the preceding paragraphs.

164.     The Unfair Competition Law ("UCL"), which is codified under California Business and Professions Code section 17200, *et seq*. prohibits acts of "unfair competition," including any unlawful, unfair, fraudulent *or* deceptive business act *or* practice as well as "unfair, deceptive, untrue or misleading advertising."

165.     A plaintiff may bring a Business & Professions Code section 17204 claim even when the underlying statutory violation does not provide the plaintiff with a private right of action. (*See Safeway v. Superior Court* (2015) 238 Cal. App. 1138, 1147 ["[t]he statutory language referring to 'any unlawful, unfair *or* fraudulent' practice makes clear that a practice may be deemed

SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

1    unfair even if not specifically proscribed by some other law"].)

2       166.    Defendants have engaged, and continue to engage, in unfair, deceptive, fraudulent,

3    and unlawful business practices in California by practicing, employing, and utilizing the

4    employment policies and practices outlined above, including, i.e., the various acts of discrimination

5    and anti-competitive practices detailed herein.

6       167.    Defendants engaged in unlawful or unfair competition by, among other things,

7    engaging in conduct as alleged herein:

8              a.   wherein the utility of such conduct, if any, is outweighed by the

9                   gravity of the consequences to Plaintiff and the members of the

10                  Plaintiff Classes;

11             b.   that is immoral, unethical, oppressive, unscrupulous, or substantially

12                  injurious to Plaintiff and the other members of the Plaintiff Classes;

13             c.   that undermines or violates the stated policies underlying California

14                  law which seek to protect employees aged 40 or over against age

15                  discrimination, and thus provide a sufficient predicate for claims for

16                  unfair competition;

17             d.   Violating the Cartwright Act; and

18             e.   Violation of the California Business and Professions Code sections §§

19                  16600 *et seq.*

20      168.    Defendants knew or should have known of their anti-competitive and discriminatory

21    conduct as alleged herein.

22      169.    Defendants committed fraudulent business practices by engaging in conduct, as

23    alleged herein, that was and is likely to deceive employees acting reasonably under the

24    circumstances.  Defendants' fraudulent business practices include, but are not limited to, failing to

25    disclose, concealing from, and/or failing to investigate whether Plaintiff and the members of the

26    Age Discrimination Class were being selected for termination, terminated, and not re-hired due to

27    their age, misrepresenting the reasons for those actions, including through reference to pretextual

28    explanations related to job performance or qualifications, and/or failing to prevent, respond to,

1   adequately investigate, and/or appropriately resolve instances of age discrimination in the

2   workplace, including the adverse impact of Defendants' employment practices on employees aged

3   40 or over.

4        170.     Defendants also acted unlawfully and unfairly by engaging in anti-competitive

5   practices to suppress wages of their respective workforce by restricting the ability of its employees

6   from obtaining employment with other technology companies, to wit 3D Systems.

7        171.     Defendants' use of such unfair, deceptive, fraudulent, and unlawful business

8   practices constitutes unfair, deceptive, fraudulent, and unlawful competition, provides an unfair

9   advantage over Defendants' competitors, and an unfair benefit to Defendants at the expense of

10   Plaintiff, the members of the Age Discrimination Class and Antitrust Class, and the general public.

11        172.     During the class period, Defendants have engaged in unlawful, deceptive, fraudulent,

12   and unfair business practices, proscribed by Business & Professions Code sections 17200, *et seq.*,

13   including those described herein, thereby obtaining valuable property, money, and services from

14   Plaintiff, members of the Age Discrimination Class and Antitrust Class, and all persons similarly

15   situated, and have deprived Plaintiff, members of the Age Discrimination Class and Antitrust Class,

16   and all persons similarly situated, of valuable rights and benefits guaranteed by law, all to their

17   detriment.

18        173.     By virtue of the direct injuries that Plaintiff and the members of the Plaintiff Classes

19   have sustained from Defendants' wrongful conduct, Plaintiff and the members of the Plaintiff

20   Classes have standing to sue in order to obtain the remedies that are available to them under the

21   UCL.

22        174.     The UCL authorizes restitutionary and injunctive relief to prevent unlawful,

23   deceptive, unfair, or fraudulent business acts for practices, and both restitution and disgorgement of

24   money or property wrongfully obtained by means of such unfair competition. (Cal. Bus. & Prof.

25   Code § 17203.)

26        175.     Plaintiff seeks, on his own behalf, and on behalf of the other members of the

27   Plaintiff Classes and on behalf of the general public, equitable and injunctive relief, along with full

28   restitution and disgorgement of monies, including interest, according to proof, to restore any and all

SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

1    monies withheld, acquired and/or converted by Defendants by means of the deceptive, unfair,

2    fraudulent, and unlawful practices complained of herein.

3    176.    The illegal, deceptive, fraudulent, and unfair conduct alleged herein is continuing,

4    and there is no indication that Defendants will cease and desist from such activity in the future.

5    Plaintiff alleges that if Defendants are not enjoined from the conduct set forth in this Complaint,

6    Defendants' illegal, deceptive, fraudulent, and unfair conduct will continue, i.e. they will continue

7    to engage in practices that disparately impact and discriminate against employees on account of age.

8    (*See Herr v. Nestle U.S.A., Inc.* (2003) 109 Cal. App. 4th 779, 789 — "injunctive relief under the

9    UCL is an appropriate remedy where a business has engaged in an unlawful practice of

10    discriminating against older workers.")

11    177.    Plaintiff, the members of the Age Discrimination Class, and all persons in interest,

12    are entitled to, and do seek restitution and such relief as may be necessary to disgorge the profits

13    which HP acquired, or of which Plaintiff and the members of the Age Discrimination Class have

14    been deprived, by means of the above-described unfair, unlawful, deceptive, and or fraudulent

15    business practices.

16    178.    Plaintiff and the members of the Age Discrimination Class and Antitrust Class have

17    no plain, speedy, and or adequate remedy at law to redress the injuries which they have suffered as

18    a consequence of HP's unfair, unlawful, deceptive, and/or fraudulent business practices. As a result

19    of the unfair, unlawful, deceptive, and/or fraudulent business practices described above, Plaintiff

20    and the members of the Age Discrimination Class and Antitrust Classes have suffered and will

21    continue to suffer irreparable harm unless HP, and each of the defendants, are restrained from

22    continuing to engage in said unfair, unlawful, and/or fraudulent business practices.

23    179.    Plaintiff and the members of the Age Discrimination Class and Antitrust Class also

24    request an order that HP identify, locate, and make restitution to affected members of the general

25    public, and specifically those terminated under the Workforce Reduction Plan, all funds and the

26    value of all things or property acquired by the acts of unfair competition and deceptive practices set

27    forth above, and all additional orders necessary to accomplish this purpose, under California

28    Business & Professions Code section 17203.

180.    For the four (4) years preceding the filing of this action, as a result of HP's unfair, deceptive, fraudulent, and unlawful business practices alleged herein, Plaintiff and the members of the Age Discrimination Class and Antitrust Class request restitution, damages to compensate them fully, and disgorgement of all monies and profits from HP in an amount according to proof at time of trial.

181.    Plaintiff is entitled to an award of attorneys' fees and costs in prosecuting this action against Defendants under California Code of Civil Procedure section 1021.5 and other applicable law.  A successful outcome in this action will confer on the general public and a large class of persons (the Age Discrimination and Antitrust Classes) both a pecuniary and nonpecuniary benefit and will result in the enforcement of important rights affecting the public interest.  The necessity and financial burden of private enforcement furthermore make such an award appropriate.

### EIGHTH CAUSE OF ACTION

### Violation of the Sherman Act, 15 U.S.C. § 1

**(Plaintiff Bryant Fonseca, on Behalf of Himself and the Antitrust Class Against Defendants)**

182.    Plaintiff incorporates by reference all the allegations in the above paragraphs as if fully set forth herein.

183.    15 United States Code section 1 provides, in part, that every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

184.    HP, by and through its officers, directors, employees, agents, and other representatives, have entered into an unlawful agreement, combination, and conspiracy in restraint of trade, in violation of 15 U.S.C. section 1.  Specifically, HP agreed in advance that HP and 3D Systems would not pursue one another's employees.  All of the foregoing directly and negatively affected the suppressed the wages of employees at HP.  HP and 3D Systems conspired and agreed to restrict competition for services provided by Plaintiff and the Antitrust Class through "no poach" agreements and arrangements and agreements to fix the wage and salary ranges for said class members, all with the purpose and effect of suppressing class members' compensation and restraining competition in the market for services of class members.

-41-
SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

185.     HP's conduct injured and damaged Plaintiff and members of the Antitrust Class by suppressing compensation to levels lower than the members otherwise would have received in the absence of the above-referenced agreements, all in an amount to be proven at trial.

186.     The aforementioned conduct by HP are either *per se* violations of the Sherman Act or violative of it.

187.     The acts done by each defendant as a part of, and in furtherance of, their contracts combinations or conspiracies were authorized, ordered, or done by their respective officers, directors, agents, employees, or representatives while actively engaged in the management of each of HP's affairs.

188.     As a result of the above violations, Plaintiff and the Antitrust Class have been damaged in an amount according to proof.  Accordingly, Plaintiff and the Antitrust Class seeks three times their damages caused by HP's violations of the Sherman Act, the costs of bringing suit, reasonable attorneys' fees, and a permanent injunction enjoining HP from ever again entering into similar agreements or arrangements in violation of the Sherman Act.

## **PRAYER FOR RELIEF**

Plaintiff, on behalf of himself individually and on behalf of Plaintiff Classes prays for relief and judgment against Defendant and any later named defendant, jointly and severally as follows:

1. Certification of the case as a class action and appointment of Plaintiff as Class Representative of each class and his counsel of record as Class Counsel;

2. All damages to which Plaintiffs and each member of the Age Discrimination Class and Antitrust Class are entitled due to Defendants' conduct, including, but not limited to, back pay, front pay, general and special damages for lost compensation and job benefits that they would have received but for the discrimination anti-competitive practices of Defendants;

3. To preliminarily and permanently enjoin Defendants from implementation of the Workforce Reduction Plan that disparately impacts and discriminates against employees on account of their age;

4. For an order requiring Defendants to restore to the general public all funds acquired by means of any act or practice declared by this Court to be unlawful or fraudulent or to constitute unfair competition under California Business and Professions Code section 17200, *et seq.*;

-42-
SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES
EXHIBIT E - 116

5.  For restitution, including, without limitation, restitutionary disgorgement;

6.  For affirmative or prospective relief;

7.  For exemplary and punitive damages;

8.  For attorneys' fees, expenses, and costs of suit;

9.  For pre-judgment and post-judgement interest;

10. An order enjoining Defendants from continuing the unfair, deceptive, fraudulent, and unlawful business practices alleged herein; and

11. For all such other and further relief the Court may deem just and proper.

DATED: August 12, 2019                              **HOGUE & BELONG**

                                                    __s/ *Jeffrey Hogue*_____
                                                    Jeffrey L. Hogue
                                                    Tyler J. Belong
                                                    Stephanie A. Sandler
                                                    Attorneys for Plaintiff Bryant Fonseca on
                                                    behalf of himself and all others similarly
                                                    situated

**<u>DEMAND FOR JURY TRIAL</u>**

Plaintiffs Bryant Fonseca hereby demands a jury trial.

DATED: August 12, 2019                              **HOGUE & BELONG**

                                                    _s/ *Jeffrey Hogue*___ _____
                                                    Jeffrey L. Hogue
                                                    Tyler J. Belong
                                                    Stephanie A. Sandler
                                                    Attorneys for Plaintiff Bryant Fonseca on
                                                    behalf of himself and all others similarly
                                                    situated

-43-
SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

Exhibit "A"



STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency                    GOVERNOR EDMUND G. BROWN JR.

**DEPARTMENT OF FAIR EMPLOYMENT & HOUSING**                                                    DIRECTOR KEVIN KISH

2218 Kausen Drive, Suite 100 I Elk Grove I CA I 95758
800-884-1684 I TDD 800-700-2320
www.dfeh.ca.gov I email: contact.center@dfeh.ca.gov

November 03, 2017

Jeffrey Hogue
170 Laurel Street
San Diego California 92101

RE:  **Notice to Complainant or Complainant's Attorney**
DFEH Matter Number: 76859-322255
Right to Sue: Fonseca / Hewlett Packard Company

Dear Complainant or Complainant's Attorney:

Attached is a copy of your complaint of discrimination filed with the Department of Fair Employment and Housing (DFEH) pursuant to the California Fair Employment and Housing Act, Government Code section 12900 et seq. Also attached is a copy of your Notice of Case Closure and Right to Sue. Pursuant to Government Code section 12962, DFEH will not serve these documents on the employer.  You or your attorney must serve the complaint.  If you do not have an attorney, you must serve the complaint yourself. Please refer to the attached Notice of Case Closure and Right to Sue for information regarding filing a private lawsuit in the State of California.

Be advised that the DFEH does not review or edit the complaint form to ensure that it meets procedural or statutory requirements.

Sincerely,

Department of Fair Employment and Housing



STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency          GOVERNOR EDMUND G. BROWN JR.

**DEPARTMENT OF FAIR EMPLOYMENT & HOUSING**                    DIRECTOR KEVIN KISH

2218 Kausen Drive, Suite 100 I Elk Grove I CA I 95758
800-884-1684 I TDD 800-700-2320
www.dfeh.ca.gov I email: contact.center@dfeh.ca.gov

November 03, 2017

RE:  **Notice of Filing of Discrimination Complaint**
DFEH Matter Number: 76859-322255
Right to Sue: Fonseca / Hewlett Packard Company

To All Respondent(s):

Enclosed is a copy of a complaint of discrimination that has been filed with the
Department of Fair Employment and Housing (DFEH) in accordance with Government
Code section 12960. This constitutes service of the complaint pursuant to Government
Code section 12962. The complainant has requested an authorization to file a lawsuit.
This case is not being investigated by DFEH and is being closed immediately. A copy of
the Notice of Case Closure and Right to Sue is enclosed for your records.

Please refer to the attached complaint for a list of all respondent(s) and their contact
information.

**No response to DFEH is requested or required.**

Sincerely,

Department of Fair Employment and Housing

EXHIBIT E -  120



STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency                    GOVERNOR EDMUND G. BROWN JR.

**DEPARTMENT OF FAIR EMPLOYMENT & HOUSING**                    DIRECTOR KEVIN KISH

2218 Kausen Drive, Suite 100 I Elk Grove I CA I 95758
800-884-1684 I TDD 800-700-2320
www.dfeh.ca.gov I email: contact.center@dfeh.ca.gov

November 03, 2017

Bryant Fonseca
170 Laurel Street
San Diego, California 92101

RE:  **Notice of Case Closure and Right to Sue**
DFEH Matter Number: 76859-322255
Right to Sue: Fonseca / Hewlett Packard Company

Dear Bryant Fonseca,

This letter informs you that the above-referenced complaint was filed with the Department of Fair Employment and Housing (DFEH) has been closed effective November 03, 2017 because an immediate Right to Sue notice was requested. DFEH will take no further action on the complaint.

This letter is also your Right to Sue notice. According to Government Code section 12965, subdivision (b), a civil action may be brought under the provisions of the Fair Employment and Housing Act against the person, employer, labor organization or employment agency named in the above-referenced complaint. The civil action must be filed within one year from the date of this letter.

To obtain a federal Right to Sue notice, you must visit the U.S. Equal Employment Opportunity Commission (EEOC) to file a complaint within 30 days of receipt of this DFEH Notice of Case Closure or within 300 days of the alleged discriminatory act, whichever is earlier.

Sincerely,


Department of Fair Employment and Housing



STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency                    GOVERNOR EDMUND G. BROWN JR.

**DEPARTMENT OF FAIR EMPLOYMENT & HOUSING**                    DIRECTOR KEVIN KISH

2218 Kausen Drive, Suite 100 I Elk Grove I CA I 95758
800-884-1684 I TDD 800-700-2320
www.dfeh.ca.gov I email: contact.center@dfeh.ca.gov

Enclosures

cc:  HP Inc. Which Will Do Business In CA As HP Computing And
     Printing Inc.

DXC Technology Services

Hewlett Packard Enterprise Services, LLC

Hewlett Packard Enterprise Company

HP, Inc.

1

## COMPLAINT OF EMPLOYMENT DISCRIMINATION

2

## BEFORE THE STATE OF CALIFORNIA

3

## DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING
### Under the California Fair Employment and Housing Act
### (Gov. Code, § 12900 et seq.)

4

5

6

In the Matter of the Complaint of                    DFEH No. 76859-322255
Bryant Fonseca, Complainant.

7

170 Laurel Street
San Diego,  California  92101

8

9

vs.

10

 Hewlett Packard Company, Respondent.
818 W Seventh St. Ste 930

11

Los Angeles,  California 90017

12

13

Complainant alleges:

14

15

1. Respondent **Hewlett Packard Company** is a **Private Employer** subject to suit under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.).  Complainant believes respondent is subject to the FEHA.

16

17

2. On or around **May 08, 2017**, complainant alleges that respondent took the following adverse actions against complainant: **Discrimination, Retaliation Laid-off, Terminated,** .  Complainant believes respondent committed these actions because of their: **Age - 40 and over, Other Failure to prevent discrimination and retaliation.**.

18

19

20

3. Complainant **Bryant Fonseca** resides in the City of **San Diego**, State of **California**.  If complaint includes co-respondents please see below.

21

22

*Complaint ±DFEH No. 76859-322255*

Date Filed: November 03, 2017

EXHIBIT E -  123

1

2   **Co-Respondents:**
     HP Inc. Which Will Do Business In CA As
3    HP Computing And Printing Inc.

4    818 W Seventh St. Ste 930
     Los Angeles  California 90017
5

6    DXC Technology Services

7    818 W Seventh St. Ste 930
     Los Angeles  California 90017
8

9    Hewlett Packard Enterprise Services, LLC

10   818 W Seventh St. Ste 930
     Los Angeles  California 90017
11

12   Hewlett Packard Enterprise Company

13   818 W Seventh St Ste 930
     Los Angeles  California 90017
14

15   HP, Inc.

16   818 W Seventh St Ste 930
     Los Angeles  California 90017
17

18

19

20

21

22

DFEH 902-1

-6-

*Complaint ±DFEH No. 76859-322255*

Date Filed: November 03, 2017

EXHIBIT E -  124

1

2

3   **Additional Complaint Details:**

4   HP Enterprise, Services, LLC, Hewlett Packard Enterprise Company, Hewlett Packard
    Company, and HP, Inc., and all of their affiliates, parent companies, and subsidiaries

5   (collectively, HP) perpetrated unlawful age discrimination (both disparate impact and
    disparate treatment) and retaliation based on Complainant`s age as well as all other

6   employees 40 years old or older.

7   Complainant is 55 years of age.  Complainant was a dedicated and loyal employee of
    HP who worked for HP approximately 36 years.  Complainant received several

8   outstanding performance reviews during his tenure with HP.

9   In approximately 2012, HP implemented a Workforce Reduction Plan.  The Workforce

10  Reduction Plan disproportionately impacts HPs 40 year and older employees for
    termination.  Specifically, HPs Workforce Reduction Plan systematically targets and

11  targeted persons 40 years or older for termination.  It has done so on a continuous
    basis from 2012 until present by way of various provisions, including, without limitation,

12  its requirement that selection for termination or redeployment under the Workforce
    Reduction Plan requires HP to assess employees based on the future requirements of

13  the new organization and based on future focused competencies.

14
    During the course of HPs implementation of the Workforce Reduction Plan, HPs
15  President and Chief Executive Officer at the time, Meg Whitman, made statements to
    stock holders evidencing HPs intent behind the Workforce Reduction Plan was to lay
16  older workers off, such as the following:

17  "Changing the shape of your labor pyramid takes a couple of years, but we are on it,

18  and were amping up our early career hiring, our college hiring.  And we put in place an
    informal rule to some extent which is, listen, when you are replacing someone, really

19  think about the new style of IT skills."

20  Ms. Whitman made similar remarks evidencing the true intent of HPs Workforce

21  Reduction Plan - to lay off employees 40 years old and older and replace them by hiring
    younger workers and early college graduates.

22
    The result of the foregoing was that HP terminated the employment of its age-protected
    workers (age 40 and older), including Complainant, in disparately higher proportions
    than its younger workers (under age 40).  HP`s Workforce Reduction Plan also has a
    Preferential Rehire Period.  That Preferential Rehire Period, however, also disparately
    impacts employees age 40 years old or older because they are rarely, if at all, re-hired.

Additionally, HP has an Adverse Impact Team that evaluates whether its employment practices disproportionately effect a protected class of employees.  But, HPs Adverse Impact Team completely ignored investigating whether HPs Workforce Reduction Plan disparately impacted HPs employees 40 years old or older.

Complainant was terminated by the WFR because of his age.

Complainant makes the above-referenced allegations on behalf of himself and on behalf of himself and all others similarly situated.

These are some, but not all, of the discriminatory, retaliatory, and otherwise unlawful actions taken against Complainant and others similarly situated that has caused them damage.

DFEH 902-1

-8-

*Complaint ±DFEH No. 76859-322255*

Date Filed: November 03, 2017

EXHIBIT E -  126

VERIFICATION

I, **Jeffrey Hogue**, am the Attorney for Complainant in the above-entitled complaint. I have read the foregoing complaint and know the contents thereof.  The same is true of my own knowledge, except as to those matters which are therein alleged on information and belief, and as to those matters, I believe it to be true.

On November 03, 2017, I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

**San Diego, CA**
**Jeffrey Hogue**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

DFEH 902-1

-9-
*Complaint ±DFEH No. 76859-322255*

Date Filed: November 03, 2017

EXHIBIT E -  127



**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
Domestic Mail Only

For delivery information, visit our website at www.usps.com®.

OFFICIAL USE

7017 1070 0000 8854 5078

Certified Mail Fee
$

Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy) $
☐ Return Receipt (electronic) $
☐ Certified Mail Restricted Delivery $
☐ Adult Signature Required $
☐ Adult Signature Restricted Delivery $

Postmark
Here

Postage
$

Total Postage and Fees
$

Sent To Hewlett Packard Enterprise Services, LLC C/O corporation
Street and Apt. No., or PO Box No. 818 W. 7th St. Ste. 930
City, State, ZIP+4® Los Angeles, CA 90017

PS Form 3800, April 2015 PSN 7530-02-000-9047    See Reverse for Instructions

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Hewlett Packard Enterprise
services, LLC C/O CT corporation
818 W. 7th St. Ste. 930
Los Angeles, CA 90017

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X   CT CORPORATION SYSTEM
    818 West Seventh Street    ☐ Agent
                               ☐ Addressee

B. Received by (Printed Name)        C. Date of Delivery
Los Angeles, CA 90017      NOV 07 2017

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☐ Certified Mail®          ☐ Priority Mail Express™
☐ Registered               ☐ Return Receipt for Merchandise
☐ Insured Mail             ☐ Collect on Delivery

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
(Transfer from service label)    7017 1070 0000 8854 5078

PS Form 3811, July 2013          Domestic Return Receipt

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

7017 1070 0000 8854 5085

For delivery information, visit our website at *www.usps.com®.*

OFFICIAL USE

Certified Mail Fee
$

Extra Services & Fees *(check box, add fee as appropriate)*
☐ Return Receipt (hardcopy)        $
☐ Return Receipt (electronic)      $
☐ Certified Mail Restricted Delivery  $
☐ Adult Signature Required         $
☐ Adult Signature Restricted Delivery $

Postage
$

Total Postage and Fees
$

11/3/17

Postmark
Here

NOV -3 2017

HORTON PLAZA
SAN DIEGO, CA 92101

Sent To
DXC Technology Services c/o ct corporation
Street and Apt. No., or PO Box No.
818 W 7th St. Ste. 930
City, State, ZIP+4®
Los Angeles, CA 90017

PS Form 3800, April 2015 PSN 7530-02-000-9047       See Reverse for Instructions

---

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

DXC Technology Services
C/O CT Corporation
818 W 7th St. Ste. 930
Los Angeles, CA 90017

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X CT CORPORATION SYSTEM       ☐ Agent
818 West Seventh Street        ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery
Los Angeles, CA 900..  NOV 07 2017

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:          ☐ No

3. Service Type
☐ Certified Mail®      ☐ Priority Mail Express™
☐ Registered          ☐ Return Receipt for Merchandise
☐ Insured Mail        ☐ Collect on Delivery

4. Restricted Delivery? (Extra Fee)           ☐ Yes

2. Article Number
(Transfer from service label)   7017 1070 0000 8854 5085

PS Form 3811, July 2013        Domestic Return Receipt

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com®*.

OFFICIAL USE

7017 1070 0000 8854 5054

Certified Mail Fee
$

Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy)        $
☐ Return Receipt (electronic)      $         Postmark
☐ Certified Mail Restricted Delivery $          Here
☐ Adult Signature Required         $
☐ Adult Signature Restricted Delivery $

11/2/17

NOV - 3 2017
SAN DIEGO, CA 92101
HORTON PLAZA PS

Postage
$

Total Postage and Fees
$

Sent To
*HP, Inc. C/O CT Corporation*

Street and Apt. No., or PO Box No.
*818 W. 7th St. Ste. 930*

City, State, ZIP+4®
*Los Angeles, CA 90017*

PS Form 3800, April 2015 PSN 7530-02-000-9047        See Reverse for Instructions

---

**SENDER:** COMPLETE THIS SECTION

☑ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

*HP, Inc. C/O CT Corporation*
*818 W. 7th st. Ste. 930*
*Los Angeles, CA 90017*

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X  CT CORPORATION SYSTEM        ☐ Agent
   818 West Seventh Street       ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery
   Los Angeles, CA 900           NOV 0 7 2017

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☐ Certified Mail®           ☐ Priority Mail Express™
☐ Registered               ☐ Return Receipt for Merchandise
☐ Insured Mail             ☐ Collect on Delivery

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
   (Transfer from service label)    7017 1070 0000 8854 5054

PS Form 3811, July 2013        Domestic Return Receipt

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
Domestic Mail Only

For delivery information, visit our website at *www.usps.com®*.

OFFICIAL USE

Certified Mail Fee
$

Extra Services & Fees *(check box, add fee as appropriate)*
☐ Return Receipt (hardcopy)          $
☐ Return Receipt (electronic)        $
☐ Certified Mail Restricted Delivery  $
☐ Adult Signature Required            $
☐ Adult Signature Restricted Delivery $

Postmark
Here

NOV -3 2017

Postage
$

Total Postage and Fees
$

Sent To
Hewlett-Packard c/o CT corporation

Street and Apt. No., or PO Box No.
818 W 7th St. Ste 930

City, State, ZIP+4®
Los Angeles, CA 90017

7017 1070 0000 8854 5108

PS Form 3800, April 2015 PSN 7530-02-000-9047          See Reverse for Instructions

---

**SENDER: COMPLETE THIS SECTION**

- ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- ■ Print your name and address on the reverse so that we can return the card to you.
- ■ Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
CT CORPORATION SYSTEM
X 818 West Seventh Street          ☐ Agent
Los Angeles, CA 90017             ☐ Addressee

B. Received by (Printed Name)     C. Date of Delivery
NOV 07 2017

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:          ☐ No

1. Article Addressed to:
Hewlett Packard Company
c/o CT corporation
818 W Seventh St. Ste 930
Los Angeles, CA 90017

3. Service Type
☐ Certified Mail®      ☐ Priority Mail Express™
☐ Registered          ☐ Return Receipt for Merchandise
☐ Insured Mail        ☐ Collect on Delivery

4. Restricted Delivery? *(Extra Fee)*          ☐ Yes

2. Article Number
(Transfer from service label)    7017 1070 0000 8854 5108

PS Form 3811, July 2013          Domestic Return Receipt

EXHIBIT E - 131



**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com®.*

OFFICIAL USE

Certified Mail Fee
$

Extra Services & Fees *(check box, add fee as appropriate)*
☐ Return Receipt (hardcopy)           $
☐ Return Receipt (electronic)         $
☐ Certified Mail Restricted Delivery   $
☐ Adult Signature Required             $
☐ Adult Signature Restricted Delivery  $

Postage
$

Total Postage and Fees
$

Sent To
HP Inc. Which will do business in CA As HP company Printing
818 W. 7th St. Ste. 930
Los Angeles, CA 90017

7017 1070 0000 8854 5092

PS Form 3800, April 2015 PSN 7530-02-000-9047    See Reverse for Instructions

---

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

HP INC. Will DO Business In CA
AS HP Computing And Printing
C/O CT Corporation
818 W. 7th St. Ste. 930
LOS Angeles, CA 90017

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X CORPORATION SYSTEM    ☐ Agent
                        ☐ Addressee
818 West Seventh Street
Suite 930
Los Angeles, CA 90017

B. Received by (Printed Name)    C. Date of Delivery
                                 NOV 07 2017

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☐ Certified Mail®        ☐ Priority Mail Express™
☐ Registered             ☐ Return Receipt for Merchandise
☐ Insured Mail           ☐ Collect on Delivery

4. Restricted Delivery? *(Extra Fee)*    ☐ Yes

2. Article Number
   *(Transfer from service label)*    7017 1070 0000 8854 5092

PS Form 3811, July 2013          Domestic Return Receipt

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
Domestic Mail Only

For delivery information, visit our website at *www.usps.com®*.

OFFICIAL USE

Certified Mail Fee
$

Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy)           $
☐ Return Receipt (electronic)         $
☐ Certified Mail Restricted Delivery  $
☐ Adult Signature Required            $
☐ Adult Signature Restricted Delivery $

Postmark
Here
NOV - 3 2017

Postage
$

Total Postage and Fees
$

Sent To Hewlett Packard Enterpise Company c/o CT corporation
Street and Apt No., or PO Box No. 818 W. 7th St. Ste. 930
City, State, ZIP+4® Los Angeles, CA 90017

7017 1070 0000 8854 5061

PS Form 3800, April 2015 PSN 7530-02-000-9047        See Reverse for Instructions

---

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Hewlett Packard Enterprise
Company c/o CT corporation
818 W. 7th St. Ste. 930
Los Angeles, CA 90017

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X CT CORPORATION SYSTEM     ☐ Agent
   818 West Seventh Street   ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery
   Los Angeles, CA 900 NOV 0 7 2017

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:       ☐ No

3. Service Type
☐ Certified Mail®        ☐ Priority Mail Express™
☐ Registered            ☐ Return Receipt for Merchandise
☐ Insured Mail          ☐ Collect on Delivery

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
   (Transfer from service label)   7017 1070 0000 8854 5061

PS Form 3811, July 2013        Domestic Return Receipt

EXHIBIT E -  133

# Exhibit "B"

 

# ANTITRUST GUIDANCE FOR HUMAN RESOURCE PROFESSIONALS

## DEPARTMENT OF JUSTICE ANTITRUST DIVISION

## FEDERAL TRADE COMMISSION

## OCTOBER 2016

This document is intended to alert human resource (HR) professionals and others involved in hiring and compensation decisions to potential violations of the antitrust laws. The Department of Justice Antitrust Division (DOJ or Division) and Federal Trade Commission (FTC) (collectively, the federal antitrust agencies) jointly enforce the U.S. antitrust laws, which apply to competition among firms to hire employees. An agreement among competing employers to limit or fix the terms of employment for potential hires may violate the antitrust laws if the agreement constrains individual firm decision-making with regard to wages, salaries, or benefits; terms of employment; or even job opportunities. HR professionals often are in the best position to ensure that their companies' hiring practices comply with the antitrust laws. In particular, HR professionals can implement safeguards to prevent inappropriate discussions or agreements with other firms seeking to hire the same employees.

## *The antitrust laws establish the rules of a competitive employment marketplace.*

Free and open markets are the foundation of a vibrant economy. Just as competition among sellers in an open marketplace gives consumers the benefits of lower prices, higher quality products and services, more choices, and greater innovation, competition among employers helps actual and potential employees through higher wages, better benefits, or other terms of employment. Consumers can also gain from competition among employers because a more competitive workforce may create more or better goods and services.

From an antitrust perspective, firms that compete to hire or retain employees are competitors in the employment marketplace, regardless of whether the firms make the same products or compete to provide the same services. It is unlawful for competitors to expressly or implicitly agree not to compete with one another, even if they are motivated by a desire to reduce costs. Therefore, HR professionals should take steps to ensure that interactions with other employers competing with them for employees do not result in an unlawful agreement not to compete on terms of employment. Any company, acting on its own, may typically make decisions regarding hiring, soliciting, or recruiting employees. But the company and its employees should take care not to communicate the company's policies to other companies competing to hire the same types of employees, nor ask another company to go along.

The federal antitrust agencies have taken enforcement actions against employers that have agreed not to compete for employees. Based on those cases, here are some general principles to help HR professionals and the companies they represent avoid running afoul of the antitrust laws as they relate to agreements and communications among employers. Note that this guidance does not address the legality of specific terms contained in contracts between an employer and an employee, including non-compete clauses.

Violations of the antitrust laws can have severe consequences. Depending on the facts of the case, the DOJ could bring a criminal prosecution against individuals, the company, or both. And both federal antitrust agencies could bring civil enforcement actions. In addition, if an employee or another private party were injured by an illegal agreement among potential employers, that

party could bring a civil lawsuit for treble damages (i.e., three times the damages the party actually suffered).

## *Agreements among employers not to recruit certain employees or not to compete on terms of compensation are illegal.*

An HR professional should avoid entering into agreements regarding terms of employment with firms that compete to hire employees. It does not matter whether the agreement is informal or formal, written or unwritten, spoken or unspoken.

An individual likely is breaking the antitrust laws if he or she:

- agrees with individual(s) at another company about employee salary or other terms of compensation, either at a specific level or within a range (so-called wage-fixing agreements), or
- agrees with individual(s) at another company to refuse to solicit or hire that other company's employees (so-called "no poaching" agreements).

Even if an individual does not agree orally or in writing to limit employee compensation or recruiting, other circumstances – such as evidence of discussions and parallel behavior – may lead to an inference that the individual has agreed to do so.

Naked wage-fixing or no-poaching agreements among employers, whether entered into directly or through a third-party intermediary, are per se illegal under the antitrust laws. That means that if the agreement is separate from or not reasonably necessary to a larger legitimate collaboration between the employers, the agreement is deemed illegal without any inquiry into its competitive effects. Legitimate joint ventures (including, for example, appropriate shared use of facilities) are not considered per se illegal under the antitrust laws.

The DOJ filed a civil enforcement action against the Arizona Hospital & Healthcare Association for acting on behalf of most hospitals in Arizona to set a uniform bill rate schedule that the hospitals would pay for temporary and per diem nurses. The case resulted in a consent judgment. And in the past few years, the DOJ brought three civil enforcement actions against

technology companies (eBay and Intuit, Lucasfilm and Pixar, and Adobe, Apple, Google, Intel, Intuit, and Pixar) that entered into "no poach" agreements with competitors. In all three cases, the competitors agreed not to cold call each other's employees. In two cases, at least one company also agreed to limit its hiring of employees who currently worked at a competitor. All three cases ended in consent judgments against the technology companies. The FTC has brought two cases relating to competition for employment. One was against Debes Corp. for entering into agreements to boycott temporary nurses' registries in order to eliminate competition among the nursing homes for the purchase of nursing services. The FTC also brought a case against the Council of Fashion Designers of America and the organization that produces the fashion industry's two major fashion shows for attempting to reduce the fees and other terms of compensation for models. Both cases ended in consent judgments.

Going forward, the DOJ intends to proceed criminally against naked wage-fixing or no-poaching agreements. These types of agreements eliminate competition in the same irredeemable way as agreements to fix product prices or allocate customers, which have traditionally been criminally investigated and prosecuted as hardcore cartel conduct. Accordingly, the DOJ will criminally investigate allegations that employers have agreed among themselves on employee compensation or not to solicit or hire each others' employees. And if that investigation uncovers a naked wage-fixing or no-poaching agreement, the DOJ may, in the exercise of its prosecutorial discretion, bring criminal, felony charges against the culpable participants in the agreement, including both individuals and companies.

## Avoid sharing sensitive information with competitors.

Sharing information with competitors about terms and conditions of employment can also run afoul of the antitrust laws. Even if an individual does not agree explicitly to fix compensation or other terms of employment, exchanging competitively sensitive information could serve as evidence of an implicit illegal agreement. While agreements to share information are not per se illegal and therefore not prosecuted criminally, they may be subject to civil antitrust liability when they have, or are likely to have, an anticompetitive effect. Even without an express or implicit agreement on terms of compensation among firms, evidence of periodic exchange of current wage

information in an industry with few employers could establish an antitrust violation because, for example, the data exchange has decreased or is likely to decrease compensation. For example, the DOJ sued the Utah Society for Healthcare Human Resources Administration, a society of HR professionals at Utah hospitals, for conspiring to exchange nonpublic prospective and current wage information about registered nurses. The exchange caused defendant hospitals to match each other's wages, keeping the pay of registered nurses in Salt Lake County and elsewhere in Utah artificially low. The case ended in a consent judgment so that registered nurses could benefit from competition for their services.

Even if participants in an agreement are parties to a proposed merger or acquisition, or are otherwise involved in a joint venture or other collaborative activity, there is antitrust risk if they share information about terms and conditions of employment.

However, not all information exchanges are illegal. It is possible to design and carry out information exchanges in ways that conform with the antitrust laws. For example, an information exchange may be lawful if:

- a neutral third party manages the exchange,
- the exchange involves information that is relatively old,
- the information is aggregated to protect the identity of the underlying sources, and
- enough sources are aggregated to prevent competitors from linking particular data to an individual source.

Also, in the course of determining whether to pursue a merger or acquisition, a buyer may need to obtain limited competitively sensitive information. Such information gathering may be lawful if it is in connection with a legitimate merger or acquisition proposal and appropriate precautions are taken.

For more information on information exchanges, you can review the DOJ's and FTC's specific guidance to the healthcare industry on when written surveys of wages, salaries, or benefits are less likely to raise antitrust concerns (see Statement 6).

If your company is considering sharing specific information or otherwise collaborating with competitors regarding compensation or other terms of

employment, and you have questions regarding the legality of the activity, the federal antitrust agencies are available to offer further guidance. The Division has a business review process that enables businesses to determine how the Division may respond to proposed joint ventures or other business conduct. The FTC has a similar process for obtaining an advisory opinion for future conduct. When the federal antitrust agencies are able to analyze and comment on the possible competitive impact of proposed business conduct *before* that conduct is implemented, companies are more likely to avoid enforcement investigations and lawsuits.

---

## Questions and Answers

*Question*: I work as an HR professional in an industry where we spend a lot of money to recruit and train new employees. At a trade show, I mentioned how frustrated I get when a recent hire jumps ship to work at a competitor. A colleague at a competing firm suggested that we deal with this problem by agreeing not to recruit or hire each other's employees. She mentioned that her company had entered into these kinds of agreements in the past, and they seemed to work. What should I do?

*Answer*: What that colleague is suggesting is a no-poaching agreement. That suggestion amounts to a solicitation to engage in serious criminal conduct. You should refuse her suggestion and consider contacting the Antitrust Division's Citizen Complaint Center or the Federal Trade Commission's Bureau of Competition to report the behavior of your colleague's company. If you agree not to recruit or hire each other's employees, you would likely be exposing yourself and your employer to substantial criminal and civil liability.

*Question*: My friend and I are both managers at different companies in an industry where employee wage growth seems to be out of control. Over lunch, my friend proposed that we could solve this problem by reaching out to other industry leaders to establish a more reasonable pay scale for our employees. Is this legal?

*Answer*: An agreement among competitors to set wages or establish a pay scale is an illegal wage-fixing agreement. If you take your friend's suggestion and form such an agreement on behalf of your company with your

friend or others acting on behalf of their companies, you would likely be exposing yourself and your employer to substantial criminal and civil liability. The DOJ could open a criminal investigation, and if it determines that your agreement is a naked wage-fixing agreement, it could bring criminal charges against you, your employer, your friend, and other individuals or companies that participate in the agreement. Participants could also be subject to substantial civil liability.

Additionally, merely inviting a competitor to enter into an illegal agreement may be an antitrust violation – even if the invitation does not result in an agreement to fix wages or otherwise limit competition. In antitrust terms, an "invitation to collude" describes an improper communication to an actual or potential competitor that you are ready and willing to coordinate on price or output or other important terms of competition. For instance, the FTC took action after an online retailer emailed a competitor to suggest that both companies sell their products at the same price, which was higher than either company was charging. The competitor declined the invitation and notified the FTC. Be aware that private communications among competitors may violate the FTC Act if (1) the explicit or implicit communication to a competitor (2) sets forth proposed terms of coordination (3) which, if accepted, would constitute a per se antitrust violation.

*Question*: I work as a senior HR professional at a nonprofit organization that works hard to keep costs down so we can serve more people. One idea we had is to cap wage increases for certain employee groups, but we are worried that we might lose employees to other nonprofit organizations that don't cap wage increases. So, I would like to call other nonprofit organizations in my region to ask them if they would consider a cap on wage growth rates as well. Should I do that? What if, instead of reaching out to other nonprofit organizations directly, we all agree to hire the same consultant who communicates the pay scale to the nonprofit organizations?

*Answer*: No. You would likely violate antitrust law if you and the other nonprofit organizations agreed to decrease wages or limit future wage increases. A desire to cut costs is not a defense. Your nonprofit organization and the others are competitors because you all compete for the same employees. It does not matter that your employer and the other organizations are not-for-profit; nonprofit organizations can be criminally or civilly liable for antitrust law violations. It also makes no difference if you propose to hire a consultant who will determine and set the pay scale; employing a third-

party intermediary does not insulate you or your organization from liability under the antitrust law.

*Question:*  I work in the HR department of a university that sometimes gets into bidding wars to attract faculty from rival institutions. Those efforts rarely succeed, but they take up a lot of time, energy, and resources. Recently someone in the Dean's office told me that we now had a "gentleman's agreement" with another university not to try to recruit each other's senior faculty. There isn't a written agreement, and efforts to hire each other's faculty were rarely successful. Is this okay?

*Answer:*  No. An illegal agreement can be oral; it need not be written down on paper. This conduct is similar to the conduct challenged by the Division in its recent no-poaching cases involving eBay, Lucasfilm, and Adobe, and the FTC in its cases against Debes Corp. and the Council of Fashion Designers. If the no-poaching agreement is naked, that is, separate from or not reasonably necessary to a larger legitimate collaboration between the universities, it is conduct that the Division will criminally investigate and may decide to criminally prosecute, charging institutions or individuals or both.

If you stopped recruiting and bidding for faculty from another university due to a gentleman's agreement, you have become a member of that no-poaching agreement and could be subject to criminal liability. You should take no further action to comply with that agreement, and notify your university's legal counsel of the university's participation in this illegal agreement. The university may wish to report the conduct to the Division under its Corporate Leniency Policy, which provides that the first qualifying corporation (including universities and other non-profit entities) to report the antitrust offense and cooperate with the Division's investigation will not be criminally charged for the reported antitrust offense. If you have already participated in the illegal agreement, you may wish to report the conduct to the Division under its Leniency Policy for Individuals, which provides that the first qualifying individual to report the antitrust offense and cooperate with the Division's investigation will not be criminally charged for the reported antitrust offense. For more information on these policies, see this link.

*Question:* I am the CEO of a small business. In my industry, firms traditionally offer gym memberships to all employees. Gym membership fees are increasing, so I would like to stop offering memberships, but I am worried

that current employees will become disgruntled and move to other companies. I would like to ask other firms in the industry to stop offering gym memberships, as well. Can I do that?

*Answer:* No, you would likely violate antitrust law if you and the other companies agreed to cease offering gym memberships. Job benefits such as gym membership, parking, transit subsidies, meals, or meal subsidies and similar benefits of employment are all elements of employee compensation. An agreement with a competitor to fix elements of employee compensation is an illegal wage-fixing agreement.

*Question:* I am an HR professional who serves on the board of our industry's professional society. We are interested in determining current and future trends in industry wages. Can we distribute a survey asking companies within the industry about current and future wages?

*Answer:* It may be unlawful for you, a member of the industry, to solicit a competitor's company-specific response to a wage survey that asks about current or future wages, or to respond to a competitor's request to provide such information. In addition, it may be unlawful for the professional society to distribute company-specific information about past, current, and future wages. Competitors' exchange of nonpublic, company-specific information about current and future wages may violate antitrust law, unless certain survey procedures are followed to mitigate the risk of competitive harm.

For more guidance on the antitrust treatment of information exchanges among competitors, see Statement 6 of the DOJ's and FTC's guidance to the healthcare industry.

*Question:* I am a new HR professional, and I am attending my first professional conference next week. What should I watch out for to avoid violating antitrust law?

*Answer:* You should not enter into agreements about employee compensation, other terms of employment, or employee recruitment with other HR professionals who work at competitors, meaning other companies that compete for the same types of employees. Also, avoid discussing specific compensation policies or particular compensation levels with HR professionals who work for competitors.

## *Other resources are available.*

The federal antitrust agencies have prepared a list of red flags that HR professionals and others should look out for in employment settings.

## *When in doubt, seek legal assistance.*

If HR professionals have questions regarding whether particular conduct violates the antitrust laws, they should consider seeking legal advice.

## *Report potential violations.*

If HR professionals or other interested parties have information about a possible antitrust violation regarding agreements among competitors to fix wages, salaries, benefits, or other terms of employment, or agreements not to compete for employees in hiring decisions, the federal antitrust agencies encourage them to report such conduct.

Reports can be made to the Division through the Citizen Complaint Center by e-mail (antitrust.complaints@usdoj.gov), phone (1-888-647-3258, toll free in the U.S. and Canada, or 202-307-2040), or mail (Citizen Complaint Center, 950 Pennsylvania Avenue, NW, Room 3322, Washington, DC 20530).

Reports can be made to the FTC through the Bureau of Competition's Office of Policy and Coordination by email (antitrust@ftc.gov), phone (202-326-3300), or mail (Office of Policy and Coordination, Room CC-5422, Bureau of Competition, Federal Trade Commission, 600 Pennsylvania Avenue, NW, Washington, DC 20580).

The federal antitrust agencies encourage HR professionals or others with information to use the following questions as a guideline to describe your complaint.

- What are the names of companies, individuals, or organizations that are involved?

- In what manner have these companies, individuals, or organizations potentially violated the federal antitrust laws?

- What examples can you give of the conduct that you believe may violate the antitrust laws? Please provide as much detail as possible.

- Who is affected by this conduct?

- How do you believe competition may have been harmed?

- What is your role in the situation?

With respect to potential criminal violations, in particular, it can be beneficial to report personal involvement in an antitrust violation quickly. Through the Division's leniency program, corporations can avoid criminal conviction and fines, and individuals can avoid criminal conviction, prison terms, and fines, by being the first to confess participation in a criminal antitrust violation, fully cooperating with the Division, and meeting other specified conditions. Additional information about the leniency program is available here.

Exhibit "C"

### Federal Trade Commission Hearings on
### Competition and Consumer Protection in the 21st Century

### Public Comments of 18 State Attorneys General on Labor Issues in Antitrust

#### July 15, 2019

We, the undersigned Attorneys General, submit these Comments in response to the Federal Trade Commission's (FTC) request for public comments in connection with the FTC's public hearings on Competition and Consumer Protection in the 21st Century. In these Comments, we offer our perspective on the growing consideration of labor issues in antitrust law, and the Attorneys General's specific interest in, and ability to address, these issues.  These Comments address some of the recent activity in the antitrust and labor area, including some of the discussions during the FTC's recent hearings, and propose ways in which enforcers can focus on this expanding area of antitrust enforcement.

### I.      Introduction

We, as State Attorneys General, have a strong interest in the competitiveness of our markets, including labor markets.  We care about workers as our residents and consumers, and we want to ensure that companies and organizations compete fairly for the labor of workers through wages and other benefits.  We are interested in ensuring that our economies prosper in an environment free of anticompetitive restraints.  For example, some Attorneys General have an interest in ensuring that public revenue, such as tax revenue, in their jurisdictions is the product of competitive markets and not depressed as a result of anticompetitive conduct.

Labor issues have long had a place in antitrust enforcement.  It may seem like a new issue today, but labor has been considered in antitrust since the passage of the Clayton Act.[1]  The nature of labor has certainly changed since then, particularly in the last few decades.  But like in all areas of commerce, the antitrust laws have and will adapt to the new ways of doing business.  We write these Comments in an attempt to continue that development and encourage appropriate antitrust enforcement action in this area.

At the outset, it is important to note that today is a time where workers have suffered a decline in relative income.[2]  This is due to a host of factors, including globalization, technological change, changes in business organization, including increased use of subcontracting and outsourcing, and decreased unionization.  Whether antitrust enforcement has played a role in the relative decline

---

[1] 15 U.S.C. § 17; Elinor R. Hoffmann, *Looking at Labor from Both Sides Now*, A.B.A. Antitrust 2019 Spring Meeting 1-3 (March 2019) (describing the early history of labor considerations in antitrust law).
[2] *Labor Share of Output Has Declined Since 1947*, BUR. OF LABOR STATISTICS (March 7, 2017), https://www.bls.gov/opub/ted/2017/labor-share-of-output-has-declined-since-1947.htm ("Before 1950 or so, most economists agreed that labor's share of national output was relatively constant. In the late 20th century, however-after many decades of relative stability—the labor share began to decline in the United States and many other economically advanced nations, falling to unprecedented lows in the early part of the 21st century.").

of wages is an open debate.[3]  Nevertheless, this reduction in relative wages gives us an impetus to revisit how antitrust law should be applied in the labor context.  Recent experience strongly suggests there is ample opportunity to make progress in this area, and recent cases and scholarship have brought labor issues to the forefront.  Chairman Simons has stated that labor issues will be considered in every FTC merger review going forward.[4]  We believe this increased focus in addition to merger retrospectives and additional contributions from the academic community will continue to sharpen our ability, as antitrust enforcers, to keep labor markets competitive for workers.

These Comments first provide some background on the analytical approach to labor issues in antitrust review.  We then discuss the four main areas that have been the focus of antitrust-labor activity in recent years and give some significant examples of enforcement activity in those areas.  We then conclude with some recommendations for ways in which State enforcers, both independently and in collaboration with federal enforcers, can include labor considerations in merger reviews and address issues developing in non-compete or no-poach agreements.

## II.    Background

Antitrust law has some idiosyncrasies when it comes to labor, in that labor unions are exempt from the reach of the antitrust laws.  The Supreme Court recognized the importance of our national labor policy that encourages collective bargaining.[5]  Unions and employers, however, cannot prescribe labor standards outside of "the bargaining unit."[6]

Apart from this carveout, the rationale for reviewing labor markets is the same as with all antitrust cases.  Harm in labor markets produces the same three "evils" that animate antitrust inquiry: anticompetitive prices, lower quantities, and/or lower quality.[7]  Competition in labor markets manifests itself through employers competing through salaries, obviously, but also through a myriad of "quality" benefits that employers can offer such as health insurance or child care that may be decreased or eliminated by anticompetitive conditions in the labor market. When there is anticompetitive behavior, anticompetitive effects are certain in the input market (labor) and also possible in the output markets that laborers generate for consumers.  But to be

---

[3] Professor Iona Marinescu presented her research at the FTC's hearing on labor issues in October 2018.  She concludes that employers have market power in numerous geographic markets.  FTC Hearing 3: Oct. 16 Opening Address and Session 1 Economic Evidence of Labor Market Monopsony, FED. TRADE COMM'N. (Oct. 16, 2018) (video at 47:00-1:00:00), https://www.ftc.gov/news-events/audio-video/video/ftc-hearing-3-oct-16-opening-address-session-1-economic-evidence-labor.

[4] *House Judiciary Hearing on Antitrust Enforcement Oversight*, (Jan. 2, 2019) (statement of FTC Chairman Simons) https://archive.org/details/CSPAN3_20190102_220500_House_Judiciary_Hearing_on_Antitrust_Enforcement_Oversight/start/2616.9/end/2640; Ben Remaly & Kaela Coote-Stemmermann, *FTC Considers Workers in Deal Reviews*, GLOB. COMPETITION REV. (October 4, 2018), https://globalcompetitionreview.com/article/usa/1175255/ftc-considers-workers-in-deal-reviews.

[5] United Mine Workers of Am. v. Pennington, 381 U.S. 657, 661 (1965) ("The antitrust laws do not bar the existence and operation of labor unions as such.").

[6] *Id*. at 668.

[7] *See* Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 52 (1911).

clear, the antitrust laws are violated when conduct or a merger has anticompetitive effects only on input suppliers; it is not necessary to prove downstream harm to consumers.[8]

Antitrust law can be applied in labor markets using the same analytical approach used in evaluating consumer product markets.[9]  This includes defining markets by asking whether a hypothetical monopolist could decrease wages by a small but significant amount for a type of worker in a geographic area.[10]  One consideration in defining geographic labor markets is the commuting distances for a given occupation in a given area.[11]  This consideration addresses whether other similar jobs in an area exert a competitive constraint on an employer.  Workers are only willing to travel so far for a job, just like consumers are only willing to travel so far to buy products.

As labor and antitrust issues intersect more regularly, the methods for assessing whether conduct aimed at the labor market is anticompetitive continue to evolve.  In some cases involving labor, it is very easy to understand that an employer's behavior unquestionably harms competition.  For example, horizontal agreements between competing employers, including no-poach agreements, have been characterized as restraints of trade that have no purpose other than to restrain competition, and thus are *per se* illegal under antitrust law.[12]  Anticompetitive agreements are not limited to higher-wage, white collar workers but are prevalent in the employment of low-wage workers.  However, there is some dispute, including among government enforcers, as to the standards that should be used to analyze other types of no-poach agreements.  As discussed in more detail below, there is debate as to whether certain agreements should be evaluated under a *per se* standard, the rule of reason, or an intermediate "quick look" standard. Other kinds of agreements, such as non-competes, are receiving more antitrust scrutiny and courts are still evaluating how to apply antitrust analysis to these types of restraints.

Furthermore, labor in antitrust analysis sometimes is viewed as a zero-sum game of harm to workers and benefits to consumers: paying workers less allows companies to keep prices low for consumers.  However, that view is mistaken as a theoretical matter of economics, and in practice.  Paying workers less can lead to fewer workers at the firm, resulting in lower output and therefore

---

[8] *See* United States v. Anthem, Inc., 855 F.3d 345, 371 (D.C. Cir.) (2017) ("The dissenting opinion also founders on the mistaken belief that any exercise of increased bargaining power short of monopsony is procompetitive. But securing a product at a lower cost due to increased bargaining power is not a procompetitive efficiency when doing so 'simply transfers income from supplier to purchaser without any resource savings.'"); Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., 549 U.S. 312 (2007); C. Scott Hemphill & Nancy L. Rose, *Mergers that Harm Sellers*, 127 YALE L.J. 1742, 2087-92 (2018); *cf*. Fed. Trade Comm'n v. Staples, Inc., 190 F. Supp. 3d 100, 127 (D.D.C. 2016) (enjoining a merger based on harm to very large businesses in their purchasing of office supplies with no allegations of consumer harm.  While not a supplier or monopsony case, the case illustrates that downstream consumers are not the only actors to consider).

[9] Suresh Naidu, Eric A. Posner, & Glen Weyl, *Antitrust Remedies for Labor Market Power*, 132 HARV. L. REV. 536, 574-77 (2018); Ioana Marinescu & Herbert Hovenkamp, *Anticompetitive Mergers in Labor Markets*, 94 IND. L.J. 1, 17 (2018) ("The boundaries of labor markets are driven mainly by employee skills or training.  Geographic markets are driven mainly by the location and mobility of current or prospective employees.").

[10] JONATHAN BAKER, THE ANTITRUST PARADIGM: RESTORING A COMPETITIVE ECONOMY 31 (2019).

[11] *Id*. at 219 n.73; Naidu, Posner, & Weyl, *supra* note 9 at 539, 575.

[12] *See infra* Pt. III.e. for discussion of cases concerning nurses, Silicon Valley employees, and rail industry workers.

higher prices for consumers.[13] In other words, output is reduced below the competitive level because the firm is not hiring a competitive level of workers, which in turn harms consumers who may have to pay more for the product and potentially receive lower-quality products. As Attorneys General, with responsibility for antitrust enforcement at the local and regional level, we believe we should review labor market issues to understand the full picture of antitrust injuries, and not focus only on a merger's or a firm's likely short-term price effects.

### III.   Types of Antitrust Issues in Labor Markets

Recent antitrust activity involving labor has occurred in four major areas: a) horizontal agreements between employers who are competitors, b) no-poach agreements (as used in these Comments, this term generally refers to vertical agreements, particularly franchise agreements), c) non-compete agreements between employers and employees, and d) mergers impacting labor markets.

### a.        Horizontal Agreements Between Employers Not to Hire Employees

Agreements between employers to not hire each other's employees are horizontal agreements between competitors that reduce competition for labor.[14] These types of agreements may be called "naked no-poach" or "no-hire" agreements. These types of agreements are *per se* illegal under antitrust law and enforcement in these cases is relatively straightforward.[15] Attorneys General and federal enforcers have enjoined the use of these types of agreements in the healthcare and technology industries.[16]

### b.        Non-Horizontal "No-poach" Agreements

"No-poach" agreements also can span across different levels of an organization. For example, a no-poach agreement may be executed between a franchisor and a franchisee, whereby the

---

[13] Naidu, Posner, & Weyl, *supra* note 9 at 559 (2018) ("[I]f firms employ fewer workers, they will produce less output, resulting in higher prices. While the firm lowers wages to workers, the cost to the firm of hiring workers rises as the firm now considers the fact that, when it hires an additional worker, it also will pay the rest of its workers more. It is this full marginal cost of an additional worker and not merely the wages that the firm now accounts for and passes on to consumers as higher, not lower, prices . . . [this] is merely the flipside of a well-understood feature of monopolistic control of product markets . . . .").

[14] Complaint at 3, United States v. Knorr-Bremse AG, No. 1:18-cv-00747 (D.D.C. April 3, 2018); DEP'T OF JUSTICE & FED. TRADE COMM'N, GUIDANCE FOR H.R. PROFESSIONALS 2, 3 (2016) ("It is unlawful for competitors to expressly or implicitly agree not to compete with one another, even if they are motivated by a desire to reduce costs. . . . Naked wage-fixing or no-poaching agreements among employers, whether entered into directly or through a third-party intermediary, are per se illegal under the antitrust laws. That means that if the agreement is separate from or not reasonably necessary to a larger legitimate collaboration between the employers, the agreement is deemed illegal without any inquiry into its competitive effects.").

[15] DEP'T OF JUSTICE & FED. TRADE COMM'N, GUIDANCE FOR H.R. PROFESSIONALS 3 (2016).

[16] *E.g., infra* Part III.e. on Silicon Valley cases; United States v. Ariz. Hosp. & Healthcare Ass'n, No. CV07-1030-PHX (D. Ariz. Sept. 12, 2007), https://www.justice.gov/atr/case-document/complaint-28.

franchisee agrees not to hire employees of other franchisees.[17]  This type of agreement operates at the employer level and does not involve the employees' consent.  State enforcers have generally viewed these agreements as subject to *per se* review, or alternatively, argue they should be analyzed using a "quick look" rule of reason standard.  Similarly, no-poach agreements orchestrated by a franchisor through its franchise agreements with franchisees could be considered a hub and spoke conspiracy under antitrust law.[18]

The pervasiveness of these type of agreements in the franchise context has been realized only recently,[19] leading to a series of enforcement actions by States and coalitions of Attorneys General.[20]  In March 2019, a coalition of fourteen Attorneys General entered into a multistate settlement with four national fast food franchisors to stop using "no-poach" agreements.[21]  The agreements, with Dunkin', Arby's, Five Guys, and Little Caesars, settled an investigation announced by the states in July 2018 over concerns that no-poach agreements harmed low-wage workers by limiting their ability to secure higher-paying jobs.  These settlements were followed shortly thereafter by a similar settlement with Panera, LLC.  Under the terms of the agreement, the franchisors agreed to stop including no-poach provisions in any of their franchise agreements and to stop enforcing any no-poach provisions already in place. The franchisors also agreed to amend existing franchise agreements to remove no-poach provisions and to ask their franchisees to post notices informing employees of the settlement.  The franchisors agreed to notify the Attorneys General if one of their franchisees attempted to restrict any employee from moving to another location under an existing no-poach provision.

The Washington State Attorney General also filed a lawsuit in state court alleging Jersey Mike's (a sandwich shop chain) no-poach provisions are *per se* violations of Washington state antitrust law or, in the alternative, that the agreements fail under a "quick look" rule of reason analysis.[22]  The Washington State Attorney General reiterated the appropriateness of the *per se* standard of review in an amicus brief filed in a class action lawsuit in federal court in Washington.[23]  The Washington Attorney General's filing was in response to a Statement of Interest filed by DOJ in that case,[24] in which DOJ argued that franchisee-franchisor no-poach agreements were part of a

---

[17] Alan B. Kruger & Orley Ashenfelter, *Theory and Evidence on Employer Collusion in the Franchise Sector* 4 (Nat'l Bureau Econ. Research, Working Paper No. 24831, 2018) (including several examples of contract language used between franchisors and franchisees that restrict the employment mobility of employees).

[18] Comment to the Fed. Trade Comm'n, Justice Catalyst, Towards Justice, & Eric Posner (Dec. 14, 2018), https://www.ftc.gov/system/files/documents/public_comments/2018/12/ftc-2018-0088-d-0016-163103.pdf.

[19] *Id.* ("We find that 58 percent of major franchise chains include 'noncompetitive clauses' in their franchise contract that restrict the recruitment and hiring of workers currently employed (and in some cases extending for a period after employment) by other units affiliated with the franchisor.").

[20] *See e.g.*, Rach Abrams, *7 Fast Food Chains to End 'No Poach' Deals the Lock Down Low-Wage Workers*, N.Y. TIMES (July 13, 2018), https://www.nytimes.com/2018/07/12/business/fast-food-wages-no-poach-deal.html.

[21] Press Release, Massachusetts Attorney General Maura Healey, Four Fast Food Chains to End Use of No-Poach Agreements (March 12, 2019), https://www.mass.gov/news/four-fast-food-chains-to-end-use-of-no-poach-agreements.

[22] Complaint at 9, 14 Washington v. Jersey Mike's Franchise Sys. Inc., No. 12-2-25822-7 SEA (King. Cty. Super. Ct. 2018).

[23] Motion at 4, Stigar v. Dough, Inc., No. 2:18-cv-000244 (E.D. Wash. March 1, 2019).

[24] Statement of Interest of the United States, Stigar v. Dough, Inc., No. 2:18-cv-00244-SAB (E.D. Wash. Mar. 7, 2019)

vertical relationship, and therefore likely should be reviewed under the full rule of reason standard.[25]

The Jersey Mike's case highlights that state Attorneys General have independent authority to address this conduct using their state laws, including state antitrust and consumer protection laws, as well as labor law and federal antitrust law.  When it comes to labor, we expect that state Attorneys General may increasingly turn to enforcing and advancing an interpretation of their own state antitrust laws, as opposed to federal law, in response to conditions in their own jurisdictions.

### c.  Non-Compete Agreements Between Employers and Employees

Non-compete agreements are undergoing new scrutiny.  A non-compete agreement between an employer and an employee restricts an employee's ability to work for a competitor after leaving their current employer.  These types of agreements have so far rarely involved antitrust litigation, but they do have real world economic impact and have come under increased scrutiny as an unfair restraint on trade.

In most states, non-compete agreements are not prohibited, and are enforceable as long as they protect a legitimate business interest, such as trade secrets, and they are reasonably limited in time and geographic scope.  Almost 20% of American workers are bound by non-competes; 12% of these workers are in low-skill, low-wage jobs that do not involve trade secrets.[26]  A recent article discussed the growing use of non-compete agreements for students or entry-level workers in internships.[27]  By limiting worker mobility, especially that of low-wage workers, non-competes restrict workers' earnings opportunities and the economic security of their families. Non-competes also harm competition by depriving businesses, who were not a party to the non-compete agreements, the opportunity to hire available, qualified workers.  Some states, such as California and Montana, refuse to enforce them.  And several organizations, including the Open Markets Institute and the AFL-CIO, recently filed a petition with the FTC seeking to outright ban employment non-compete agreements on the ground that they are unfair trade practices.[28]

Certain states have or are considering legislation to ban non-competes overall or in certain situations.  For example, in 2016, Illinois enacted the Illinois Freedom to Work Act, which prohibits the use of non-compete agreements for employees who earn $13 an hour or less.[29]  In 2018, Massachusetts enacted legislation that regulates non-competes, limits their enforceability,

---

[25] *Id*. at 11-13.

[26] Evan Starr, J.J. Prescott, & Norman Bishara, *Noncompetes in the U.S. Labor Force* (U. Mich. L. & Econ. Research Paper No. 18-013, 2019), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2625714.

[27] Harriet Torry, *Interns' Job Prospects Constrained by Noncompete Agreements*, WALL ST. J. (June 29, 2019), https://www.wsj.com/articles/interns-job-prospects-constrained-by-noncompete-agreements-11561800600.

[28] Open Markets Inst. et al., Petition for Rulemaking to Prohibit Worker Non-Compete Clauses (Fed. Trade Comm'n, 2019*)*, https://openmarketsinstitute.org/wp-content/uploads/2019/03/Petition-for-Rulemaking-to-Prohibit-Worker-Non-Compete-Clauses.pdf.

[29] Illinois Freedom to Work Act, 820 ILL. COMP. STAT. 90, http://www.ilga.gov/legislation/ilcs/ilcs3.asp?ActID=3737&ChapterID=68.

and codifies express requirements that non-compete agreements must meet to be enforceable.[30]
On April 26, 2019, the Washington State Legislature passed the Non-Compete Act which will
become effective on January 1, 2020, and will ban non-compete agreements for workers in the
state with the exception of employees making more than $100,000 per year.[31]  The Maryland
General Assembly also enacted legislation making non-compete agreements in employment
contracts for employees making less than $15 per hour or $31,200 annually void as against the
state's public policy.[32]  This law takes effect October 1, 2019 and provides for limited
exceptions for agreements regarding a company's client related information.  In February 2019,
the New Hampshire Senate approved a senate bill, similar to the Illinois Freedom to Work Act, that,
that, if enacted, would prohibit employers from requiring low-wage workers to enter into non-
compete agreements, and make such agreements void and unenforceable.[33]  Also in 2019, the
Vermont Legislature introduced Bill H.1, which seeks to prohibit all employment non-compete
agreements.[34]  The New York Attorney General has proposed legislation that would prohibit
non-competes for workers earning below $75,000 per year, among other things.[35]

This spate of state activity shows states are experimenting with limiting non-competes, and that
there will be much to learn from these disparate approaches.  The non-compete bans or
limitations do not appear to be impacting competition or innovation in the states that are
engaging in this experiment.  For instance, California has long prohibited non-competes and is
still recognized as generating innovative companies and industries.

The issue has caught attention at the federal legislative level as well.  Several senators recently
sent a letter to the FTC citing bipartisan concern over the use of non-competes and the "serious
anti-competitive harms" workers suffer as a result of employment non-compete agreements.[36]
Several senators have proposed bills to restrict non-competes.  For example, the "Workforce
Mobility Act of 2018", proposed by Connecticut Senator Chris Murphy, would prohibit
employment non-compete agreements for most employees.[37]  Florida Senator Marco Rubio's
proposed legislation, the "Freedom to Compete Act", would ban the use of noncompete
agreements for certain low-wage workers.[38]

---

[30] Massachusetts Noncompetition Agreement Act, Mass. Gen. Laws ch. 228, § 24L
(2018)https://www.mass.gov/info-details/massachusetts-law-about-noncompetition-agreements#massachusetts-
laws-.
[31] H.R. 1450, 66th Leg., Reg. Sess. (Wash. 2019) http://lawfilesext.leg.wa.gov/biennium/2019-
20/Pdf/Bills/Session%20Laws/House/1450-S.SL.pdf.
[32] H.B. 0038 (Md. 2019), http://mgaleg maryland.gov/2019RS/bills/hb/hb0038T.pdf.
[33] New Hampshire Senate Bill 197, https://legiscan.com/NH/text/SB197/id/2031105.  In 2016, New Hampshire also
enacted legislation prohibiting contract terms that restrict the right of physicians to practice medicine in any
geographic area for any period of time after the termination of a partnership, employment, or professional
relationship contract.  New Hampshire Rev. Stat. Ann. § 329:31-a.
[34] Vermont Bill H.1, H.R. 1, 2019 Leg. (Vt. 2019), https://legislature.vermont.gov/bill/status/2020/H.1.
[35] New York Assembly Bill A07864, https://nyassembly.gov/leg/?bn=A07864&term=2017.
[36] Letter from Sen. Richard Blumenthal et al., to Joseph Simons, Chairman, Fed. Trade Comm'n (Mar. 20, 2019),
https://www.blumenthal.senate.gov/imo/media/doc/Sen%20Blumenthal%20et%20al%20re%20non%20competes_v
F.pdf.
[37] S. 2782, Workforce Mobility Act of 2018, 115th Cong., 2d Sess. (2018), https://www.congress.gov/bill/115th-
congress/senate-bill/2782/text.
[38] S. 124, Freedom to Compete Act,116th Cong., 1st Sess. (2019), https://www.congress.gov/bill/116th-
congress/senate-bill/124/text.

State Attorneys General, meanwhile, have been increasingly active in policing non-competes. The first wave began in 2016 when the New York and Illinois Attorneys General reached settlements with Jimmy John's Gourmet Sandwiches to stop using non-competes. Jimmy John's had been including language in its contracts with workers that precluded a worker for two years from taking a job at another establishment within two miles that made 10% of its revenue from sandwiches.[39] Two years later, the New York and Illinois Attorneys General reached a settlement with the office sharing company WeWork to stop imposing non-compete clauses on nearly all of its employees.[40]

A subset of these agreements are non-solicitation agreements, whereby the employer and employee agree that if the employee leaves the company, she will not solicit other employees from the old company to join the new company. We believe these types of agreements deserve antitrust scrutiny, especially when an employer tries to use the existence of such an agreement to similar ends as a non-compete, such as seeking to enjoin an employee from taking a position with a competitor.

### d. Mergers

Mergers can harm not only buyers of the merged firms' products, but also sellers that provide inputs to the merging firms. In the labor context, a "seller" includes current and potential employees of the merging parties.[41] Just as there is concern over monopoly and monopolization, there is equal concern for monopsony or monopsonization, which means only one or very few buyers of a good or service instead of sellers, as in monopoly. Monopsony is harmful for the same reason monopoly is understood to be harmful: it creates dead weight loss and harms the competitive process. A monopsonist employer can push wages below their competitive level, causing sellers to exit the market, quantity of jobs to decrease, and worker satisfaction to decrease. This can indirectly cause consumer prices to increase, quantities of output to decrease, and product quality to decrease.

State Attorneys General investigate and litigate anticompetitive mergers, independently and in collaboration with federal enforcers. Frequently, merger markets and anticompetitive effects on competition are localized. We believe state enforcers can play a particularly important role in identifying situations in merger review where two companies may not be competing in downstream product markets but nevertheless compete for employees in local markets.

---

[39] Press Release, New York Attorney General, A.G. Schneiderman Announces Settlement With Jimmy John's To Stop Including Non-Compete Agreements In Hiring Packets (June 22, 2016), https://ag.ny.gov/press-release/ag-schneiderman-announces-settlement-jimmy-johns-stop-including-non-compete-agreements; Press Release, Illinois Attorney General, A.G. Madigan Announces Settlement With Jimmy John's For Imposing Unlawful Non-Compete Agreements (December 7, 2016), http://www.illinoisattorneygeneral.gov/pressroom/2016_12/20161207.html.
[40] Eliot Brown, *WeWork Reaches Settlement on Noncompete Pacts*, WALL ST. J. (Sept. 18, 2018), https://www.wsj.com/articles/wework-reaches-settlement-on-noncompete-pacts-1537304008.
[41] C. Scott Hemphill & Nancy L. Rose, *Mergers that Harm Sellers*, 127 YALE L.J. 1742 (2018).

### e. Examples of Recent Activity

Over the last ten years, several antitrust cases have directly confronted labor issues. The cases have ranged from low-wage fast food workers to high-earning doctors and Silicon Valley employees. The range of cases highlights that competitive harms are not limited to any category of worker, and that even high prestige, in demand workers can suffer anticompetitive harm. Below are some of the recent examples of antitrust activity in labor markets.

- **"Wabtec" Merger**
  While investigating a merger, the DOJ uncovered an agreement between two rail road equipment suppliers to not compete for each other's employees. The agreements spanned several years.[42] The DOJ filed a complaint against the companies in 2018 and subsequently settled the matter.[43] The companies agreed to not use such agreements in the future.

- **Silicon Valley Non-Compete Investigations and Litigation**
  In 2010, the DOJ began a series of cases concerning the hiring practices of Silicon Valley tech companies.[44] In short, the companies agreed not to solicit each other's employees, and the agreements emanated from, and were enforced by, some of the highest ranking people in the world's most valuable companies, including Steve Jobs (Apple), George Lucas (Pixar), and Meg Whitman (Ebay).

  The California Attorney General's Office subsequently sued eBay over its anticompetitive agreement with Intuit. The agreement between the companies prevented each other from cold calling each other's employees. The case settled in 2014. The settlement required that eBay not enter into any further anti-competitive agreements for workers and pay $2.375 million to employees and prospective employees. As part of the *cy pres* portion of the settlement, the California Attorney General funded a documentary on antitrust and labor titled "When Rules Don't Apply."[45]

- **Duke/UNC**
  In 2018, a private lawsuit was filed against Duke University over its agreement with the University of North Carolina to not hire away each other's medical faculty. Both defendants have settled the claims, and Duke has recently agreed to pay over $50 million to affected workers.[46]

---

[42] United States v. Knorr-Bremse AG, No. 1:18-cv-00747 (D.D.C. 2018).

[43] Press Release, Office of Pub. Affairs, U.S. Dep't of Justice, Justice Department Requires Knorr and Wabtec to Terminate Unlawful Agreements Not to Compete for Employees (April 3, 2018), https://www.justice.gov/opa/pr/justice-department-requires-knorr-and-wabtec-terminate-unlawful-agreements-not-compete.

[44] Press Release, Office of Pub. Affairs, U.S. Dep't of Justice, Justice Department Requires Six High Tech Companies to Stop Entering into Anticompetitive Employee Solicitation Agreements (Sept. 24, 2010), https://www.justice.gov/opa/pr/justice-department-requires-six-high-tech-companies-stop-entering-anticompetitive-employee.

[45] When Rules Don't Apply: An Education Campaign to Protect Workers' Rights (2019), https://www.whenrulesdontapply.com/.

[46] Brent Kendall, *Duke University Moves to Settle No-Poach Case for $54.5 Million*, WALL ST. J. (May 21, 2019), https://www.wsj.com/articles/duke-university-agrees-to-54-5-million-settlement-in-no-poach-case-11558392798.

9

- **Franchisees' No-poach Agreements**

In 2018, the Washington State Attorney General's Office began investigating no-poach clauses in franchise contracts.[47]   Since opening the investigation, over 60 franchise chains have reached settlements and have removed no-poach clauses from their franchise contracts across the country.[48]   Washington State has also filed a lawsuit in state court alleging Jersey Mike's no-poach provisions are *per se* violations of antitrust law.[49]

- **Anthem/Cigna Merger**

In 2016, the DOJ and twelve states challenged the merger of Anthem and Cigna.  The plaintiffs alleged a monopsony claim in labor markets due to the proposed transaction.[50]  Specifically, the Complaint alleged that some doctors and hospitals would face lower reimbursement rates as a result of the transaction.  The merging parties did not show that the new entity would be unable to use its market power to depress reimbursement rates below competitive levels, but instead relied on their contention that savings from those lower rates would be passed onto consumers.[51]

## IV. Recommendations

In light of the discussion above, the undersigned Attorneys General make the following recommendations to further emphasize labor considerations in our work.  As a preliminary matter, we note that this is certainly an area where more economic study and research is needed.  Additional study on the areas discussed above, and new theories and issues that arise, will be valuable in helping all the stakeholders improve antitrust review and enforcement.  We support additional work in this area and expect that it will inform additional recommendations in the future.  We also note that the state Attorneys General have a long history of collaborating with the FTC in merger reviews and look forward to continuing that collaboration.  We believe that these recommendations will allow us to strengthen state and joint state-federal enforcement relating to labor issues.

The following are recommendations for avenues in which the Attorneys General, independently and in collaboration with federal enforcers, can focus more on labor issues that arise in today's economies.

---

[47] The investigation was spurred by a New York Times article.  Rachel Abrams, *Why Aren't Paychecks Growing? A Burger-joint Clause Offers a Clue*, N.Y. TIMES (Sept. 28, 2017), https://www.nytimes.com/2017/09/27/business/pay-growth-fast-food-hiring.html.

[48] Press Release, Wash. Office of Att'y Gen., AG Ferguson's Initiative to End No-Poach Clauses Nationwide Secures End to Provisions at 50 Corporate Chains (Jan. 14, 2019), https://www.atg.wa.gov/news/news-releases/ag-ferguson-s-initiative-end-no-poach-clauses-nationwide-secures-end-provisions (since this press release, additional companies have settled, bringing the total to over 60 companies).

[49] Complaint at 9, Washington v. Jersey Mike's Franchise Sys. Inc., No. 12-2-25822-7 SEA (King. Cty. Super. Ct. 2018).

[50] Complaint at 24-28, United States v. Anthem, Inc., No. 1:16-cv-01493 (D.D.C. July 21, 2016).

[51] United States v. Anthem, Inc., 855 F.3d at 262, 366-67 (D.C. Cir.) (2017).

### a.   Incorporating Labor Concerns into Merger Review

Chairman Simons stated that the FTC would include labor considerations in all of its merger reviews.[52]  The State Attorneys General who conduct merger reviews can work with the FTC to develop ways to identify relevant considerations.  We suggest, for example, enforcers should look whether the merger involves companies that 1) have specialized labor needs and/or 2) are within the same geographic area with a small labor force.  Specialized laborers involve antitrust consideration because those laborers have less willingness and ability to switch to other types of work.[53]  If it seems that there could be a labor market issue, enforcers should consider gathering information from company human resources departments more frequently in merger reviews.  For example, examining "diversion ratios" and the hiring history of the merging companies could be useful (*i.e.* how often the companies are hiring each other's employees and whether they recruit from the same places).  Interviewing human resources managers from the merging parties and from competitors in the broader hiring market could be useful as well to understanding labor market considerations.

In a broader sense, we suggest that it may be time to re-examine the assumption that layoffs are an efficiency in merger reviews.  That has been the traditional view.  However, layoffs are only an efficiency when the merger lessens the need for work but does not result in lower total production.  Bare cost-cutting is neither an antitrust benefit nor an efficiency in the merger analysis.[54]  After all, only if the downstream market is competitive would savings from employee layoffs be likely to get passed through to consumers.[55]  Additionally, competition in labor markets, like many markets, manifests itself in different ways simultaneously.  In labor markets, employers compete for laborers through more than just salaries, but also through benefits such as health insurance benefits, paid time off, flexibility in work schedules, or on-site amenities such as child care, gyms, and cafeterias, for example.  These measures of "quality" are difficult to capture in empirical studies, but they are nevertheless a key way that employers compete for workers.

As enforcement agencies become more familiar with labor markets in antitrust review, it may be worthwhile to consider updating the Horizontal Merger Guidelines with more detail on how to weigh labor market considerations.  At this time, there appear to be differences of opinion on how to understand the impact of buyer power that reduces input costs.[56]  When that input is

---

[52] *House Judiciary Hearing on Antitrust Enforcement Oversight*, (Jan. 2, 2019) (statement of FTC Chairman Simons) https://archive.org/details/CSPAN3_20190102_220500_House_Judiciary_Hearing_on_Antitrust_Enforcement_Oversight/start/2616.9/end/2640; Ben Remaly & Kaela Coote-Stemmermann, *FTC Considers Workers in Deal Reviews*, GLOB. COMPETITION REV. (October 4, 2018), https://globalcompetitionreview.com/article/usa/1175255/ftc-considers-workers-in-deal-reviews.

[53] *See* JONATHAN BAKER, *supra* note 10 at 219-20 n.73 (2019); Naidu, Posner, & Weyl, *supra* note 9 at 575.

[54] United States v. Anthem, Inc., 855 F.3d 345, 371 (D.C. Cir.) (2017).

[55] Comment to the Fed. Trade Comm'n, Justice Catalyst, Towards Justice, & Eric Posner (Dec. 14, 2018).

[56] *See* Jonathan Sallet, *Buyer Power in Recent Merger Reviews*, 32 ANTITRUST 1, 82 (2017) (comparing the FTC's position in *Express Scripts/Medco* with the DOJ and States position in *Anthem/Cigna*).

labor, we recommend that the federal agencies remain sensitive to the possibility that a merger may harm workers, and not yield cognizable efficiency savings from labor.[57]

We look forward to working with the FTC on developing protocols for analyzing labor concerns in merger reviews.

### b.   Non-Compete, Non-Solicitation, and No-Poach Agreements

Rapidly changing labor markets, particularly those involving low-wage workers, and the development of antitrust enforcement actions over the last decade shape our recommendations here.

As discussed above, use of these agreements for low-wage workers is far more widespread than previously recognized.  Beyond agreements that restrain employees, many lower-wage workers participate in the "gig" economy and are dependent on an app or platform that connects different groups of users of the platform.  Platforms grow through network effects, where additional users on a platform make the platform more valuable and attractive.  In those situations, non-compete agreements imposed by a platform can be especially harmful because a non-compete agreement prevents laborers from switching to an upstart platform, which will have difficultly achieving the necessary scale to meaningfully enter the market.  Similarly, the antitrust treatment of multi-sided platforms is in flux following the Supreme Court's *American Express* decision in 2018,[58] and therefore may lead to disputes regarding the balancing of harms to labor markets and benefits to consumers.

When non-compete agreements  are entrenching monopoly power, enforcers should treat those agreements as potential violations of the Sherman Act Section 2.[59]  For example, there is a question of whether non-competes prevent market entry because upstart firms are unable to hire workers away from an incumbent.  If this situation exists, both workers and consumers may be harmed because new firms provide product market and labor market competition.

---

[57] *But cf.* Statement of the Federal Trade Commission Concerning the Proposed Acquisition of Medco Health Solutions by Express Scripts, Inc., FTC File No. 111-0210, at 8 (Apr. 2, 2012) (accepting an increase in buyer power because it was "likely that a large portion of any cost savings" would be passed downstream).
[58] Ohio v. Am. Express Co., 138 S. Ct. 2274 (2018).
[59] *See* Alan Kreuger & Eric Posner, *A Proposal for Protecting Low-Income Worker From Monopsony and Collusion* 4-5 (The Hamilton Project 2018),
http://www.hamiltonproject.org/assets/files/protecting_low_income_workers_from_monopsony_collusion_krueger_posner_pp.pdf ("[T]here is a concern that in 'thin' labor markets for critical talent, an employer can use non-compete agreements to bind workers and discourage competitors from entering the market because they will face a scarcity of available labor."); Petition for Rulemaking by Open Markets Inst., et. al., *supra* note 28 ("Non-competes can also impair product market competition.  In a highly concentrated market, monopolists and other powerful firms can use non-compete clauses to deprive rivals of essential works and thereby impede their ability to compete. Through this strategic use of non-competes, dominant firms can weaken and exclude rivals and maintain market power.").

The FTC should consider using its Section 5 enforcement authority to stop the use of non-compete, non-solicitation, and no-poach agreements in many situations.[60]  At a minimum, we recommend that the FTC use its authority to ban intra-franchise no-poach agreements and non-compete agreements for low-wage workers.  We understand that the FTC is studying such action right now.  We further propose the FTC consider a ban on non-competes involving multi-sided platforms.

Our recommendation above recognizes that the debate regarding the appropriate standard of review for no-poach agreements is ongoing.  We see some challenges in the position stated by DOJ that these agreements, when ancillary to the overall franchise agreement, should be evaluated under the rule of reason as the agreements could result in pro-consumer benefits.  Some of the stated potential pro-competitive benefits, such as cost savings from depressed wages, should not offset labor harm as antitrust law does not recognize that cost cutting alone is a cognizable antitrust benefit.[61]  As enforcers familiar with local markets, our enforcement efforts to date have not demonstrated that pro-competitive effects will equal or outweigh the anticompetitive effects of restraining labor markets.  Generally, the lack of real potential benefits supports evaluating these restraints under *per se* or a "quick look" analysis.[62]  We believe that increased judicial experience with these arrangements likely will lead to that outcome.

We thank the FTC for providing the opportunity to submit these Comments and contribute to the Commission's review of current and evolving antitrust issues.  We look forward to continuing to collaborate with the FTC on antitrust/labor issues.

---

[60] Alan Kreuger & Eric Posner, *supra* note 36 at 12-13, 14; Petition for Rulemaking by Open Markets Inst., *supra* note 28.

[61] Law v. Nat'l Collegiate Athletic Ass'n, 134 F.3d 1010, 1022 (10th Cir. 1998) ("The NCAA next advances the justification that the plan will cut costs.  However, cost-cutting by itself is not a valid procompetitive justification.  If it were, any group of competing buyers could agree on maximum prices.  Lower prices cannot justify a cartel's control of prices charged by suppliers, because the cartel ultimately robs the suppliers of the normal fruits of their enterprises.").

[62] Am. Antitrust Inst., Letter to Delrahim (May 2, 2019), https://www.antitrustinstitute.org/wp-content/uploads/2019/05/AAI-No-Poach-Letter-w-Abstract.pdf; Steve Salop, Comments at the A.B.A. 2019 Antitrust Spring Meeting, Beyond No-Poach: Mergers, Monopsony, and Labor Markets (March 29, 2019).

Respectfully Submitted,

Karl A. Racine
Attorney General for the District of Columbia

Kathleen Jennings
Delaware Attorney General

Kwame Raoul
Illinois Attorney General

Aaron M. Frey
Maine Attorney General

Maura Healey
Massachusetts Attorney General

Keith Ellison
Minnesota Attorney General

Xavier Becerra
California Attorney General

Clare E. Connors
Attorney General for the State of Hawaii

Tom Miller
Attorney General of Iowa

Brian Frosh
Maryland Attorney General

Dana Nessel
Michigan Attorney General

Aaron D. Ford
Nevada Attorney General

14

Gurbir S. Grewal
Attorney General of New Jersey

Letitia James
New York Attorney General

Josh Shapiro
Pennsylvania Attorney General

Peter F. Neronha
Rhode Island Attorney General

Mark R. Herring
Virginia Attorney General

Robert W. Ferguson
Washington Attorney General

15

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PROOF OF SERVICE
<u>Foncesa v. Hewlett-Packard Company, et al.</u>
Case No. 37-2017-00045630-CU-WT-CTL

STATE OF CALIFORNIA, COUNTY OF SAN DIEGO

I am employed in the County of San Diego, State of California.  I am over the age of 18 and not a party to the within action; my business address is HOGUE & BELONG (the "firm"), 170 Laurel Street, San Diego, CA 92101.

On August 12, 2019, I served the following document(s) described as

- **SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES**

[X]     Electronically Via One Legal

CLAUDETTE G. WILSON, ESQ.
cwilson@wilsonturnerkosmo.com
MERYL C. MANEKER, ESQ.
mmaneker@wilsonturnerkosmo.com
MARK A. REIN, ESQ.
mrein@wilsonturnerkosmo.com
WILSON TURNER KOSMO LLP
402 W. Broadway, Suite 1600
San Diego, CA 92101

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on August 12, 2019, at San Diego, California.

_s/ Kellie Turnbull_
Kellie Turnbull

1
PROOF OF SERVICE

EXHIBIT E -  162