1  JEFFREY L. HOGUE (SBN 234557)
   TYLER J. BELONG (SBN 234543)
2  STEPHANIE A. SANDLER (SBN 315165)
   **HOGUE & BELONG**
3  170 Laurel Street
   San Diego, CA 92101
4  Tel.:(619) 238-4720
   Fax: (619) 238-5260
5
   Attorneys for Plaintiff
6

7             **UNITED STATES DISTRICT COURT**

8           **SOUTHERN DISTRICT OF CALIFORNIA**

9   BRYANT FONSECA, an                CASE NO.: 3:19-cv-01748-GPC-MSB
    individual, on behalf of himself
10  and all others similarly situated,  **THIRD AMENDED CLASS ACTION**
    and on behalf of the general        **COMPLAINT FOR DAMAGES**
11  public,
                                        1) **DISPARATE TREATMENT –**
12          Plaintiff,                     **CALIFORNIA GOVERNMENT**
                                          **CODE § 12940(a)**
13                                      2) **DISPARATE IMPACT –**
        vs.                               **CALIFORNIA GOVERNMENT**
14                                        **CODE §§ 12940(A), 12941;**
15                                      3) **WRONGFUL TERMINATION**
    HEWLETT-PACKARD                       **IN VIOLATION OF PUBLIC**
16  COMPANY, a Delaware                   **POLICY;**
    Corporation; HP ENTERPRISE         4) **FAILURE TO PREVENT**
17  SERVICES, LLC, a Delaware            **DISCIMINATION;**
    Limited Liability Company; HP,     5) **VIOLATION OF THE**
18  Inc., a Delaware corporation; and    **CARTWRIGHT ACT –**
    DOES 1-100, inclusive.               **CALIFORNIA BUSINESS AND**
19                                        **PROFESSIONS CODE §§ 16270,**
20          Defendants.                   *et seq.*
                                        6) **VIOLATION OF CALIFORNIA**
21                                        **BUSINESS AND**
                                          **PROFESSIONS Code §§ 16600**
22                                        *et seq.*
23                                      7) **UNFAIR COMPETITION –**
                                          **CALIFORNIA BUSINESS &**
24                                        **PROFESSIONS CODE §§ 17200,**
                                          *et seq.*
25                                      8) **VIOLATION OF THE**
26                                        **SHERMAN ACT – 15 U.S.C. § 1**
27
28  _____   **DEMAND FOR JURY TRIAL**

_____
THIRD AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

Bryant Fonseca ("Fonseca" or "Plaintiff"), individually and on behalf of all others similarly situated, alleges the following:

## INTRODUCTION

1.      This class action is brought by Plaintiff, on behalf of himself, and on behalf of all others similarly situated, and on behalf of the general public against Hewlett-Packard Company, a Delaware corporation and its successors, HP Enterprise Services, LLC, a Delaware Limited Liability Company, and HP Inc., a Delaware corporation (collectively, "HP").  Plaintiff alleges on information and belief, except for information on personal knowledge, as follows.

2.      Plaintiff petitions this Court to allow him to represent and prosecute claims against HP in class action proceedings on behalf of all those similarly situated who are residing in the State of California.

## THE PARTIES

3.      At all material times, Mr. Fonseca was a resident of the County of San Diego in the State of California.  At all material times, Mr. Fonseca was the employee of HP within the meaning of California Government Code section 12940.

4.      At all material times, HP conducted business within the County of San Diego.  HP's headquarters and principal place of business are located in the city of Palo Alto, California.  Palo Alto is the location where HP directs, controls, and coordinates its business operations.

///

///

///

///

///

THIRD AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

5.    HP has gone through significant corporate restructuring.  Below is an organizational chart of that restructuring:



6.    All the aforementioned entities share a unity of interest and all are co-conspirators for the acts described below.

7.    The true names and capacities, whether individual, corporate, partnership, associate or otherwise of defendants DOES 1 through 100, inclusive, are unknown to Plaintiff who therefore sues these defendants by such fictitious names under California Code of Civil Procedure section 474.  Plaintiff will either seek leave to amend this Class Action Complaint or file a DOE statement to allege the true names and capacities of DOES 1 through 100, inclusive, when the same are ascertained.  The DOE defendants together with HP are collectively referred to herein as "Defendants."

8.    Plaintiff is informed and believes, and thereon alleges, that Defendants are each responsible in some manner for one or more of the events

and happenings that proximately caused the injuries and damages hereinafter alleged.

9.      Plaintiff is informed and believes, and thereon alleges, that Defendants knowingly and willfully acted in concert, conspired together and agreed among themselves to enter into a combination and systemized campaign of activity to cause the injuries and damages hereinafter alleged, and to otherwise consciously and or recklessly act in derogation of the rights of Plaintiff, the Age Discrimination Class (defined below), and the Antitrust Class (defined below). Defendants further violated the trust reposed by Plaintiff, the Age Discrimination Class, and the Antitrust Class by their negligent and or intentional actions. Said conspiracy, and Defendants' concerted actions, were such that, on information and belief, and to all appearances, Defendants represented a unified body so that the actions of one defendant was accomplished in concert with, and with knowledge, ratification, authorization and approval of each and every other defendant.

10.     Plaintiff is informed and believes and thereon alleges, that each and every defendant named in this Class Action Complaint, including DOES 1 through 100, inclusive, is, and at all times mentioned herein was, the agent, servant, alter ego, and or employee of each of the other defendants and that each defendant was acting within the course of scope of his, her or its authority as the agent, servant and or employee of each of the other defendants. Consequently, each and every defendant is jointly and severally liable to Plaintiff, the Age Discrimination Class, and the Antitrust Class for the damages sustained as a proximate result of their conduct.

11.     At all times herein mentioned, the Defendants, and each of them,

were members of, and engaged in, a joint venture, partnership and common enterprise, and acted within the course and scope of said agency, employment, and enterprise. Defendants operate as a single enterprise to transact their business through unified operation and common control. At all times herein mentioned, the acts and omissions of various Defendants, and each of them, concurrently contributed to the various acts and omissions of each and every one of the other Defendants in proximately causing the wrongful conduct, harm, and damages alleged here

12.    At all times herein mentioned, Defendants, and each of them, approved, condoned and/or otherwise ratified each and every one of the acts or omissions complained of herein. At all times herein mentioned, the Defendants, and each of them, aided and abetted the acts and omissions of each and every one of the other Defendants, thereby proximately causing the damages as herein alleged.

## JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction over this action pursuant to the California Constitution, Article VI, section 10, which grants the Superior Court, "Original Jurisdiction in all causes except those given by statute to other courts." The causes of action alleged herein are not reserved for any court other than the Superior Court of California. Additionally, the statutes under which this action is brought do not specify any other basis for jurisdiction.

14.    This Court has jurisdiction over each of the defendants because upon information and belief, each defendant is either a citizen of California, has sufficient minimum contacts in California, or otherwise intentionally avails itself of the California market so as to render the exercise of jurisdiction over it by the

California courts consistent with traditional notions of fair play and substantial justice.

15.      Venue as to HP is proper in this judicial district under California Code of Civil Procedure sections 395(a) and 395.5 as a portion of the acts complained of herein occurred in the County of San Diego.  The injuries to Plaintiff occurred in the County of San Diego.  HP either owns, maintains offices, transacts business, has an agent or agents within the County of San Diego, or otherwise is found within the County of San Diego.  Further, Plaintiff was employed by HP in the County of San Diego.

## ADMINISTRATIVE PREREQUISITES

16.      On November 3, 2017, Mr. Fonseca filed a charge against HP with the Department of Fair Employment and Housing ("DFEH") concerning HP's policy that targeted himself and other employees aged 40 years and older through a pattern and practice of unlawful terminations.  The DFEH issued Mr. Fonseca an immediate right-to-sue letter. (*See* Exhibit A.)

## FACTUAL ALLEGATIONS

**Bryant Fonseca was a Talented and Experienced Employee that had Loyally Served HP for More Than 35 Years.**

17.      Mr. Fonseca was 55 years old at the time he filed his complaint.

18.      Mr. Fonseca was employed by HP for nearly 36 years.  He worked out of HP's San Diego site, located in Rancho Bernardo.

19.      Mr. Fonseca first worked for HP as a part of a summer program while he was in high school in 1978.  For most of his career, Mr. Fonseca worked in the "CHIL" work group, where his title was "Procurement Ops Associate V."

The CHIL group conducted research and development related to HP's all-in-one printers. Mr. Fonseca would work with vendors in order to obtain all supplies that the group required.

20.     Over time, Mr. Fonseca's responsibilities began to increase dramatically. Mr. Fonseca became an expert at using the SAP program – a business software program that makes a business's purchasing department run more efficiently. Mr. Fonseca later became classified as a "SAP Super User."

21.     In approximately August 2016, the CHIL work group was dissolved, and Mr. Fonseca began to work in an engineering support group.

**HP's Employees Were Older, More Experienced, and Therefore More Expensive Than the Employees at HP's Competitors.**

22.     In 2012, the median age of HP's workforce was 39 years old, the oldest in the tech industry. With one-half of its workforce over the age of 39, HP's labor costs were higher than other tech companies. HP employees with 10-19 years of experience are paid an average of just over $97,000 annually while employees with 20 or more years of experience are paid an average of just over $110,000 annually. By contrast, HP employees with less than 1 year of experience are paid an average of just over $64,000 while employees with 1-4 years of experience are paid an average of just over $65,000.

**HP's Workforce Reduction Plan Sought to Replace Older, Experienced Employees with Younger, Cheaper Ones.**

23.     On or about early 2012, HP implemented its "2012 U.S. Workforce Reduction Plan" ("Workforce Reduction Plan"), which was a scheme to terminate its older, higher paid employees and replace them with younger, lower paid employees. HP's Workforce Reduction Plan involuntarily terminates employees

on a rolling basis.  Although HP's Workforce Reduction Plan purports to lay off employees on a neutral basis, it actually is a companywide practice that disproportionately targets employees who are 40 years of age or older – a protected class – for termination.

24.     HP has stated that its purpose in instituting the Workforce Reduction Plan was to realign its "organization to further stabilize the business and create more financial capacity to invest in innovation, but it's not enough.  If [HP is] to position [itself] as the industry leader for the future, then [HP] must take additional actions that, while tough, are necessary to move [its] business forward. These actions include a reduction in [HP's] global workforce." On October 9, 2013, HP's then-CEO Meg Whitman described HP's staffing objectives at the company's "Hewlett-Packard Securities Analyst Meeting". **Whitman explained that HP was aggressively seeking to *replace* older employees with younger employees**.  On this topic, some of Whitman's comments include, but are not limited to:

- ". . . a question that is actually completely relevant for all large-cap IT companies, which is how do you keep up with this next generation of IT and how do you bring people into this company for whom it isn't something they have to learn, it is what they know."

- ". . . we need to return to a labor pyramid that really looks like a triangle where you have a lot of early career people who bring a lot of knowledge who you're training to move up through your organization, and then people fall out either from a performance perspective or whatever."

- "And over the years, our labor pyramid . . . [has] become a bit more of a diamond.  And we are working very hard to recalibrate and reshape our labor pyramid so that it looks like the more classical pyramid that you should have in any

company and particularly in ES.  If you don't have a whole host of young people who are learning how to do delivery or learning how to do these kinds of things, you will be in real challenges."

- "So, this has a couple of things.  One is we get the new style of IT strength and skills.  It also helps us from a cost perspective . . . if your labor pyramid isn't the right shape, you're carrying a lot of extra cost.  The truth is we're still carrying a fair amount of extra costs across this company because the overall labor pyramid doesn't look the way it should."

- "Now, that's not something that changes like that.  Changing the shape of your labor pyramid takes a couple of years, but we are on it, and we're amping up our early career hiring, our college hiring.  And we put in place an informal rule to some extent which is, listen, when you are replacing someone, really think about the new style of IT skills."

25.     HP's CFO Cathie Lesjak ("Lesjak") explained the scheme as a way to proactively shift the makeup of HP's workforce towards low-level recent graduates:

"And the way I think about the restructuring charge . . ., it's basically catching up.  It's actually dealing with the sins of the past in which we have not been maniacally focused on getting the attrition out and then just agreeing to replace anyway and not thinking through it carefully and thinking through what types of folks we hire as replacements . . . We hire at a higher level than what we really need to do.  And the smarter thing to do would be to prime the pipeline, bring in fresh new grads, and kind of promote from within as opposed to hiring a really experienced person that is going to be much more expensive."

26.     HP's Manager of Employee Relations for the Americas, Sheri Bowman, explained that it was critical for some HP organizations to reduce expenses, and one way they had done so was by changing the composition of their workforce:

> The focus within the different organizations has evolved a lot over the past four or five years because of the turnaround that we have been trying to achieve within the organization. And so there is a tremendous focus on increasing revenue, increasing client satisfaction to help increase revenue and reducing, you know, overall expenses. So that has just resulted in some organizations modifying their workforce to try to get to the right labor pyramid to achieve their business goals.

**HP Executed the Workforce Reduction Plan That Targeted Older Employees.**

27.     In November 2015, HP was still persistently eliminating the jobs of older, age-protected employees, like Mr. Fonseca, and actively replacing them with younger employees. Ms. Whitman confirmed as much in her public statements intended to reach the ears of HP investors:

> "That should be it. I mean, that will allow us to right size our enterprise services business to get the right onshore/offshore mix, to make sure that we have a labor pyramid with lots of young people coming in right out of college and graduate school and early in their careers. That's an important part of the future of the company . . . This will take another couple of years and then we should be done."

28.     Consistent with HP's strategy to eliminate the older members of its workforce in favor of younger workers, when selecting which employee to terminate under its Workforce Reduction Plan, HP's goal is to single out those workers who it thinks "will not fit the bill long term in [the] team growing to [an advisory] position."

29.     Although purportedly neutral on their face, HP's terminations under its Workforce Reduction Plan are actually targeted to eliminate older, age-protected workers in grossly disproportionate numbers.  As of October 2015, a total of 1,765 out of 2,076 California-based employees who were terminated under HP's Workforce Reduction Plan (or over 85%) are 40 years of age, or older.

30.     HP's Workforce Reduction Plan is implemented on a rolling basis. That is, it does not terminate HP's employees all at once.  But, it serves as a mechanism for HP to terminate members of a protected class of employees whenever it wants.  Plaintiff is informed and believes that HP is *still* engaged in the systematic elimination of its age protected class of employees.

31.     Also, HP implements its Workforce Reduction Plan to carefully avoid triggering a Workforce Adjustment and Retraining Notification ("WARN") event. A WARN Act event is triggered when a covered establishment terminates 50 employees in the same geographic region at any one time.  If a WARN Act event is triggered, the company must provide terminated employees with at least 60 days' notice of his or her termination, and pay them for 60 days' worth of pay.  HP actively evades these requirements by not terminating 50 or more employees at any one time in the same geographic area.

**HP's "Fake" Measures that Purportedly Helped Terminated Employees to Retain Employment in a Different Capacity were Illusory and Restricted Competition.**

32.     Theoretically, HP employees terminated under the Workforce Reduction Plan are encouraged to apply for other jobs at HP through HP's 60-day "Preferential Rehire Period."  A termination is cancelled for any HP employee who is hired during this "Preferential Rehire Period."  While the Preferential Rehire

Period is supposed to be neutral in its application, it is not applied neutrally because it adversely impacts disproportionate numbers of age protected employees.  In fact, during the Preferential Rehire Period, HP's older employees are almost never rehired.  If an older employee is even offered a job, the job is rarely, if at all, comparable to the one that employee held before he or she was terminated.

33.    From the time that the Workforce Reduction Plan was implemented in 2012 until approximately 2014, a terminated employee that was not rehired during the "Preferential Rehire Period" became ineligible for 12 months following termination – according to HP's written policy.  Beginning in August 2014, employees terminated under the workforce reduction plan were made completely ineligible for rehire despite continuing to be told that they could take advantage of the Preferential Rehire Period.  Simply put, the Preferential Rehire Period is a façade that masks the systematic terminations of Defendants' older employees by making it appear as though HP was interested in retaining these individuals.

34.    Since August 2013, HP's Human Resources has incorporated written guidelines that require HP to hire mostly younger employees.  Specifically, those guidelines state: "New corporate requisition policy requires 75% of all External hire requisitions be 'Graduate' or 'Early Career' employees."  Thus, age-protected employees who were terminated under the Workforce Reduction Plan and who sought rehiring under the Preferential Rehiring Period, were fighting an uphill battle against HP's inherent prerogative to hire a disproportionate percentage of younger "early career" and "recent graduates".[1]

_____

[1] Notably, the Equal Employment Opportunity Commission views the use of "new grad" and "recent grad" in job notices to be illegal because it discourages older applicants from applying.

35.    Thus, available job postings included discriminatory language that made clear that HP was looking for a "younger" employee to fill those available jobs.  Accordingly, age-protected employees were rejected for rehiring under the Preferential Rehire Period provision of the Workforce Reduction Plan in disparately greater numbers than their younger peers who applied either externally or pursuant to the Preferential Rehire Period provision.

36.    HP also implemented an early retirement program in which employees of a certain age and tenure are eligible to "voluntarily" retire early.  If the employee does not choose voluntary early retirement, he or she may soon be unemployed. This retirement program presents age-protected employees with a Hobson's choice: either participate in the voluntary retirement program or risk being terminated under the Workforce Reduction Plan.  The aforementioned dilemma works to HP's advantage.

37.    The Workforce Reduction Plan also deters the recipient from looking for jobs from third party employers.  Specifically, the Workforce Reduction Plan requires the employee to notify his or her manager "immediately" upon acceptance of employment with a "competitor" of HP, and states that if they do not they will forfeit their ability to receive severance pay:

> "A Participant who accepted a job offer with a competitor and did not promptly notify his management about such job shall not be eligible to receive a Cash Severance Payment."

The summary Plan Description of the Workforce Reduction Plan that was given to Plaintiff goes a step further and clarifies that the mere acceptance of a job with

a competitor immediately terminates the employee's eligibility for Cash Severance Payment:

> "**Cash Severance** […] The amount of your Cash Severance Payment will equal one week of pay for each year of qualifying service with HP, with a minimum of eleven weeks of Base Pay, and a maximum of fifty-two weeks of Base Pay."
>
> "**Acceptance of Position with an HP Competitor:** If you accept a position with a competitor of HP, you are required by the HP Standards of Business Conduct to notify your manager immediately. It is a violation of the HP Standards of Business Conduct for you to fail to notify HP of your acceptance of a position with a competitor, and it is grounds for a misconduct termination.  **If you accept a position with a competitor during the WFR Redeployment Period, you will terminate your Plan participation at that point and you will not be eligible for the Cash Severance Pay.**"
>
> (emphasis added.)

Thus, the Workforce Reduction Plan restrained HP's employees' ability to work for competitors and it was also used as a mechanism to support HP's agreements with competitors such as 3D Systems not to compete by poaching each other's employees, as described in greater detail below.

///

**HP Has Deliberately Avoided Confronting the Reality that Its Policies Disproportionately Impact Age Protected Employees.**

38.     Older employees were well aware of the fact that many of their age-protected peers had been selected for termination under the Workforce Reduction Plan.  In the engineering support group, older employees would advise each other not to disclose their age or how long they had worked at HP in order to avoid being selected for termination under the Workforce Reduction Program.

39.     HP has an "Adverse Impact Team" that evaluates various HP employment practices to determine whether or not those practices impact a significant number or percentage of a particular protected class of employees. Although HP has an "Adverse Impact Team," for unknown reasons, it <u>does not</u> investigate the facts related to whether or not the Workforce Reduction Plan adversely affects a class of *age* protected employees disproportionately.

40.     According to its "HP 2016 Sustainability Report," HP provides workforce data regarding its diversity in the United States, but tellingly provides no facts about its age-protected workforce data.

41.     On or about February 2017, HP set forth a "diversity mandate" when it hires outside attorneys to defend it from lawsuits.  If a law firm does not fit HP's selective "diversity" requirements then it can withhold ten percent (10%) of the firm's attorneys' fees.  Tellingly, "age" is not one of the criteria or factors included in this "diversity mandate."  This omission further evidences HP's devaluation of age-protected class of persons.

42.     Consequently, since July 2012 there have been approximately *forty* age discrimination charges filed against HP with the Department of Fair Employment & Housing ("DFEH") and California Superior Court.

43.     According to a January – February 2017 article published by AARP, HP has received more allegations of age discrimination than *any* other technology company in recent years.

**Mr. Fonseca was Terminated under the Workforce Reduction Plan, and Was Not Rehired During Either the Redeployment Period or the Preferential Rehire Period Because He Was Replaced by Somebody Younger and Cheaper.**

44.     On May 8, 2017, Mr. Fonseca was notified by his manager that his employment was being terminated pursuant to the Workforce Reduction Plan, and that his termination date would be May 19, 2017.  In a letter, Mr. Fonseca was informed that "your position has been eliminated."  He was never given any further details regarding why he had been selected for termination under the Workforce Reduction Plan.

45.     Mr. Fonseca was informed that he would have two weeks as part of his "redeployment period" to find another job with HP.  If he was able to successfully find another position during that time, then he would be allowed to continue to work without interruption.  If he was not able to find another position at HP within the redeployment period, then he would be terminated and the 60-day "Preferential Rehire Period" would commence.  During that time, Mr. Fonseca would be allowed to apply for jobs within HP, and if he was selected then he would be re-hired without having to undertake the approval process normally required for a rehire.

46.     At the time that Mr. Fonseca was terminated, he was the oldest person in his work group.  He had previously worked with other individuals that

were older than him, however, they had already been terminated pursuant to the Workforce Reduction Plan.

47.    Mr. Fonseca received excellent performance reviews.  In his most recent performance review, his manager stated that he was one of the employees who "consistently achieve[s] their goals and demonstrate[s] HP's Leader Attributes and Behaviors in achieving these goals.  [His] contributions have a positive impact to the team, organization, and HP."  That review praised a number of Mr. Fonseca's achievements, including work that he did with other labs and sites beyond what was required of his position.  After listing the many contributions to HP that Mr. Fonseca had made during the period, his manager summarized, "That is an impressive list of accomplishments.  Bryant, you've really stepped up with your additional responsibilities and done a great job."

48.    Mr. Fonseca also received numerous performance related awards within his department.

49.    After his termination, Mr. Fonseca sought to be rehired by HP.  Mr. Fonseca applied to two different positions within the company, both of which he was incredibly qualified.  One position was located in Corvallis, Oregon.  He did not receive any response whatsoever with regard to that position.  The other position was in Vancouver, Washington.  He visited Vancouver in order to interview for this job.  Ultimately, high-level management denied him this position without giving any explanation.  As a result, Mr. Fonseca was not rehired by HP.

50.    As part of his benefits package under the Workforce Reduction Plan, HP paid for Mr. Fonseca to receive a four-month career transition program from Lee, Hecht, Henderson - a firm focusing career counseling.  Mr. Fonseca

participated in this program, however, he found it to be largely ineffective because the career counselor was largely unavailable, and her advice was more or less, "Applying for jobs is worthless," and getting a job is all about "Who you know."

51.    HP subsequently hired a new employee who was younger and less expensive than Mr. Fonseca to perform the tasks that he previously did.  Despite submitting multiple job applications every day since his termination, Mr. Fonseca has yet to find gainful employment.

52.    As a result of his unlawful termination, Mr. Fonseca has had to resort to government assisted welfare and food stamps in order to support his family and their three foster children.[2]  Mr. Fonseca's foster children have lost their medical care providers as well because his family was kicked off HP's health insurance plan.

**HP and 3D Systems, Inc.'s Conspiracy to Limit Competition.**

53.    In 2014, Ebay, through its former Chief Executive Officer ("CEO"), Meg Whitman, entered into a settlement with the Department of Justice ("DOJ") regarding a "no poach" agreement that HP entered into with Intuit.  Meg Whitman was either the CEO, on the Board of Directors, or both of HP during the time period from 2011 through 2018.  The no-poach agreement between HP and 3D Systems also occurred during Meg Whitman's watch.

54.    On or about November 2015, HP split their operations into two parts – one that focused on computers and printers, and one that focused on, among other things, servers, software, and consulting services.  HP's two entities (HP, Inc. &

---

[2] Mr. Fonseca has fostered approximately 35 children over the course of his life and has been the recipient of the Foster Parent of the Year award.

Hewlett Packard Enterprise Co.) came to a no-poach agreement with one another for a period of approximately 10 months.

55.    In 2016, HP expanded its 3-dimentional ("3D") printing operations and made substantial investment in that operation and technology.  HP's research and development budget increased in 2016, in the area of 3D printing.

56.    The 3D printing industry is highly competitive.  Two major competitors are HP and 3D Systems – who builds various 3D printer products and equipment.  In order to remain competitive in this emerging and highly competitive market space (3D printing) and keep pace with the technological advancement in the printing industry, HP had to look for ways to minimize competition with other competitors.

57.    Technology employees, such as the employees who work for 3D Systems and HP, are frequently in high demand due to their specialized technology skills and ability.  As HP began engaging in more business in the 3D printing market space, 3D Systems began aggressively poaching (i.e., hiring-away) HP's talent – starting with HP's top printing executives and working its way down through managers and other talent.

58.    For example, in approximately early 2016, 3D Systems hired Vyomesh Joshi, HP's Executive Vice President of Imaging and Printing at HP Inc. to be 3D System's new CEO.  Mr. Joshi was "a former HP executive with significant connections to HP." (Engineering.com (April 28, 2016.)  "So HP Won't Be Buying 3D Systems?")  Prior to becoming 3D System's new CEO, Joshi had a "30 year career at HP, where he served as the Executive Vice President of the Imaging and Printing Group." (TechCrunch.com (2016) 3D Systems Outlines Plans to Shift 3D Printing from Prototype to Production.)

59.    In his first few months as CEO of 3D Systems the former HP executive began "revealing some *major changes* for 3D Systems." In fact, almost immediately after Mr. Joshi was hired by 3D Systems, 3D Systems' management began to aggressively poach HP's top talent – including, without limitation, executives, managers and engineers, replacing many of 3D System's "C suite" executives with HP personnel. After arriving at 3D Systems, 3D's new CEO himself stated "I am reorganizing. I'm augmenting the management team I have with exceptional people that helped me to grow and scale HP's printing business. I'm hiring regional managers. I've already hired a CFO. I already hired a supply chain manager." In fact, Joshi immediately hired away approximately six high-level HP employees to 3D Systems' management team. Given the normally increasing value of top-level workers in the printing and technology space, unsurprisingly 3D Systems began aggressively hiring many top-level HP employees away from HP – especially at a time when 3D Systems had just hired its CEO from HP and was in need of improving its own stock value.

60.    When Joshi was HP's VP of Imaging and Printing (before he became 3D Systems' CEO), he developed a close business relationship with a number of top-level executives at HP, including, without limitation, Stephen Nigro – who, on information and belief, was promoted to President of HP's 3D Printing unit once Joshi became the CEO of 3D Systems.

61.    Accordingly, soon after Joshi began executing 3D System's campaign of poaching away top talent from HP, HP's executives and 3D System's executives entered into a "cease-fire", in the form of an no-poach agreement – an agreement whereby each of HP and 3D Systems would take necessary measures to refrain from soliciting the hiring of one another's employees through, for example cold

calling, and to dissuade their own current employees from applying for work at the other company. On information and belief through investigations, this "cease-fire" arrangement was initiated by a phone call made to Joshi by Ron Coughlin, who at the time was an HP executive who had recently had some of his top employees hired-away by Joshi and 3D Systems. Based on witness investigations, Plaintiff is informed and believes that Coughlin called Joshi and told him to stop hiring away HP's employees, and during this phone call and subsequent communications between Joshi, Coughlin and Nigro in 2016, Joshi agreed to comply so long as the arrangement was mutual. Accordingly, in or around 2016, both 3D Systems and HP ceased cold-calling each other's employees in furtherance of the conspiracy.

62.    Further, HP and 3D Systems also ceased hiring one another's employees through third party recruiting firms in furtherance of the conspiracy.

63.    Additionally, HP and 3D Systems also shared pay scales with one another to assure that they would not be in a bidding war with one another to retain top talent. HP and 3D Systems' sharing of pay scales, assured that 3D Systems would not poach HP's employees in its printing group by offering HP employees more compensation. For instance, average salaries at 3D Systems during the relevant time period were $73,007 (payscale.com) and $130,265 in San Diego (paysa.com). However, Plaintiff made approximately $50,000 annually (with additional compensation for overtime worked) and other employees in Plaintiff's printing group at HP made approximately the same amount annually. Thus, before the no poach/no solicitation agreement was reached, 3D Systems could more easily poach HP employees by offering them more compensation, and HP wanted to avoid a bidding war to prevent incurring added costs of retaining talented employees. This conduct was in furtherance of the conspiracy with the intended

effect to suppress wages of its employees, and restraining trade; thus, causing injury to Plaintiff and the Antitrust Class (defined below). Tellingly, soon after the no-poach agreement went into effect, an increasing number of 3D System employees began publicly voicing their concerns about no longer receiving competitive wages at 3D Systems. (*See, e.g.,* glassdoor.com).

64. As a result of this deal both companies gained renewed confidence in their respective abilities to retain top talent while minimizing operational costs – i.e., payroll costs. Joshi himself openly stated that he was confident he could boost 3D Systems' earnings by *fixing and improving operational efficiency*, […] *even while end-market demand remains subdued*." (Investor's Business Daily (April 2016) "As 3D Systems, Stratasys Jump, Is 3D Printer Market Set to Rebound?")

65. As a result, by approximately August 2016, soon after HP's CHIL group had been dissolved and 3D Systems had poached a significant number of talented HP employees, the no-poach agreement between the two companies began to take effect. Managerial level HP employees began holding meetings with their subordinate employees to try to carry out HP's side of the bargain under the no-poach agreement. For example, in approximately August 2016, the managers of the team at HP where Mr. Fonseca was employed called a meeting during which hundreds of HP employees were informed that they were required to immediately notify HP if they were offered a position with 3D Systems. They were further informed that any HP employee that was offered a position with 3D Systems would not be allowed to receive the severance check that he or she would otherwise be entitled to under the Workforce Reduction Plan's release agreement, according to the individuals conducting the meeting. This deterred HP employees from applying at 3D Systems by alleviating pressure on 3D Systems to extend interviews or hiring

at least some HP employees for purposes of concealing the no-poach agreement.  As a result, outgoing employees, including Plaintiff, stopped seeking employment at 3D Systems; thus, causing Plaintiff and the Antitrust Class injury.

66.    Moreover, HP employees chosen for termination per the WFR were prevented from seeking employment with 3D Systems.  Specifically, the WFR had a provision stating it was "misconduct" to fail to notify your manager if you accept employment at a competitor, and it is grounds for a "misconduct termination." Further, as stated, the WFR provided:

> *If you accept a position with a competitor during the WFR Redeployment Period, you will terminate your Plan participation at that point and you will not be eligible for the Cash Severance Pay. ....*

This provision was an additional reason that HP employees selected for the WFR , like Plaintiff, stopped seeking employment with 3D Systems; thus, causing Plaintiff and the Antitrust Class injury.

67.    Additionally, HP acted consistent with the terms of a no-poach agreement with 3D Systems by taking action against its own employees who violated the directives designed to dissuade them from applying for work with 3D Systems.  For instance, during at least one work group meeting Mr. Fonseca and other employees were informed that one of their coworkers had "interviewed with 3D Systems" and "that is why HP terminated him."

68.    Likewise, other managers informed Mr. Fonseca and hundreds of other employees that "if you are being laid off, we will help you with job searches, but, if you are applying to or talking with 3D Systems, I don't want to know about it, because if I or my managers know about it, you will get 'escorted-

out'" – meaning you will be "immediately terminated and forfeit your right to any of the benefits of the severance package" you otherwise would have been given. That manager went on to inform the large room full of HP employees that he has even witnessed other employees be escorted out of HP because of interviewing with 3D Systems. This chilled HP employees from interviewing or applying to 3D Systems furthering the anticompetitive goals of HP's and 3D Systems' no-poach agreement.

69.    Upon Plaintiff's information and belief, HP's conspiracy and agreement with 3D Systems stopped or greatly limited 3D Systems from attempting to hire outgoing HP employees, and vice versa, and the companies' respective implementation of the agreement caused Mr. Fonseca and other employees to refrain from applying (or delay in applying) to the other company.

70.    Furthermore, on information and belief, the no-poach agreement between 3D Systems and HP resulted in the suppression of 3D Systems' hiring current and outgoing employees from HP, including Mr. Fonseca.

71.    In fact, in 2017, at the time that Mr. Fonseca's employment with HP ended, he applied to 3D Systems. Mr. Fonseca would have applied sooner but for the directives from HP management informing him of repercussions if he applied to 3D Systems. Nevertheless in 2017, at the time Mr. Fonseca eventually applied to 3D Systems, he also specifically inquired about his job applications and open positions at 3D Systems by reaching out to at least two hiring managers at 3D Systems, Dave Tribolet and Shawn Nielson. In response to his submitted application and his separate and concurrent inquiries, 3D Systems did not hire Mr. Fonseca. Nor did 3D Systems even offer Mr. Fonseca an interview for any of the open positions for which he was well qualified. Other than informing him that

there was no other place for him to submit an application other than 3D Systems' main website, Mr. Fonseca did not receive any additional feedback or response from 3D Systems. The intended and actual effect of this "no poach" conspiracy was that it restricted recruitment, fixed and suppressed employee compensation, and imposed unlawful restrictions on employee mobility. Thus, Plaintiff as well as the Class suffered injury.

72.    In October 2016, the DOJ's Antitrust Division released its "Antitrust Guidance for Human Resource Professionals." (Ex. B.) The publication regarded the issue of "no poach" agreements. The Antitrust Division recommended that companies "implement safeguards to prevent inappropriate discussions or agreements with other firms seeking to hire the same employees." Despite its history entering into "no poach" agreements, HP did not have any safeguards in place that would prevent companies from agreeing not to actively hire each other's employees. On information and belief, 3D Systems likewise had no safeguards in place that would prevent it from agreeing not to hire away another company's employees.

73.    Also, in the DOJ's memorandum, it stated that "[i]t is _unlawful_ for competitors to expressly or _implicitly_ agree not to compete with one another, even if they are motivated by a desire to reduce costs," and that "[i]t does not matter whether the agreement is informal or formal, written or unwritten, spoken or unspoken." And, also stated, "[e]ven if an individual does not agree orally or in writing to limit employee compensation or recruiting, other circumstances – such as evidence of discussions and parallel behavior – may lead to an inference that an individual has agreed to do so."

74.     The DOJ memorandum went on to state, "no-poaching agreements among employers, whether entered into directly or through a third-party intermediary, are **_per se_** illegal under the antitrust laws.  That means that if the agreement is separate from or not reasonably necessary to a larger legitimate collaboration between the employers, the agreement is deemed illegal **_without any inquiry into its competitive effects_**."  HP and 3D Systems did not have any such legitimate joint venture or collaborative agreements.  Rather, the arrangement was a naked agreement not to poach or hire each others' employees.  Thus, the illegal nature of the agreement is established without any inquiry into its competitive effects per the DOJ guidelines.

75.     Given the DOJ's prohibition of no poach agreements, combined with the fact that HP desperately needed to maintain a competitive workforce, HP entered into the above described anti-poach agreement with 3D Systems, while concealing that agreement from investors and the public.  In HP's SEC 2016 – 10K filing it admits that its ability to remain competitive relied heavily on maintaining a competitive workforce.  Nevertheless, HP concealed the fact that it entered into the no-poach agreement with 3D Systems.  HP's 2016 – 10K filing stated the following:

> **Risk Factors.**  The process of developing new high-technology products and services and enhancing existing products and services is complex, costly and uncertain, and any failure by us to anticipate customers' changing needs and emerging technological trends accurately could significantly harm our market share, results of operations and financial condition. For example, to offset industry declines in some of our businesses, we must successfully grow in adjacencies such as copier printers, maintain our strong position in graphics, develop and introduce 3D printers and execute on our strategy to grow commercial mobility by providing specialized

products and services to address the needs of our customers. We must make long-term investments, develop or acquire and protect appropriate intellectual property, and commit significant research and development and other resources before knowing whether our predictions will accurately reflect customer demand for our products and services. Any failure to accurately predict technological and business trends, control research and development costs or execute our innovation strategy could harm our business and financial performance. **Our research and development initiatives may not be successful in whole or in part, including research and development projects which we have prioritized with respect to funding and/or personnel.**

Our industry is subject to rapid and substantial innovation and technological change. Even if we successfully develop new products and technologies, future products and technologies may eventually supplant ours if we are unable to keep pace with technological advances and end-user requirements and preferences and timely enhance our existing products and technologies or develop new ones. Our competitors may also create products that replace ours. As a result, any of our products and technologies may be rendered obsolete or uneconomical.

76.     HP also put a premium on the "*hiring* and *retention of key employees*," and thus the poaching of employees in their printing unit was cause for concern.

77.     In its 2017 and 2018 10-K filings, HP also placed an emphasis on "expanding our footprint in the 3D printing marketplace" and "accelerating growth in Graphics solutions and 3D printing."  And, having 3D printing became more and more profitable and became necessary to offset revenue losses elsewhere.  In its 2017 10-K filing, HP stated, "to offset industry declines in some of our businesses, we must successfully grow in adjacencies such as copier

printers, maintain our strong position in graphics, ***develop and introduce 3D printers***."

78.     On July 15, 2019, a group of State Attorney Generals, including California, issued a 15 page letter ("Letter"), in response to the Federal Trade Commissions request for comments on Competition and Consumer Protection in the 21st Century. (Ex. C.)  Significant focus was placed on the problem of "no-poach" agreements between competing companies, and that was one of the reasons that "workers have suffered a decline in relative income."

79.     The Letter stated, "horizontal agreements between competing employers, including no-poach agreements, have been characterized as restraints of trade that have no purpose other than to restrain competition, and thus are ***per se*** illegal under antitrust law."  And, further, "[t]hese types of agreements are ***per se*** illegal under antitrust law and enforcement in these cases is relatively straightforward," and, "increased judicial experience with [no-poach agreement] arrangements will likely lead to that outcome."

80.     HP's conspiracy and agreements restrained trade and the overarching conspiracy is *per se* unlawful under California and federal law.  Plaintiff and the Antitrust Class seek injunctive relief and damages for violations of the Cartwright Act (Cal. Bus. and Code §§ 16720, et seq.), California Business and Professions Code sections 16600 and 17200, *et seq.*, and Sherman Act (15 U.S.C. § 1.)

81.     In a lawfully competitive labor market, HP would have needed to consider the risk that a particular competitor would hire one of its employees when deciding whether to terminate that employee.  The risk that an employee might begin working for a competitor also would have been prominent for HP in deciding how much it was willing to pay in order to retain that employee.

Because of HP's agreement with 3D Systems, some of HP's employees became artificially disposable as their value to competitors was instantly eliminated.  This allowed HP to terminate employees that it would not otherwise terminate because they did not have to worry about whether the competitive labor market would drive their former employee to a competitor.  HP and each of its co-participants would also have competed against each other for employees and would have hired employees according to the needs of their business and the going market rates for employee wages.  And, in such a lawfully competitive labor market, the participants of the secret "no poach" agreements would have engaged in such employee hiring in direct competition with one another, resulting in employees accepting offers from the company who makes the most favorable offer of employment.

82.    Additionally, in a lawfully competitive labor market, an outgoing employee would have the ability to apply to all possible employers and then accept a position with the employer that offered him or her the highest salary. Employers would be incentivized to offer higher salaries to more valuable prospective employees in order to ensure that they were not outbid.  Because of the agreement in this case (1) outgoing employees (including Mr. Fonseca)  were restricted from seeking employment with 3D Systems, and were denied any salary offer that they might have made and (2) HP and other potential employers were not pressured to outbid 3D Systems for outgoing employees' services, thus paid below-market rates for their employees' services.

83.    The competitive marketplace helps to ensure that companies can benefit by taking advantage of rivals' efforts expended soliciting, interviewing, and training skilled employees – provided they pay salaries sufficient to lure

employees away from competitors. The competitive marketplace also benefits the public by fostering the flow of new non-proprietary information, skills, and technologies across competing industry leaders. And, for obvious reasons, this competitive process benefits our country's work force by compensating employees for the fair market value of their skills, knowledge, and experience.

84.    For these reasons, competitive hiring serves as a critical role, particularly in the high technology industry where companies benefit from obtaining employees with advanced skills and abilities. By restricting hiring, employee salaries at competing companies are restricted and depressed, decreasing the pressure of an employee's current employer to match a rival's offer and vice versa. Restrictions on hiring also limit an employee's leverage when negotiating his or her salary with his or her current employer. Furthermore, when companies restrict hiring of rival companies' employees the wages of those employees are suppressed because companies are not bidding against each other. As a result, the effects of hiring restrictions impact all employees of participating companies, namely HP and 3D Systems, so that competition between the two companies was injured.

85.    Plaintiff and each member of the Antitrust Class was harmed and injured by this secretive no-poach arrangement. HP and 3D Systems purposefully destroyed competition. HP and 3D, through the secretive no-poach agreement, eliminated competition, suppressed compensation, and restricted mobility all which had a negative cumulative effect on the Antitrust class members' wages; thus, inflicting injury.

///

///

## CLASS ALLEGATIONS

86.     This class action is properly brought under the provisions of California Code of Civil Procedure section 382, and, to the extent applicable, the procedural provisions of Rule 23 of the Federal Rules of Civil Procedure, which have been adopted by the California Supreme Court for use by the trial courts of this State.  Plaintiff brings this class action on behalf of himself and all others similarly situated, with Plaintiff proceeding as the representative member of the following classes defined as:

> All current, former, or prospective employees who worked for HP in the State of California between April 22, 2012, and present who were at least 40 years old at the time HP selected them for termination under HP's Workforce Reduction Plan. ("Age Discrimination Class").

> All natural persons employed by HP in the United States on a salaried basis at any time from January 1, 2016 to the present (the "Class Period"). ("Antitrust Class").

87.     To the extent equitable tolling applies to toll claims by the above-referenced Class' against Defendants, the class period should be adjusted accordingly.

88.     This action has been brought and may properly be maintained as a class action, under California Code of Civil Procedure section 382 because a well-defined community of interest in the litigation exists and because the proposed class is easily ascertainable, and for the other reasons explained in this Class Action Complaint.

89.     <u>Numerosity:</u>  The persons who comprise Age Discrimination Class and the Antitrust Class (collectively, the "Plaintiff Classes") are so numerous that joinder of all such persons would be unfeasible and impracticable.  The

membership of Plaintiff Classes is unknown to Plaintiff at this time; however, the Age Discrimination Class alone is at least one thousand seven hundred individuals, whose identities are readily ascertainable by inspection of HP's payroll records.

90.    <u>Commonality:</u>  Common questions of fact or law arising from HP's conduct exist, as described in this Complaint, as to all members of Plaintiff Classes, which predominate over any questions solely affecting individual members of the proposed class, including but not limited to:

- Whether HP's policies or practices relating to the Workforce Reduction Plan were based on discriminatory intent towards employees over 40 who were otherwise qualified for those positions;

- Whether HP's Workforce Reduction Plan had a disproportionate adverse impact on its California employees aged 40 or older;

- Whether HP's policy of selecting employees to terminate under its Workforce Reduction Plan had a disproportionate adverse effect on those California employees aged 40 or older;

- Whether HP's termination selection policy (i.e., the Workforce Reduction Plan) was a substantial factor in causing the Class member terminations (i.e., harm);

- Whether HP failed to adequately investigate, respond to, and/or appropriately resolve instances of age discrimination in the workplace;

- Whether HP failed to implement policies and practices to prevent discrimination against older employees.

- Whether HP's Workforce Reduction Plan was an unfair, unlawful, deceptive, and or fraudulent business practice;

- Whether an alternative or modification to the Workforce Reduction Plan existed that would have had less of an adverse impact on employees aged 40 years and older;

- Whether HP's anti-competitive conspiracies, associated agreements, and practices violated the Cartwright Act;

- Whether HP's anti-competitive conspiracies, associated agreements, and practices restrained trade, commerce, or competition violated Business and Professions Code section 16600, *et seq*.;

- Whether HP's anti-competitive conspiracies, associated agreements, and practices constituted unlawful or unfair business acts or practices in violation of California Business and Professions Code section 17220; and

- Whether HP's anti-competitive conspiracies, associated agreements, and practices caused antitrust injury;

91.     HP's defenses, to the extent that any such defense is applied, are applicable generally to Plaintiff Classes and are not distinguishable to any degree relevant or necessary to defeat predominance in this case.

92.     <u>Typicality</u>:  Plaintiff's claims are typical of the claims for the members of the Age Discrimination Class and Antitrust Class as a whole, all of whom have sustained and/or will sustain injuries, including irreparable harm, as a legal (proximate) result of HP's common course of conduct as complained of in this operative complaint.  Plaintiff's class claims are typical of the claims of the Age Discrimination Class and Antitrust Class because HP used its policies and practices (i.e., its Workforce Reduction Plan, accompanying Preferential Rehire Period, and anti-competitive practices) to subject Plaintiff and each member of the Age Discrimination Class and Antitrust Class to identical unfair, unlawful, deceptive, and/or fraudulent business practices, acts, and/or omissions.

93.     <u>Adequacy</u>:  Plaintiff, on behalf of all others similarly situated, will fairly and adequately protect the interests of all members of the Age Discrimination Class and Antitrust Class in connection with which they have

retained competent attorneys. Plaintiff is able to fairly and adequately protect the interests of all members of the aforementioned Classes because it is in Plaintiff's best interests to prosecute the claims alleged herein to obtain full compensation due to them. Plaintiff does not have a conflict with either the Age Discrimination Class nor the Antitrust Class, and his interests are not antagonistic to either of those Classes. Plaintiff has retained counsel who are competent and experienced in representing employees in complex class action litigation

94.    <u>Superiority:</u>  Under the facts and circumstances set forth above, class action proceedings are superior to any other methods available for both fair and efficient adjudication of the controversy. A class action is particularly superior because the rights of each member of the Age Discrimination Class or Antitrust Class, inasmuch as joinder of individual members of either Class is not practical and, if the same were practical, said members of the Age Discrimination Class or the Antitrust Class could not individually afford the litigation, such that individual litigation would be inappropriately burdensome, not only to said citizens, but also to the courts of the State of California.

95.    Litigation of these claims in one forum is efficient as it involves a single decision or set of decisions that affects the rights of thousands of employees. In addition, class certification is superior because it will obviate the need for unduly duplicative litigation that might result in inconsistent judgment concerning HP's practices.

96.    To process individual cases would increase both the expenses and the delay not only to members of the Age Discrimination Class, but also to HP and the Court. In contrast, a class action of this matter will avoid case management difficulties and provide multiple benefits to the litigating parties, including

efficiency, economy of scale, unitary adjudication with consistent results and equal protection of the rights of each member of the Age Discrimination Class and Antitrust Class, all by way of the comprehensive and efficient supervision of the litigation by a single court.

97.     This case is eminently manageable as a class.  Defendants' computerized records, including meticulous payroll and personnel data, provide an accurate and efficient means to obtain information on the effect and administration of the Workforce Reduction Plan *en masse*, including class-wide damages, meaning class treatment would significantly reduce the discovery costs to all parties.

98.     In particular, since HP is obfuscating the import of its Workforce Reduction Plan, misleading its employees, suppressing their wages and mobility, the Age Discrimination Class and Antitrust Class are neither sophisticated nor legally knowledgeable enough be able to obtain effective and economic legal redress unless the action is maintained as a class action.  Given the unlikelihood that many injured class members will discover, let alone endeavor to vindicate, their claims, class action is a superior method of resolving those claims.

99.     There is a community of interest in obtaining appropriate legal and equitable relief for the common law and statutory violations and other improprieties, and in obtaining adequate compensation for the damages and injuries which HP's actions have inflicted upon Plaintiff and the Age Discrimination Class or the Antitrust Class.

100.     There is also a community of interest in ensuring that the combined assets and available insurance of HP are sufficient to adequately compensate the members of the Age Discrimination Class or Antitrust Class for the injuries

sustained.

101.     Notice of the pendency and any result or resolution of the litigation can be provided to members of the Age Discrimination Class or the Antitrust Class by the usual forms of publication, sending out to members a notice at their current addresses, establishing a website where members can choose to opt-out, or such other methods of notice as deemed appropriate by the Court.

102.     Without class certification, the prosecution of separate actions by individual members of the Plaintiff Classes would create a risk of: (1) inconsistent or varying adjudications with respect to individual members of Age Discrimination Class and Antitrust Class that would establish incompatible standards of conduct for HP; or (2) adjudications with respect to the individual members of Age Discrimination Class and Antitrust Class that would, as a practical matter, be disparities of the interests of the other members not parties to the adjudication, or would substantially impair or impede their ability to protect their interest.

## FIRST CAUSE OF ACTION

**Age Discrimination: Disparate Treatment – Cal. Govt. Code § 12900 *et seq.***

**(Plaintiff Bryant Fonseca, on Behalf of Himself and the Age Discrimination Class Against Defendants)**

103.     Mr. Fonseca, on behalf of himself and the Age Discrimination Class, re-alleges and incorporates by reference, as though fully set forth herein, all of the preceding paragraphs.

104.     Under the Fair Employment & Housing Act ("FEHA"), it is unlawful for an employer to use its employee's age as a basis to terminate or lay off, refuse to hire, re-hire, or re-instate, or discriminate in compensation or in terms, conditions, or

privileges of employment. (Cal. Govt. Code § 12940(a).)

105.    The FEHA protects employees over the age of 40. (Cal. Govt. Code §§ 12926(b), 12941(a).)  Mr. Fonseca was an employee of HP over the age of 40—when HP fired Mr. Fonseca, he was 55 years old.  Thus, because Mr. Fonseca was an employee over the age of 40 at the time of his firing, he is in a class of persons protected by the FEHA.  Likewise, all members of the Age Discrimination Class were aged 40 or over at the time of their termination pursuant to the Workforce Reduction Plan and are thus protected by the FEHA.

106.    The FEHA covers "employers" who are "regularly employing five or more persons." (Cal. Gov't Code § 12926(d).)  HP employs more than five persons and is therefore an employer under the FEHA.

107.    As referenced above, Mr. Fonseca filed timely charges with the DFEH against Hewlett-Packard Company, HP Enterprise Services, LLC, and HP Inc. and received an immediate right to sue notice.  Mr. Fonseca served the charge and right-to-sue letter upon Hewlett-Packard Company, HP Enterprise Services, LLC, and HP Inc.

108.    Defendants' terminating or laying off Mr. Fonseca and the members of the Age Discrimination Class because of their age constitutes willful, knowing, intentional, and unlawful discrimination in violation of the FEHA.

109.    Defendants' not re-hiring, re-instating, or hiring Mr. Fonseca and the members of the Age Discrimination Class, especially in comparable positions, because of their age constitutes willful, knowing, intentional, and unlawful discrimination in violation of the FEHA.

110.    Defendants denying Mr. Fonseca and the members of the Age Discrimination Class the benefits of their employment with Defendants because of

their age constitutes willful, knowing, intentional, and unlawful discrimination in violation of the FEHA.

111.    Mr. Fonseca is informed and believes, and based thereon alleges, that his and the members of the Age Discrimination Class's years of age was the substantial motivating factor in Defendants' decision to terminate Plaintiff and the members of the Age Discrimination Class.

112.    In addition to the conduct described above, Defendants have failed to prevent, respond to, adequately investigate, and/or appropriately resolve instances of age discrimination in the workplace.

113.    As a direct and proximate result of Defendants' willful, knowing, and intentional discrimination against Mr. Fonseca and the members of the Age Discrimination Class, Mr. Fonseca and the members of the Age Discrimination Class have suffered and will continue to suffer pain and suffering, and extreme and severe mental anguish and emotional distress.  Mr. Fonseca and the members of the Age Discrimination Class are therefore entitled to general and compensatory damages in an amount to be proven at trial.

114.    As a direct and proximate result of Defendants' willful, knowing, and intentional discrimination against Mr. Fonseca and the members of the Age Discrimination Class, Mr. Fonseca and the members of the Age Discrimination Class have incurred and will continue to incur a loss of earnings and other employment benefits and job opportunities.  Mr. Fonseca and the members of the Age Discrimination Class are therefore entitled to general and compensatory damages in amounts to be proven at trial.

115.    Mr. Fonseca is informed and believes, and based thereon alleges, that Defendants' outrageous conduct directed at Mr. Fonseca and the members of the Age

Discrimination Class described above, was done with malice, fraud, or oppression and with conscious and/or reckless disregard for the rights of Mr. Fonseca and the members of the Age Discrimination Class, and with the intent, design, and purpose of injuring them.  Defendants, through their officers, managing agents, and or their supervisors, authorized, condoned, and or ratified the unlawful of all of the other defendants.  Thus, Mr. Fonseca and the members of the Age Discrimination Class are entitled to exemplary or punitive damages from Defendants in amounts to be determined according to proof at trial.

116.    As a further direct and proximate result of Defendants' actions, Mr. Fonseca and the members of the Age Discrimination Class are entitled to and seek their attorney fees and costs. (*See* Cal. Govt. Code § 12965(b).)

117.    Mr. Fonseca and the members of the Age Discrimination Class also seek the "affirmative relief" or "prospective relief" afforded them under California Government Code section 12926(a).

## SECOND CAUSE OF ACTION

**Age Discrimination: Disparate Impact – Cal. Govt. Code §§ 12940(a), 12941**

**(Plaintiff Bryant Fonseca, on Behalf of Himself and the Age Discrimination Class Against Defendants)**

118.    Mr. Fonseca, on behalf of himself and the Age Discrimination Class, re-alleges and incorporates by reference, as though fully set forth herein, all of the preceding paragraphs.

119.    The FEHA protects employees over the age of 40. (Cal. Govt. Code §§ 12926(b), 12941(a).)  Mr. Fonseca was an employee of HP over the age of 40—when HP fired Mr. Fonseca, he was 55 years old.  Thus, because Mr. Fonseca was an employee over the age of 40 at the time of his firing, he is in a class of persons

protected by the FEHA.  Likewise, all members of the Age Discrimination Class were aged 40 or over at the time of their termination pursuant to the Workforce Reduction Plan and are thus protected by the FEHA.

120.    When Mr. Fonseca and the members of the Age Discrimination Class applied for other positions within HP and HP refused to select them for comparable positions within HP, Mr. Fonseca and the members of the Age Discrimination Class were aged 40 or over and were therefore in a class of persons the FEHA protects.

121.    The FEHA covers "employers" who are "regularly employing five or more persons." (Cal. Govt. Code § 12926(d).)  HP employs more than five persons and is therefore an employer under the FEHA.

122.    As part of its reduction in workforce, HP implemented its Workforce Reduction Plan.

123.    HP's Workforce Reduction Plan disproportionately selected for termination HP's employees aged at least 40 years.  Further, HP's Workforce Reduction Plan disproportionately terminated the employment of HP's employees aged at least 40 years.  For example, among all those terminated under the Workforce Reduction Plan, over 85% were at least 40 years old.  In other words, out of a total of 2,076 employees laid off under the Workforce Reduction Plan, 1,765 were 40 years old or older.  HP's Workforce Reduction Plan adversely affected Mr. Fonseca and the members of the Age Discrimination Class through HP selecting and terminating them.  Mr. Fonseca and the members of the Age Discrimination Class were also adversely affected by Defendants not re-hiring, re-instating, or hiring Mr. Fonseca and the members of the Age Discrimination Class, especially in comparable positions.

124.    HP's implementation of the Workforce Reduction Plan was a substantial

factor in directly and proximately causing harm to Mr. Fonseca and the members of the Age Discrimination Class.

125.    In addition to the conduct described above, Defendants have failed to prevent, respond to, adequately investigate, and/or appropriately resolve instances of age discrimination in the workplace.

126.    As a substantial direct and proximate result of HP implementing the Workforce Reduction Plan to terminate Mr. Fonseca and the members of the Age Discrimination Class, Mr. Fonseca and the members of the Age Discrimination Class have suffered and will continue to suffer pain and suffering, and extreme and severe mental anguish and emotional distress. Mr. Fonseca and the members of the Age Discrimination Class are therefore entitled to general and compensatory damages in an amount to be proven at trial.

127.    As a substantial direct and proximate result of HP implementing the Workforce Reduction Plan against Mr. Fonseca and the members of the Age Discrimination Class, Mr. Fonseca and the members of the Age Discrimination Class have incurred and will continue to incur a loss of earnings and other employment benefits and job opportunities.  Mr. Fonseca and the members of the Age Discrimination Class are therefore entitled to general and compensatory damages in amounts to be proven at trial.

128.    Mr. Fonseca is informed and believes, and based thereon alleges, that Defendants' outrageous conduct directed at Mr. Fonseca and the members of the Age Discrimination Class described above, was done with malice, fraud, or oppression and with conscious and/or reckless disregard for the rights of Mr. Fonseca and the members of the Age Discrimination Class, and with the intent, design, and purpose of injuring them.  Defendants, through their officers, managing agents, and or their

supervisors, authorized, condoned, and or ratified the unlawful of all of the other defendants.  Thus, Mr. Fonseca and the members of the Age Discrimination Class are entitled to exemplary or punitive damages from Defendants in amounts to be determined according to proof at trial.

129.    As a further direct and proximate result of Defendants' actions, Mr. Fonseca and the members of the Age Discrimination Class are entitled to and seek their attorneys' fees and costs. (*See* Cal. Govt. Code § 12965(b).)

130.    Mr. Fonseca and the members of the Age Discrimination Class also seek the "affirmative relief" or "prospective relief" afforded them under California Government Code section 12926(a).

## THIRD CAUSE OF ACTION

### Wrongful Termination in Violation of Public Policy

### (Plaintiff Bryant Fonseca, on Behalf of Himself and the Age Discrimination Class Against Defendants)

131.    Mr. Fonseca, on behalf of himself and the Age Discrimination Class, re-alleges and incorporates by reference, as though fully set forth herein, all of the preceding paragraphs.

132.    It is the public policy of the State of California, as expressed in the FEHA (Cal. Gov't Code § 12940, *et seq.*) and Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e, *et seq.*) that employers shall not subject employees to age discrimination and terminate employees because of age.  This public policy of the State of California is one that benefits the public at large and guarantees the rights of employees to perform their work free from discrimination.  Further public policy support for the wrongful termination claims of Mr. Fonseca and the members of the Age Discrimination Class is also found in California Labor Code sections 6300,

6400, and the California Constitution Article I, section 8.

133.    As a direct and proximate result of Defendants' willful, knowing, and intentional discriminatory termination against Mr. Fonseca and the members of the Age Discrimination Class, Mr. Fonseca and the members of the Age Discrimination Class have suffered and will continue to suffer pain and suffering and extreme and severe mental anguish and emotional distress.  Mr. Fonseca and the members of the Age Discrimination Class are thereby entitled to general and compensatory damages in amounts to be proven at trial.

134.    As a direct and proximate result of Defendants' willful, knowing, and intentional discriminatory termination against Mr. Fonseca and the members of the Age Discrimination Class, Mr. Fonseca and the members of the Age Discrimination Class have incurred and will continue to incur a loss of earnings and other employment benefits and job opportunities.  Mr. Fonseca and the members of the Age Discrimination Class are thereby entitled to general and compensatory damages in amounts to be proven at trial.

135.    Mr. Fonseca is informed and believes, and based thereon alleges, that Defendants directed the outrageous conduct directed at Mr. Fonseca and the members of the Age Discrimination Class, as described above, with malice, fraud, and or oppression and with conscious disregard for the rights of Mr. Fonseca and the members of the Age Discrimination Class and with the intent, design, and purpose of injuring them.  Defendants, through their officers, managing agents and or their supervisors, authorized, condoned and or ratified the unlawful conduct of all of the other defendants.  Thus, Mr. Fonseca and the members of the Age Discrimination Class are entitled to punitive or exemplary damages in a sum according to proof at trial.

136.    Plaintiff is entitled to an award of attorneys' fees and costs in prosecuting this action against Defendants under California Code of Civil Procedure section 1021.5 and other applicable law.  A successful outcome in this action will confer on the general public and a large class of persons (the Age Discrimination Class) both a pecuniary and nonpecuniary benefit and will result in the enforcement of important rights affecting the public interest.  The necessity and financial burden of private enforcement furthermore make such an award appropriate.

## FOURTH CAUSE OF ACTION

**Failure to Prevent Discrimination – Cal. Govt. Code §§ 12900, *et seq*.**

**(Plaintiff Bryant Fonseca on Behalf of Himself and the Age Discrimination Class Against Defendants)**

137.    Mr. Fonseca, on behalf of himself and the Age Discrimination Class, re-alleges and incorporates by reference, as though fully set forth herein, all of the preceding paragraphs.

138.    The FEHA protects employees over the age of 40. (Cal. Gov't Code §§ 12926(b), 12941(a).)  Mr. Fonseca was an employee of HP over the age of 40—when HP fired Mr. Fonseca, he was 55 years old.  Thus, because Mr. Fonseca was an employee over the age of 40 at the time of his firing, he is in a class of persons protected by the FEHA.  Likewise, all members of the Age Discrimination Class were aged 40 or over at the time of their termination pursuant to the Workforce Reduction Plan and are thus protected by the FEHA.

139.    The FEHA covers "employers" who are "regularly employing five or more persons." (Cal. Govt. Code § 12926(d).)  HP employs more than five persons and is therefore an employer under the FEHA.

140.    HP subjected Mr. Fonseca and the members of the Age Discrimination

Class to discrimination when HP selected Mr. Fonseca and the members of the Age Discrimination Class for termination under HP's Workforce Reduction Plan. In addition, HP subjected Mr. Fonseca and the members of the Age Discrimination Class to discrimination when HP terminated Mr. Fonseca and the members of the Age Discrimination Class under the Workforce Reduction Plan. Mr. Fonseca and the members of the Age Discrimination Class were also subjected to discrimination by Defendants not re-hiring, re-instating, or hiring Mr. Fonseca and the members of the Age Discrimination Class, especially in comparable positions.

141.    HP failed to take all reasonable steps to prevent Mr. Fonseca and the members of the Age Discrimination Class's discriminatory selection and termination under HP's Workforce Reduction Plan. HP's failure to take reasonable steps to prevent Mr. Fonseca and the members of the Age Discrimination Class's discriminatory termination under HP's Workforce Reduction Plan was a substantial factor in causing harm to Mr. Fonseca and the members of the Age Discrimination Class.

142.    As a substantial direct and proximate result of Defendants willfully, knowingly, and intentionally discriminating against Mr. Fonseca and the members of the Age Discrimination Class, Mr. Fonseca and the members of the Age Discrimination Class have suffered and will continue to suffer pain and suffering and extreme and severe mental anguish and emotional distress. Thus, Mr. Fonseca and the members of the Age Discrimination Class are entitled to general and compensatory damages in an amount to be proven at trial.

143.    As a substantial direct and proximate result of Defendants' willful, knowing, and intentional discrimination against Mr. Fonseca and the members of the Age Discrimination Class, Mr. Fonseca and the members of the Age Discrimination

Class have incurred and will continue to incur a loss of earnings and other employment benefits and job opportunities.  Mr. Fonseca and the members of the Age Discrimination Class are therefore entitled to general and compensatory damages in amounts to be proven at trial.

144.    Mr. Fonseca is informed and believes, and based thereon alleges, that Defendants' outrageous conduct directed at Mr. Fonseca and the members of the Age Discrimination Class described above, was done with malice, fraud, or oppression and with conscious and/or reckless disregard for the rights of Mr. Fonseca and the members of the Age Discrimination Class, and with the intent, design, and purpose of injuring them. Defendants, through their officers, managing agents, and or their supervisors, authorized, condoned, and or ratified the unlawful of all of the other defendants.  Thus, Mr. Fonseca and the members of the Age Discrimination Class are entitled to exemplary or punitive damages from Defendants in amounts to be determined according to proof at trial.

145.    As a further direct and proximate result of Defendants' actions, Mr. Fonseca and the members of the Age Discrimination Class are entitled to and seek their attorney fees and costs. (See Cal. Govt. Code § 12965(b).)

146.    Mr. Fonseca and the members of the Age Discrimination Class also seek the "affirmative relief" or "prospective relief" afforded them under California Government Code section 12926(a).

## FIFTH CAUSE OF ACTION

**Violation of the Cartwright Act – California Business and Professions Code §§ 16720 *et seq.***

**(Plaintiff Bryant Fonseca, on Behalf of Himself and the Antitrust Class Against Defendants)**

147.    Mr. Fonseca, on behalf of himself and the Antitrust Class, re-allege and

incorporate by reference, as though fully set forth herein, all of the preceding paragraphs.

148.     Except as expressly provided in California Business and Professions Code sections 16720 *et seq.*, every trust is unlawful, against public policy, and void. A trust is a combination of capital, skill, or acts by two or more persons for any of the following purposes:

a.  To create or carry out restrictions in trade or commerce.

b.  To limit or reduce the production, or increase the price of merchandise or of any commodity.

c.  To prevent competition in manufacturing, making, transportation, sale or purchase of merchandise, produce or any commodity.

d.  To fix at any standard or figure, whereby its price to the public or consumer shall be in any manner controlled or established, any article or commodity of merchandise, produce or commerce intended for sale, barter, use or consumption in this State.

149.     HP, by and through its officers, directors, employees, agents or other representatives, has entered into an unlawful agreement, combination, and conspiracy in restraint of trade, in violation of California Business and Professions Code section 16720.

150.     HP conspired with 3D Systems and entered into an unlawful trust agreement in restraint of trade and commerce by, among other things, restricting and limiting, to a substantial degree, competition among these defendants' skilled labor, and fixing the wages and salary ranges for said class members, all with the purpose

and effect of suppressing class members' compensation and restraining competition in the market for services of members of the Antitrust Class.

151.    As a direct and proximate result of HP's conduct members of the Antitrust Class were also injured by incurring suppressed compensation to levels lower than the members otherwise would have incurred in the absence of HP's unlawful trust, all in an amount to be proven at trial.

152.    HP, Plaintiff, and other members the Antitrust Class are "persons" within the meaning of the Cartwright Act as defined in California Business and Professions Code section 16702.

153.    HP's practices and associated agreements are *per se* violations of the Cartwright Act, and their conduct violates the Cartwright Act.

154.    As a result of the above violations, Plaintiff and the Antitrust Class have been damaged in an amount according to proof.

## SIXTH CAUSE OF ACTION

**Violation of California Business and Professions Code §§ 16600 *et seq.***

**(Plaintiff Bryant Fonseca, on Behalf of Himself and the Antitrust Class Against Defendants)**

155.    Mr. Fonseca, on behalf of himself and the Antitrust Class, re-allege and incorporate by reference, as though fully set forth herein, all of the preceding paragraphs.

156.    Under California Business and Professions Code section 16600, *et seq.*, except as expressly provided for by section 16600, et seq., every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void.  While an employer's conspiracy with another competitor (e.g., a "no poach" agreement between two competing companies) is a violation of

section 16600, a plaintiff *does not* need to rely on any conspiracy between two competitors; rather, the employer may be held to have violated section 1660 by *unilaterally* requiring its own employees to agree not to work for its competitors. (*Chamberlain* v. *Augustine*, (1916) 172 Cal. 285, 288; *Morris* v. *Harris* (1954) 127 Cal.App.2d 476, 478 – "This section invalidates provisions in employment contracts prohibiting an employee from working for a competitor after completion of his employment or imposing a penalty if he does so unless they are necessary to protect the employer's trade secrets . . . ."; see also, *Muggill* v. *Reuben H. Donnelley Corp*. (1965) 62 Cal.2d 239, 242-3 – Former employer's agent notified plaintiff that his rights to receive payments from his former employer's retirement plan had been terminated on the ground that plaintiff "entered the employ of a competitor.")  The California Supreme Court held that pursuant to Section 16600, "The provision forfeiting plaintiff's pension rights if he works for a competitor restrains him from engaging in a lawful business and is therefore void."; and *see,* Cal. Bus. & Prof. Cod. 16600 – "*[E]very* contract by which *anyone* is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void.")

157.    The above-described "no poach" or anti-hire agreements that HP struck with its competitor, 3D Systems are alone sufficient to trigger a violation of Section 16600.  Further,  HP's WFR is an additional and independent ground for HP's violation of Section 16600.  As stated, HP implemented and enforced an early retirement program in which employees of a certain age and tenure were eligible to "voluntarily" retire early, in which case the employee will be entitled to certain monetary retirement incentive, *unless* he or she goes to work for a competitor of HP: "If you accept a position with a competitor during the WFR Redeployment Period, you will terminate your Plan participation at that point you will not be eligible for the

Cash Severance Pay." HP's WFR was itself a violation of Section 16600's prohibition against restricting employees' ability to go to work for competitors.

158.    HP entered into, implemented, enforced agreements, policies, and engaged in practices that are unlawful and void under Section 16600.

159.    HP's policies, practices, agreements, and conspiracy have included concerted action and undertakings among the Defendant and others with the purpose and effect of: (a) reducing open competition among Defendant and other companies for skilled labor; (b) reducing employee mobility; (c) reducing or eliminating opportunities for employees to pursue lawful employment of their choice; and (d) limiting employee professional betterment.

160.    HP's practices, agreements, and conspiracy are contrary to California's settled legislative policy in favor of open competition and employee mobility, and are therefore void and unlawful.

161.    HP's practices, agreements, and conspiracy were not intended to protect and were not limited to protecting any legitimate proprietary interest of Defendant.

162.    HP's practices, agreements, and conspiracy do not fall within any statutory exception to Section 16600, *et seq.*

163.    Additionally, because HP's WFR is in writing and violates California Business Code Section 16600, HP also violated California Labor Code Section 432.5, which states: "No employer, or agent, manager, superintendent, or officer thereof, shall require any employee or applicant for employment to agree, in writing, to any term or condition which is known by such employer, or agent, manager, superintendent, or officer thereof to be prohibited by law."

164.    The acts done by HP and each of the parties to the anti-competitive practices and agreements as part of, and in furtherance of, their contracts,

combinations or conspiracies were authorized, ordered, or done by their respective officers, directors, agents, employees, or representatives while actively engaged in the management of each defendant's affairs

165.    Accordingly, Plaintiff and members of Antitrust Class seek a judicial declaration that Defendant's agreements and conspiracy are void as a matter of law under Section 16600, and a permanent injunction enjoining HP from ever again entering into similar agreements in violation of Section 16600.

166.    Although Plaintiff is unaware of the exact date that this conspiracy began, Plaintiff alleges upon information and belief that this cause of action accrued within the last four years, as described in detail above.

## SEVENTH CAUSE OF ACTION

**Unfair Competition – California Business and Professions Code §§ 17200, *et seq*.**

**(Plaintiff Bryant Fonseca on Behalf of Himself and the Age Discrimination Class and Antitrust Class Against Defendants)**

167.    Mr. Fonseca, on behalf of himself and the Age Discrimination Class and Antitrust Class, re-allege and incorporate by reference, as though fully set forth herein, all of the preceding paragraphs.

168.    The Unfair Competition Law ("UCL"), which is codified under California Business and Professions Code section 17200, *et seq*. prohibits acts of "unfair competition," including any unlawful, unfair, fraudulent *or* deceptive business act *or* practice as well as "unfair, deceptive, untrue or misleading advertising."

169.    A plaintiff may bring a Business & Professions Code section 17204 claim even when the underlying statutory violation does not provide the plaintiff with a private right of action. (*See Safeway v. Superior Court* (2015) 238 Cal. App. 1138,

1147 ["[t]he statutory language referring to 'any unlawful, unfair *or* fraudulent' practice makes clear that a practice may be deemed unfair even if not specifically proscribed by some other law"].)

170.    Defendants have engaged, and continue to engage, in unfair, deceptive, fraudulent, and unlawful business practices in California by practicing, employing, and utilizing the employment policies and practices outlined above, including, i.e., the various acts of discrimination and anti-competitive practices detailed herein.

171.    Defendants engaged in unlawful or unfair competition by, among other things, engaging in conduct as alleged herein:

    a.  wherein the utility of such conduct, if any, is outweighed by the gravity of the consequences to Plaintiff and the members of the Plaintiff Classes;

    b.  that is immoral, unethical, oppressive, unscrupulous, or substantially injurious to Plaintiff and the other members of the Plaintiff Classes;

    c.  that undermines or violates the stated policies underlying California law which seek to protect employees aged 40 or over against age discrimination, and thus provide a sufficient predicate for claims for unfair competition;

    d.  Violating the Cartwright Act; and

    e.  Violation of the California Business and Professions Code sections §§ 16600 *et seq.*

172.    Defendants knew or should have known of their anti-competitive and discriminatory conduct as alleged herein.

173.    Defendants committed fraudulent business practices by engaging in

conduct, as alleged herein, that was and is likely to deceive employees acting

reasonably under the circumstances.  Defendants' fraudulent business practices

include, but are not limited to, failing to disclose, concealing from, and/or failing to

investigate whether Plaintiff and the members of the Age Discrimination Class were

being selected for termination, terminated, and not re-hired due to their age,

misrepresenting the reasons for those actions, including through reference to

pretextual explanations related to job performance or qualifications, and/or failing to

prevent, respond to, adequately investigate, and/or appropriately resolve instances of

age discrimination in the workplace, including the adverse impact of Defendants'

employment practices on employees aged 40 or over.

174.    Defendants also acted unlawfully and unfairly by engaging in anti-

competitive practices to suppress wages of their respective workforce by restricting

the ability of its employees from obtaining employment with other technology

companies, to wit 3D Systems.

175.    Defendants' use of such unfair, deceptive, fraudulent, and unlawful

business practices constitutes unfair, deceptive, fraudulent, and unlawful competition,

provides an unfair advantage over Defendants' competitors, and an unfair benefit to

Defendants at the expense of Plaintiff, the members of the Age Discrimination Class

and Antitrust Class, and the general public.

176.    During the class period, Defendants have engaged in unlawful,

deceptive, fraudulent, and unfair business practices, proscribed by Business &

Professions Code sections 17200, *et seq.*, including those described herein, thereby

obtaining valuable property, money, and services from Plaintiff, members of the Age

Discrimination Class and Antitrust Class, and all persons similarly situated, and have

deprived Plaintiff, members of the Age Discrimination Class and Antitrust Class, and

all persons similarly situated, of valuable rights and benefits guaranteed by law, all to their detriment.

177.    By virtue of the direct injuries that Plaintiff and the members of the Plaintiff Classes have sustained from Defendants' wrongful conduct, Plaintiff and the members of the Plaintiff Classes have standing to sue in order to obtain the remedies that are available to them under the UCL.

178.    The UCL authorizes restitutionary and injunctive relief to prevent unlawful, deceptive, unfair, or fraudulent business acts for practices, and both restitution and disgorgement of money or property wrongfully obtained by means of such unfair competition. (Cal. Bus. & Prof. Code § 17203.)

179.    Plaintiff seeks, on his own behalf, and on behalf of the other members of the Plaintiff Classes and on behalf of the general public, equitable and injunctive relief, along with full restitution and disgorgement of monies, including interest, according to proof, to restore any and all monies withheld, acquired and/or converted by Defendants by means of the deceptive, unfair, fraudulent, and unlawful practices complained of herein.

180.    The illegal, deceptive, fraudulent, and unfair conduct alleged herein is continuing, and there is no indication that Defendants will cease and desist from such activity in the future.  Plaintiff alleges that if Defendants are not enjoined from the conduct set forth in this Complaint, Defendants' illegal, deceptive, fraudulent, and unfair conduct will continue, i.e. they will continue to engage in practices that disparately impact and discriminate against employees on account of age. (*See Herr v. Nestle U.S.A., Inc.* (2003) 109 Cal. App. 4th 779, 789 — "injunctive relief under the UCL is an appropriate remedy where a business has engaged in an unlawful practice of discriminating against older workers.")

181.     Plaintiff, the members of the Age Discrimination Class, and all persons in interest, are entitled to, and do seek restitution and such relief as may be necessary to disgorge the profits which HP acquired, or of which Plaintiff and the members of the Age Discrimination Class have been deprived, by means of the above-described unfair, unlawful, deceptive, and or fraudulent business practices.

182.     Plaintiff and the members of the Age Discrimination Class and Antitrust Class have no plain, speedy, and or adequate remedy at law to redress the injuries which they have suffered as a consequence of HP's unfair, unlawful, deceptive, and/or fraudulent business practices.  As a result of the unfair, unlawful, deceptive, and/or fraudulent business practices described above, Plaintiff and the members of the Age Discrimination Class and Antitrust Classes have suffered and will continue to suffer irreparable harm unless HP, and each of the defendants, are restrained from continuing to engage in said unfair, unlawful, and/or fraudulent business practices.

183.     Plaintiff and the members of the Age Discrimination Class and Antitrust Class also request an order that HP identify, locate, and make restitution to affected members of the general public, and specifically those terminated under the Workforce Reduction Plan, all funds and the value of all things or property acquired by the acts of unfair competition and deceptive practices set forth above, and all additional orders necessary to accomplish this purpose, under California Business & Professions Code section 17203.

184.     For the four (4) years preceding the filing of this action, as a result of HP's unfair, deceptive, fraudulent, and unlawful business practices alleged herein, Plaintiff and the members of the Age Discrimination Class and Antitrust Class request restitution, damages to compensate them fully, and disgorgement of all monies and profits from HP in an amount according to proof at time of trial.

185.    Plaintiff is entitled to an award of attorneys' fees and costs in prosecuting this action against Defendants under California Code of Civil Procedure section 1021.5 and other applicable law.  A successful outcome in this action will confer on the general public and a large class of persons (the Age Discrimination and Antitrust Classes) both a pecuniary and nonpecuniary benefit and will result in the enforcement of important rights affecting the public interest.  The necessity and financial burden of private enforcement furthermore make such an award appropriate.

## EIGHTH CAUSE OF ACTION

### Violation of the Sherman Act, 15 U.S.C. § 1

**(Plaintiff Bryant Fonseca, on Behalf of Himself and the Antitrust Class Against Defendants)**

186.    Plaintiff incorporates by reference all the allegations in the above paragraphs as if fully set forth herein.

187.    15 United States Code section 1 provides, in part, that every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

188.    HP, by and through its officers, directors, employees, agents, and other representatives, have entered into an unlawful agreement, combination, and conspiracy in restraint of trade, in violation of 15 U.S.C. section 1.  Specifically, HP agreed in advance that HP and 3D Systems would not pursue one another's employees.  All of the foregoing directly and negatively affected the suppressed the wages of employees at HP.  HP and 3D Systems conspired and agreed to restrict competition for services provided by Plaintiff and the Antitrust Class through "no poach" agreements and arrangements and agreements to fix the wage and salary ranges for said class members, all with the purpose and effect of suppressing class

members' compensation and restraining competition in the market for services of class members.

189.    HP's conduct injured and damaged Plaintiff and members of the Antitrust Class by suppressing compensation to levels lower than the members otherwise would have received in the absence of the above-referenced agreements, all in an amount to be proven at trial.

190.    The aforementioned conduct by HP are either *per se* violations of the Sherman Act or violative of it.

191.    The acts done by each defendant as a part of, and in furtherance of, their contracts combinations or conspiracies were authorized, ordered, or done by their respective officers, directors, agents, employees, or representatives while actively engaged in the management of each of HP's affairs.

192.    As a result of the above violations, Plaintiff and the Antitrust Class have been damaged in an amount according to proof.  Accordingly, Plaintiff and the Antitrust Class seeks three times their damages caused by HP's violations of the Sherman Act, the costs of bringing suit, reasonable attorneys' fees, and a permanent injunction enjoining HP from ever again entering into similar agreements or arrangements in violation of the Sherman Act.

## **PRAYER FOR RELIEF**

Plaintiff, on behalf of himself individually and on behalf of Plaintiff Classes prays for relief and judgment against Defendant and any later named defendant, jointly and severally as follows:

1. Certification of the case as a class action and appointment of Plaintiff as Class Representative of each class and his counsel of record as Class Counsel;

2. All damages to which Plaintiffs and each member of the Age Discrimination Class and Antitrust Class are entitled due to Defendants' conduct, including, but not limited to, back pay, front pay, general and special damages for lost compensation and job benefits that they would have received but for the discrimination anti-competitive practices of Defendants;

3. To preliminarily and permanently enjoin Defendants from implementation of the Workforce Reduction Plan that disparately impacts and discriminates against employees on account of their age;

4. For an order requiring Defendants to restore to the general public all funds acquired by means of any act or practice declared by this Court to be unlawful or fraudulent or to constitute unfair competition under California Business and Professions Code section 17200, *et seq.*;

5. For restitution, including, without limitation, restitutionary disgorgement;

6. For affirmative or prospective relief;

7. For exemplary and punitive damages;

8. For attorneys' fees, expenses, and costs of suit;

9. For pre-judgment and post-judgement interest;

10. An order enjoining Defendants from continuing the unfair, deceptive, fraudulent, and unlawful business practices alleged herein; and

11. For all such other and further relief the Court may deem just and proper.

DATED: February 24, 2020                    **HOGUE & BELONG**

                                            __s/ Tyler Belong_
                                            Jeffrey L. Hogue
                                            Tyler J. Belong
                                            Stephanie A. Sandler
                                            Attorneys for Plaintiff Bryant Fonseca
                                            on behalf of himself and all others
                                            similarly situated

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **DEMAND FOR JURY TRIAL**

Plaintiffs Bryant Fonseca hereby demands a jury trial.

DATED: February 24, 2020

**HOGUE & BELONG**

s/ Tyler Belong
Jeffrey L. Hogue
Tyler J. Belong
Stephanie A. Sandler
Attorneys for Plaintiff Bryant Fonseca
on behalf of himself and all others
similarly situated