1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRYANT FONSECA, an individual, on behalf of himself and all others similarly situated, and on behalf of the general public,<br><br>Plaintiffs,<br><br>v.<br><br>HEWLETT-PACKARD COMPANY, a Delaware Corporation; HP ENTERPRISE SERVICES, LLC, a Delaware Limited Liability Company; HP, Inc., a Delaware corporation; and DOES 1-100, inclusive,<br><br>Defendants. | Case No.: 19cv1748-GPC-MSB<br><br>**ORDER GRANTING MOTION TO DISMISS COUNTS FIVE, SIX, AND EIGHT OF THE THIRD AMENDED COMPLAINT**<br><br>**[ECF No. 18]** |

/ / /
/ / /
/ / /
/ / /

1

19cv1748-GPC-MSB

Before the Court is Defendant HP Inc.'s ("HP" or "Defendant") motion to dismiss counts five, six, and eight of the third amended complaint ("TAC").  ECF No. 18.  Bryant Fonseca ("Plaintiff" or "Fonseca") filed an opposition on April 17, 2020.  ECF No. 22.  HP filed a reply on May 4, 2020.  ECF No. 25.  The Parties filed supplemental briefing at the direction of the Court.  ECF Nos. 29, 32, 34, 41, 42, 43.  For the reasons discussed below the Court **GRANTS** HP's motion to dismiss counts five, six, and eight.

## PROCEDURAL BACKGROUND

On November 29, 2017, a class action was commenced in the Superior Court for the State of California, County of San Diego, entitled *Bryant Fonseca v. Hewlett-Packard Company, a Delaware Corporation; HP Enterprise Services, LLC, a Delaware Limited Liability Company; HP, Inc., a Delaware Corporation; and Does 1-100, inclusive*, Case No. 37-2017-00045630-CU-WT-CTL.  ECF No. 1-2, Ex. A ("State Complaint").

This case was first removed to this Court on January 11, 2018 (3:18-cv-0071-BEN-JLB) and was remanded back to the Superior Court for the County of San Diego on September 5, 2018.  ECF No. 12-1, Ex. 2, Order.

On January 28, 2019, Defendant moved for a stay of the entire action in Superior Court.  ECF No. 12-2 (Declaration of Jeffrey L. Hogue or "Hogue Decl.") ¶ 3.  On April 12, 2019, the Superior Court for the County of San Diego entered an order staying the case "except with respect to the two 'no poach' antitrust counts (counts 5 and 6)" in light of *Forsyth v. HP Inc., et al.* which is currently pending in the U.S. District Court for the Northern District of California, Civil Action No. 5:16-cv-04775-EJD.  *Id.* ¶ 4; ECF No. 1-10 at 38.

On April 22, 2019, Plaintiff filed a First Amended Class Action Complaint ("FAC") in response to Defendant's then-pending demurrer to Counts Five and Six for violations of the Cartwright Act and Section 16600.  ECF 12-2, Hogue Decl. ¶ 4.  On

1   August 2, 2019, the Superior Court for the County of San Diego sustained Defendant's

2   demurrer.  Order, ECF No. 12-1 at 112.

3          On August 12, 2019, Plaintiff filed a Second Amended Class Action Complaint in

4   San Diego Superior Court (37-2017-00045630-CU-WT-CTL).  ECF No. 1-2, Ex. E

5   ("Second Amended Complaint" or "SAC").  The SAC re-alleged the counts in the FAC

6   and additionally alleged an eighth count for violation of the Sherman Act, 15 U.S.C. § 1.

7   SAC ¶¶ 182-88.

8          On September 11, 2019, Defendant removed the case to this Court.  ECF No. 1.

9   The Court granted Defendant's motion to dismiss counts five, six, and eight of the SAC.

10  ECF No. 16 on February 3, 2020.  On February 24, 2020, Plaintiff filed a Third Amended

11  Class Action Complaint ("TAC").  ECF No. 17.[1]  The TAC contains the following eight

12  counts: (1) Disparate Treatment – California Government Code §§ 12900 et seq.; (2)

13  Disparate Impact – California Government Code §§ 12940(A), 12941; (3) Wrongful

14  Termination In Violation Of Public Policy; (4) Failure To Prevent Discrimination –

15  California Government Code §§ 12900 et seq.; (5) Violation of the Cartwright Act,

16  California Bus. & Prof. Code §§ 16720 et seq.; (6) Violation of California Bus. & Prof.

17  Code §§ 16600 et seq.; (7) Unfair Competition – California Bus. & Prof. Code § 17200,

18  et seq.; and (8) Violation of the Sherman Act, 15 U.S.C. § 1.  ECF No. 17 ¶¶ 103-192.

19  Defendant moves to dismiss counts five, six, and eight.

20                          **FACTUAL BACKGROUND**

21         Plaintiff is a resident of the County of San Diego and was an employee for HP at

22  HP's San Diego site.  TAC ¶ 3, 18.  Defendants are Hewlett-Packard Company, HP

23  Enterprise Services, LLC, and HP Inc. (collectively, "HP").  *Id.* ¶ 1.  HP's headquarters

24

25  _____

26  [1] Plaintiff failed to file a redline with its TAC, in contravention of Local Civil Rule 15.1.c.  Plaintiff has
    since filed the redline on May 6, 2020.  ECF No. 26.

27                                          3

28                                                              19cv1748-GPC-MSB

and principal place of business are in Palo Alto, California.  *Id.* ¶ 4.   Non-party 3D

Systems Inc. ("3D Systems") is HP's major competitor in the 3D printing industry.  *Id.* ¶

49.  Plaintiff also names as defendants Does 1 through 100 as agents, servants, alter egos,

and/or employees of the other defendants.  *Id.* ¶ 10.

Plaintiff brings this class action on behalf of all individuals employed by HP from

January 1, 2016 to present and all current, former, or prospective employees who were at

least 40 years old at the time that HP terminated them under HP's 2012 U.S. Workforce

Reduction ("WFR") plan.  *Id.* ¶ 84.  At the time that he filed his complaint, Plaintiff was

fifty-five years old.  *Id.* ¶ 17.  Plaintiff alleges that HP eliminated the jobs of older, age-

protected employees in November 2015 in order to begin replacing them with younger

employees.  *Id.* ¶¶ 27-28.  Additionally, Plaintiff additionally alleges that, due to HP's

"no-poach" agreement with 3D Systems, Plaintiff and other HP employees were unable

to obtain employment at 3D Systems.  *Id.*

Plaintiff worked for HP's printing and engineering groups for nearly thirty-six

years.  *Id.* ¶¶ 18-21.  According to the TAC, HP purported to use the WFR plan to

terminate employees on a neutral basis.  *Id.* ¶ 23.  However, Plaintiff alleges that HP used

the WFR plan to terminate older, higher-paid employees and replace them with younger,

lower-paid employees.  *Id.*  On May 8, 2017, Plaintiff was notified by his manager that he

was being terminated pursuant to the WFR plan and that his termination date would be

May 19, 2017.  *Id.* ¶ 44.  HP informed Plaintiff that he would have two weeks as part of

his "Redeployment Period" to find another job with HP.  If he were unsuccessful, then

HP would provide him with a 60-day "Preferential Rehire Period" during which time

Plaintiff would be allowed to apply for jobs within HP and if re-hired, could bypass the

conventional rehiring process.  *Id.* ¶ 46.

In the TAC, Plaintiff has added further details regarding the WFR plan,

specifically, allegations regarding the provisions governing severance payment and

accepting employment with competitors.  The WFR plan provided that if an employee being terminated under the WFR plan had not accepted another job with HP by the end of the 60-day Preferential Rehire period, then the employee will be eligible to receive a severance payment.  *Id.* ¶ 37.  However, the WFR plan provided that employees would forfeit their severance pay if they either accepted a job with a competitor during the Redeployment Period, or if they accepted a job offer with a competitor but failed to notify their manager.  *Id.*.  However, outside the Redeployment Period, if any employee participating in the WFR plan accepted a job with a competitor of HP, they would still be eligible to receive the severance payment, so long as the employee notified his or her manager promptly upon accepting that position with HP's competitor.  ECF No. 22-2 at 127.

After Plaintiff's termination, Plaintiff applied for two different positions at HP but did not receive offers.  *Id.* ¶ 49.  Plaintiff also participated in a four-month career transition program with a career counseling firm, which was offered to him as part of his benefits package under the WFR plan.  *Id.* ¶ 50.  In 2017, Plaintiff applied for a job at 3D Systems but did not receive an offer.  *Id.* ¶ 71.  Plaintiff alleges that he, like other HP employees, were denied offers from 3D Systems due to the "no-poach agreement" between HP and 3D Systems.  *Id.* ¶¶ 61-65.

The TAC alleges that the "no-poach" agreement began in 2016 after 3D Systems poached several of HP's most talented employees.  *Id.* ¶¶ 57, 59, 61.  In 2016, Vyomesh Joshi, a former HP executive, was hired by 3D Systems to become its new CEO.  *Id.* ¶ 58.[2]  Joshi began poaching HP's top executives and began hiring many top-level HP employees.  *Id.* ¶ 59.  Plaintiff alleges that Joshi developed a close business relationship with a number of top-level executives at HP, including, Stephen Nigro, who was

---

[2] Defendant notes that Joshi left HP in 2012.  ECF No. 10-1 at 9.

promoted to President of HP's 3D Printing unit once Joshi became the CEO of 3D Systems.  *Id.* ¶ 60.[3]

However, the TAC alleges that soon after Joshi poached away several of HP's employees, HP and 3D Systems' executives entered into a "cease-fire."  Plaintiff alleges, on information and belief, that a HP executive, Ron Coughlin, called Joshi in 2016 and told him to stop "hiring away HP's employees" and that "during this phone call and subsequent communications between Joshi, Coughlin and Nigro in 2016, Joshi agreed to comply so long as the arrangement was mutual."  *Id.* ¶ 61.  As a result of this "cease-fire," the TAC alleges that both 3D Systems and HP ceased cold calling each other's employees in order to solicit them, and dissuaded their current employees from applying for work at the other company.  *Id.* ¶ 61.

As a result of this agreement between HP and 3D Systems, Plaintiff alleges that in August 2016 a group of HP managers informed HP employees that they were required to notify HP if they were offered a position at 3D Systems and that any HP employee offered a position with 3D Systems would be deprived of the severance check provided under the WFR.  *Id.* ¶ 65.  The TAC additionally alleges that in at least one group meeting, Plaintiff and other HP employees were informed that one of their coworkers "interviewed with 3D Systems" and "that is why HP terminated him."  *Id.* ¶ 67.  Plaintiff also alleges that an HP manager told Plaintiff and other employees that HP would help them with their job searches if they were laid off, but if they were applying or talking to 3D Systems, the manager did not "want to know about it, because if [he] or [other] managers know about it, you will get 'escorted out'" meaning you will "be immediately terminated and forfeit your right" to the severance package benefits.  *Id*. ¶ 68.  Plaintiff

---

[3] Plaintiff also alleges that Meg Whitman served as a top executive at HP during the time of the "no-poach agreement," and notes that Whitman was involved in a 2014 settlement with the Department of Justice regarding eBay Inc.'s separate no-poach agreement with Intuit Inc.  TAC ¶ 53.

asserts that he would have applied for a job with 3D Systems earlier, but refrained from doing so due to HP managers' warnings that Plaintiff would face repercussions if he applied to 3D Systems.  *Id.* ¶ 69.

Plaintiff also alleges that as part of their agreement, HP and 3D Systems ceased hiring one another's employees through third-party recruiters and shared their pay scales to avoid entering a bidding war with one another.  *Id.* ¶¶ 62-63.  Plaintiff states that he made approximately $50,000 annually while "average salaries" at 3D Systems during the relevant time period were $73,007 and $130,265 in San Diego, citing "payscale.com" and "paysa.com" for each figure, respectively.  *Id.*  Plaintiff alleges that "soon after the no-poach agreement went into effect, an increasing number of 3D System employees began publicly voicing their concerns about no longer receiving competitive wages at 3D Systems. (*See, e.g.,* glassdoor.com)."  *Id.*

## LEGAL STANDARD

Federal Rule of Civil Procedure ("Rule") 12(b)(6) permits dismissal for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  Dismissal under Rule 12(b)(6) is appropriate where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory.  *See Balistreri v. Pacifica Police Dep't.*, 901 F.2d 696, 699 (9th Cir. 1990).  Under Rule 8(a)(2), the plaintiff is required only to set forth a "short and plain statement of the claim showing that the pleader is entitled to relief," and "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

A complaint may survive a motion to dismiss only if, taking all well-pleaded factual allegations as true, it contains enough facts to "state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "In sum, for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (quotations omitted). In reviewing a Rule 12(b)(6) motion, the Court accepts as true all facts alleged in the complaint, and draws all reasonable inferences in favor of the plaintiff. *al-Kidd v. Ashcroft*, 580 F.3d 949, 956 (9th Cir. 2009). The Court evaluates lack of statutory standing under the Rule 12(b)(6) standard. *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011).

Where a motion to dismiss is granted, "leave to amend should be granted 'unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.'" *DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992) (quoting *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986)). In other words, where leave to amend would be futile, the Court may deny leave to amend. *See Desoto*, 957 F.2d at 658; *Schreiber*, 806 F.2d at 1401.

## DISCUSSION

Defendant moves to dismiss the fifth, sixth, and eighth counts of the TAC. Plaintiff opposes and also seeks judicial notice of six exhibits. ECF No. 22-2. The Court first addresses Plaintiff's request for judicial notice, and then addresses Defendant's arguments in turn.

## I.   Request for Judicial Notice

Plaintiff seeks judicial notice of orders or pleadings filed in the underlying state court action or filed previously in this Court. As a general rule, "a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion." *Lee v.*

*City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001).  However, two exceptions to this rule exist.  First, a district court may consider "material which is properly submitted as part of the complaint."  *Id.*  If the documents are not attached to the complaint, an exception exists if the documents' "authenticity . . . is not contested" and "the plaintiff's complaint necessarily relies" on them.  *Id.* (citations omitted).  Second, a court may take judicial notice of "matters of public record" under Federal Rule of Evidence ("Rule") 201.  *Id.* at 688-89.  However, under Rule 201, a court may not take judicial notice of a fact that is "subject to reasonable dispute."  Fed. R. Evid. 201(b).  If the contents of a matter of public record are in dispute, the court may take notice of the fact of the document at issue but not of the disputed information contained within.  *See id.* at 689-90.

Since these documents are either pleadings or documents otherwise recorded by the court, they are the proper subject of judicial notice.  *See Burbank-Glendale-Pasadena Airport Auth. v. City of Burbank*, 136 F.3d 1360, 1364 (9th Cir. 1998) (granting judicial notice of pleadings filed in a related state court action); *Reynolds v. Applegate*, No. C 10-04427 CRB, 2011 WL 560757, at *1 n.2 (N.D. Cal. Feb. 14, 2011) (granting judicial notice of documents recorded in the county recorder office since "the Court may properly see them"); *Ewing v. Superior Court of California*, 90 F. Supp. 3d 1067 (S.D. Cal. 2015) (granting judicial notice of documents filed in state court case, including trial court's judgment and opinion of state appellate court); *Amato v. Narconon Fresh Start*, No. 3:14-CV-0588-GPC-BLM, 2014 WL 5390196, at *4 (S.D. Cal. Oct. 23, 2014) ("Orders in federal court cases and state licenses are matters of public record and are capable of accurate and ready determination.").

On a Rule 12(b)(6) motion to dismiss, when a court takes judicial notice of another court's opinion, it may do so "not for the truth of the facts recited therein, but for the existence of the opinion, which is not subject to reasonable dispute over its authenticity."

*Lee*, 250 F.3d at 690.  Accordingly, Plaintiff's request for judicial notice for Exhibits 1, 2, 3, and 4 are **GRANTED**.  The Court takes notice of these documents for the fact of their existence, but not for the truth of the content therein.

Plaintiff additionally requests judicial notice of HP Inc.'s Workforce Reduction Plan Summary Plan Description (Ex. 5) and Hewlett-Packard Company Workforce Reduction Plan (Ex. 6).  For these documents, "authenticity . . . is not contested" and "the plaintiff's complaint necessarily relies" on them.  *Lee*, 250 F.3d at 688.  Accordingly, Plaintiff's request for judicial notice for Exhibits 5 and 6 are **GRANTED**.  The Court takes notice of these documents for the fact of their existence, but not for the truth of the content therein.

## II.    Sherman Act and Cartwright Act

HP argues that Plaintiff's amended claims under the Sherman Act and Cartwright Act must again be dismissed since (1) the TAC fails to allege direct evidence of a conspiracy; (2) the TAC fails to adequately allege parallel conduct; and (3) Plaintiff lacks the requisite standing.  HP also notes that the TAC does not link Defendant Enterprise Services to the no-poach agreement.  Plaintiff opposes each of the arguments.

### A.    Legal Standard

Under section 1 of the Sherman Act, "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. To state a section 1 claim, a plaintiff must plead not just ultimate facts (such as a conspiracy), but evidentiary facts which, if true, will prove:

> (1) a contract, combination or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intended to harm or restrain trade or commerce among the several States, or with foreign nations; (3) which actually injures competition.

*Kendall v. Visa U.S.A., Inc*., 518 F.3d 1042, 1047 (9th Cir. 2008) (citing *Les Shockley Racing Inc. v. National Hot Rod Association*, 884 F.2d 504, 507 (9th Cir.1989); *see also Bell Atlantic v. Twombly*, 550 U.S. 544 (2007)).  "In addition to these elements, plaintiffs must also plead (4) that they were harmed by the defendant's anti-competitive contract, combination, or conspiracy, and that this harm flowed from an 'anti-competitive aspect of the practice under scrutiny.'  This fourth element is generally referred to as 'antitrust injury' or 'antitrust standing.' "  *Brantley v. NBC Universal, Inc*., 675 F.3d 1192, 1197 (9th Cir. 2012) (citations omitted).

The analysis under California antitrust law—*i.e*., the Cartwright Act—"mirrors the analysis under federal law because the Cartwright Act was modeled after the Sherman Act." *Cnty. of Tuolumne v. Sonora Cmty. Hosp.,* 236 F.3d 1148, 1160 (9th Cir. 2001); *see also Nova Designs, Inc. v. Scuba Retailers Ass'n,* 202 F.3d 1088, 1091 (9th Cir. 2000).  "[I]f Plaintiffs plead a valid Sherman Act claim, they likewise plead a valid Cartwright Act claim."  *In re High-Tech Employee Antitrust Litig.*, 856 F. Supp. 2d 1103, 1114 (N.D. Cal. 2012)

## B.    Contract, Combination, or Conspiracy

The "crucial question" in antitrust claims under section 1 of the Sherman Act is whether "the challenged anticompetitive conduct stem[s] from independent decision or from an agreement, tacit or express."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 553 (2007) (quoting *Theatre Enterprises, Inc. v. Paramount Film Distributing Corp*., 346 U.S. 537, 540 (1954)) (internal quotation marks omitted).  To allege an agreement between antitrust co-conspirators, a complaint must "contain enough factual matter (taken as true) to suggest that an agreement was made."  *Id*. at 556.  In other words, "the complaint must allege facts such as a 'specific time, place, or person involved in the alleged conspiracies' to give a defendant seeking to respond to allegations of a conspiracy an idea of where to begin."  *Kendall*, 518 F.3d at 1047.  "A bare allegation of

a conspiracy is almost impossible to defend against, particularly where the defendants are large institutions with hundreds of employees entering into contracts and agreements daily." *Id.* at 1047.  The Ninth Circuit has noted that "discovery in antitrust cases frequently causes substantial expenditures and gives the plaintiff the opportunity to extort large settlements even where he does not have much of a case." *Id.*

Defendant argues that Plaintiff has failed to meet the requisite pleading standard, citing *Frost v. LG Electroncs Inc.*, No. 16-CV-05206-BLF, 2018 WL 6256790, at *4 (N.D. Cal. July 9, 2018), *aff'd sub nom. Frost v. LG Elecs., Inc.*, 801 F. App'x 496 (9th Cir. 2020) and *Bona Fide Conglomerate, Inc. v. SourceAmerica*, 691 F. App'x 389 (9th Cir. 2017).

In *Frost,* the court dismissed the plaintiffs' Sherman Act claims where plaintiffs alleged that the agreement was made during a certain time period, but did not allege a specific date when the agreement was made.  *Frost*, 2018 WL 6256790, at *4.  The *Frost* plaintiffs additionally cited statements made by one of the defendant's head of human resources to a newspaper that the two defendants had an understanding that they would not hire from each other without a gap of a year.  *Id.* at *3.  The *Frost* court held that the plaintiffs were asking the court to take "too big a leap" by inferring a conspiracy based on the relative dearth of direct evidence, "[g]iven the seriousness of [p]laintiffs' claims, and the potential impact of the asserted conspiracy on thousands of individuals."  *Frost*, 2018 WL 6256790, at *5.  In *Bona Fide*, the court similarly held that the plaintiffs failed to meet the *Kendall* standard where plaintiffs' allegations failed to "explain where and when the alleged collusive activity among the defendants occurred.  *Bona Fide*, 691 F. App'x at 390.

Here, as direct evidence of a conspiracy, the TAC alleges, "on information and belief through investigations" that a "'cease-fire' arrangement" was initiated by a phone call made by HP executive, Ron Coughlin, who told Joshi to stop "hiring away HP's

employees".  TAC ¶ 61.  Telling 3D's Joshi to stop "hiring away HP's employees" does not evidence a "no poaching" agreement.  Recognizing this, the TAC further alleges that "during this phone call and subsequent communications between Joshi, Coughlin and Nigro in 2016, Joshi agreed to comply so long as the arrangement was mutual." *Id.*  The TAC fails to identify the reporting witness to this call or otherwise demonstrate that he or she exists.  Instead, it is based "on information and belief through investigations."  The TAC additionally fails to state when in 2016 the telephone call occurred, where Joshi and Coughlin were when the call was made, nor does the TAC identify any email or document that memorialized the "cease-fire arrangement."  While the reported telephone conversation provides a "who and what was said," the specifics are wanting and fail to go beyond allegations that are based "on information and belief."  Like *Frost*, the latest allegations in the TAC asks the Court to take "too big a leap" by inferring a conspiracy based on a dearth of direct evidence.  *Frost*, 2018 WL 6256790, at *5.

In addition to a dearth of direct evidence, the circumstances surrounding the reported call provide little support for the allegation that Joshi entered a "no poaching" agreement with HP.  First, Joshi had little, if any, incentive to enter such an agreement. Plaintiff's allegations regarding poaching focus solely on 3D's recruitment of HP's executive employees, and the TAC fails to allege that HP either attempted to or successfully did poach any of 3D Systems' employees; accordingly, 3D Systems would not have had any need for a "cease fire" since HP had not aimed any "fire" at 3D Systems.[4]  Second, had there in fact been a no-poach agreement in place that was being

---

[4] The only reference to HP's attempts to poach of 3D Systems' employees is cursory: "HP's conspiracy and agreement with 3D Systems stopped or greatly limited 3D Systems from attempting to hire outgoing HP employees, and *vice versa*."  TAC ¶ 68 (emphasis added).  Aside from this passing "vice versa" reference, the TAC fails to allege that HP attempted to or successfully did poach 3D Systems employees.  Additionally, Plaintiff alleges that the average salary for 3D Systems employees was $130,625, whereas HP employees in Plaintiff's printing group was approximately $50,000.  TAC ¶ 63.

1    followed, 3D Systems would not have offered HP employees job opportunities and HP

2    would have little motive to deter its employees from accepting employment with 3D

3    Systems.  That is, if a no-poaching agreement restricted 3D Systems from making job

4    offers to HP employees, then HP would have no need to strip its employees of severance

5    benefits if they accepted an offer with 3D Systems, or to direct its employees to report

6    any entreaties or offers made by 3D Systems.  Accordingly, HP's alleged reporting

7    requirements and punitive measures for those who accepted employment from 3D

8    Systems tend to belie the existence of any no-poach agreement.  Moreover, although

9    Plaintiff's age discrimination claims are not at issue in the instant motion to dismiss, the

10   Court notes that it is difficult to reconcile Plaintiff's allegations regarding HP's age-based

11   discrimination with Plaintiff's antitrust claims; while the age discrimination claims assert

12   that HP was illegally ridding itself of older employees, Plaintiff's antitrust claims imply

13   that HP was illegally preventing 3D Systems from poaching any of its employees—

14   including HP's older-aged employees.

15        Lastly, Plaintiff also references HP's former Chief Executive Officer Meg

16   Whitman's participation with a 2014 settlement with DOJ regarding a "no-poach"

17   agreement between HP and Intuit Inc.  TAC ¶ 53.  Given that this settlement occurred

18   three years before the alleged HP/3D Systems conspiracy and involved Intuit rather than

19   3D Systems, it provides nothing as to the "who, what, when and how" relating to the

20   alleged HP/3D Systems no-poach agreement.

21        In sum, Plaintiff's allegations fall far short of those that have been found to be

22   sufficient in *In re High-Tech Employee Antitrust Litig.*, 856 F. Supp. 2d 1103 (N.D. Cal.

23   2012) and *In re Animation Workers Antitrust Litig.*, 123 F. Supp. 3d 1175 (N.D. Cal.

24

25   ————————————

26   Plaintiff does not address how this pay disparity would incentivize any 3D Systems employees to seek
27   employment at HP.

28                                                                                    19cv1748-GPC-MSB

2015).  In *High-Tech*, plaintiffs alleged a conspiracy consisting of express bilateral agreements between employers seeking to suppress compensation and restrict employees' mobility in violation of, *inter alia*, the Sherman Act and the Cartwright Act.  According to the plaintiffs, senior executives for the defendant companies participated in negotiating, executing, monitoring compliance with, and policing violations of the bilateral agreements.  *Id*. at 1110.  The *High-Tech* plaintiffs set forth how the "nearly identical agreements, of identical scope, were entered into in various cities and counties in California . . . how these agreements were the subject of a DOJ investigation in which the DOJ found the agreements to be 'per se unlawful' and in which Defendants agreed that the DOJ stated a federal antitrust claim."  *Id.* at 1117.  The *High-Tech* plaintiffs further alleged how the defendants' senior executives served on each other's board of directors.  *Id.*  In light of all this evidence, the court concluded that the plaintiffs' allegations were sufficient to survive a motion to dismiss.

Similarly, in *Animation Workers*, the plaintiffs pled their allegations with great factual support and detail – including discussion of who drafted the agreement, the specific involvement of the top executives in the drafting of said agreement, and a multitude of email communications describing the enforcement of the no-poach agreement.  *Animation Workers*, 123 F. Supp. 3d at 1182.

Plaintiff argues that because the *High Tech* and the *Animation Workers* plaintiffs received the benefit of prior DOJ investigations, they were able to allege evidence with greater specificity.  ECF No. 22 at 15.  Accepting this as true, Plaintiff is not excused from meeting its burden merely because HP has not been the subject of an investigation into the alleged "no-poaching agreement" with 3D Systems.

The Court finds that Plaintiff's allegations fail to provide sufficient factual content to support their claims.  Here, Plaintiff has made numerous conclusory allegations regarding the alleged no-poaching agreement, including claims that HP and 3D shared

pay scales, and discontinued cold-calling each other's employees, third-party recruiting firms stopped pursuing each other's employees and 3D systems employees began to complain about their wages after the agreement was entered.  TAC ¶¶ 60-61.  Aside from the conclusory allegations, the TAC fails to provide specific facts to demonstrate that the claim is plausible.

### 1.    Parallel Conduct

A plaintiff must allege facts at the pleading stage "tending to exclude the possibility of independent action."  *Twombly,* 550 U.S. at 544 (internal citation omitted).  "[W]hen allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action."  *Id.* at 557.  Examples of an allegation that would suffice under this standard include "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties." *Id.* at 556 n. 4 (internal quotation marks omitted).  The Ninth Circuit has distinguished permissible parallel conduct from impermissible conspiracy by looking for certain "plus factors."  *See, e.g., In re Citric Acid Litig.,* 191 F.3d 1090, 1102 (9th Cir. 1999) ("Parallel pricing is a relevant factor to be considered along with the evidence as a whole; if there are sufficient other 'plus' factors, an inference of conspiracy can be reasonable.").  Whereas parallel conduct is as consistent with independent action as with conspiracy, plus factors are economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action.  *See Twombly,* 550 U.S. at 557 n. 4.  If pleaded, they can place parallel conduct "in a context that raises a suggestion of preceding agreement."  *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 (9th Cir. 2015).

In support of his argument on parallel conduct, Plaintiff relies on the following allegations: (1) HP and 3D Systems ceased hiring one another's employees (TAC ¶¶ 62, 69); and (2) HP and 3D Systems shared pay scales to avoid entering a bidding war with one another (TAC ¶ 63).

As previously stated, these two allegations are conclusory and not founded on facts. As to the first, there are no allegations that HP ever hired 3D's employees. With respect to the second claim, pay scales were readily available online. According to information available on "payscale.com" and "paysa.com", Plaintiff and other members of his printing group at HP made approximately $50,000 annually while "average salaries" at 3D Systems during the relevant time period were $73,007 and $130,265 in San Diego. TAC ¶ 63. Plaintiff argues that this shows how 3D Systems "could more easily poach HP employees by offering them more compensation." *Id.* Given this divergence in pay, however, it is not plausible that anyone would leave 3D Systems for HP. It shows that HP was not in the position to poach 3D's employees and 3D had no need for a "no poaching" agreement.

Plaintiff further summarily alleges that "[t]ellingly, soon after the no-poach agreement went into effect, an increasing number of 3D System employees began publicly voicing their concerns about no longer receiving competitive wages at 3D Systems. (*See, e.g.,* glassdoor.com)." TAC ¶ 53. There are no allegations as to the dates, numbers or content of these publicly voiced concerns. Also, there is nothing that alleges that 3D System's $130,265 average salary ever dipped anywhere close to the $50,000 salary paid Plaintiff after the alleged no-poaching agreement.

In *Kelsey K. v. NFL Enterprises, LLC*, plaintiffs argued that defendants engaged in parallel conduct by suppressing the wages of National Football League cheerleaders. 254 F. Supp. 3d 1140, 1146 (N.D. Cal. 2017), *aff'd*, 757 F. App'x 524 (9th Cir. 2018). The *Kelsey* plaintiffs provided exact figures of wages across different teams and additionally

alleged that no NFL team paid cheerleaders for rehearsals.  However, the *Kelsey* court held that the plaintiffs had nevertheless failed to provide more than "a mere allegation" and therefore could not "nudge the overall conspiracy across the line from *conceivable* to *plausible*."  *Id.* (emphasis in original).  Here, Plaintiff has alleged that HP and 3D Systems shared pay scales in order to assure that 3D Systems would not poach HP's employees by offering HP employees more compensation. Other than conclusory statements, there are no allegations which provide factual support for these claims.

In addition, Plaintiff asserts that HP employees were required to notify HP if they were offered a position with 3D Systems and would be denied the severance check they would have been entitled to under the Workforce Reduction Plan's release agreement (TAC ¶ 66); and HP disciplined employees who were found to have interviewed with 3D Systems (TAC ¶¶ 67-68).  HP argues that its actions were justified by its right to demand loyalty from current employees in order to take lawful precautions to protect company proprietary information.  ECF No. 18-1 at 20.

Plaintiff responds that given the new allegations regarding the telephone call that initiated the "cease-fire agreement", any justifications made by HP are no longer plausible.  ECF 22 at 18. The Court has already identified the shortcomings of these "cease-fire agreement" allegations and rejects this argument as unavailing.

Also, Plaintiff argues that the WFR plan was used as a "scare tactic" in order to discourage employees from applying to a competitor, noting that the WFR plan states that "[a] participant [in the WFR plan] who accepted a job offer with a competitor and did not promptly notify his management about such job shall not be eligible to receive a Cash Severance Payment."  ECF No. 22-2 at 127.  However, this allegation does not substantiate parallel conduct since Plaintiff is not alleging that 3D Systems was similarly engaged in parallel behavior.  Instead, at best, this would be "circumstantial evidence of the no-poach agreement."  ECF No. 22 at 18.  HP argues that even in the context of

circumstantial evidence, Plaintiff's allegation fails to support his argument since an eligible employee would receive the Cash Severance Payment even if he or she began working for a competitor, as long as this was disclosed to the employee's manager.  The Court agrees.

In sum, Plaintiff's plus factor allegations are either insufficient or independently explained by rational business decisions on the part of HP and therefore do not exclude the possibility that HP's actions were the result of independent conduct.  *See Kendall*, 518 F.3d at 1049 (anticompetitive agreement cannot be inferred when allegations "just as easily suggest rational, legal business behavior.").  Without more of the "plus" factors, an inference of conspiracy would be unreasonable.  *See e.g., In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1189 (9th Cir. 2015) (allegation that manufacturers adopted similar advertisement policies was an insufficient "plus factor" to state a claim under section 1 of the Sherman Act).

Ultimately, Plaintiff's opaque allegations do not nudge this alleged conspiracy from "*conceivable* to *plausible*."  *Kelsey K.*, 254 F. Supp. 3d at 1146.  Moreover, given that Plaintiff has failed to do so after three opportunities, Plaintiff's claims under the Sherman and Cartwright Acts – counts five and eight – are **DISMISSED** with prejudice

### C.    Standing

HP argues that Plaintiff lacks both Article III and antitrust standing.  On Article III standing, HP argues that Plaintiff has not been injured by the alleged no-poach agreement.  ECF No. 18-1 at 23.  Plaintiff counters that he was injured because the no-poach agreement suppressed 3D Systems' hiring of HP employees.  He alleges he was harmed because the agreement eliminated competition and restricted mobility.  Further, Plaintiff's wages were suppressed as a result of the no-poach agreement since has was never solicited for employment with 3D Systems.

On antitrust standing, HP argues that Plaintiff has not been injured by an injury of the type that antitrust laws were meant to prevent—*i.e.*, by an anticompetitive aspect of the Defendant's acts.  Plaintiff opposes.  Plaintiff no longer argues that the standing standard is affected by an agreement's alleged *per se* illegality.[5]

### 1. Legal Standard

In order to allege Article III standing, a plaintiff must allege that he has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016), *as revised* (May 24, 2016).  The Supreme Court has observed that "[h]arm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact."  *Associated General Contractors,* 459 U.S. 519, 535 n. 31.

While Article III standing is required to establish a justiciable case or controversy within the jurisdiction of the federal courts, antitrust standing is a requirement for treble damages under Section 4 of the Clayton Act.  *See Gerlinger v. Amazon.com Inc., Borders Grp., Inc.*, 526 F.3d 1253, 1256 (9th Cir. 2008).  Standing for antitrust actions brought under Section 4 of the Clayton Act is accorded to a person who is injured "in his business or property by reason of anything forbidden in the antitrust laws."  15 U.S.C. § 15 (1976).  While a plaintiff that proves injury sufficient to satisfy antitrust standing has also satisfied the Article III standard for proving an injury in fact, an antitrust plaintiff must still make a further showing that he is the proper party to bring a private antitrust action. *See Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 535 n. 31 (1983).

---

[5] The Court previously addressed the relationship between *per se* illegality and standing in its prior order.  ECF No. 16 at 16-20.

In order to pursue a claim for violation of federal or California antitrust law, plaintiff must meet the requirements for "antitrust standing." *Glen Holly Entm't, Inc. v. Tektronix Inc.,* 352 F.3d 367, 371 (9th Cir. 2003); *Kolling v. Dow Jones & Co.,* 137 Cal.App.3d 709 723 (1982).  "[N]ot all parties who suffer consequential harm have standing to sue for antitrust damages, even if the harm is intentional." *Ostrofe v. H.S. Crocker Co.*, 740 F.2d 739, 741 (9th Cir. 1984) (citing *Associated Gen.,* 459 U.S. 519). In order to satisfy antitrust standing requirements, a plaintiff must show that his injury is "of the type that the antitrust laws were intended to prevent" and that "flows from that which makes defendant's acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc*., 429 U.S. 477, 489 (1977).

In considering the question of antitrust standing, the Ninth Circuit has applied the following five-factor test from *Associated General:*

> (1) the nature of the plaintiff's alleged injury; that is, whether it was the type the antitrust laws were intended to forestall;
> (2) the directness of the injury;
> (3) the speculative measure of the harm;
> (4) the risk of duplicative recovery; and
> (5) the complexity in apportioning damages.

*Amarel v. Connell*, 102 F.3d 1494, 1507 (9th Cir. 1996), *as amended* (Jan. 15, 1997). "No single factor is decisive. The court must balance the factors." *Id.*  (citing *R.C. Dick Geothermal Corp. v. Thermogenics, Inc.,* 890 F.2d 139, 146 (9th Cir. 1989)).  The Ninth Circuit has "rejected any implication that a favorable finding in each and every one of the *Associated Gen. Contractors* factors is a necessary precondition to a finding of antitrust standing." *Id.*  However, "the nature of the plaintiff's alleged injury is of 'tremendous significance' in determining whether a plaintiff has antitrust standing." *Id.* (citing *Bhan v. NME Hospitals, Inc.,* 772 F.2d 1467, 1470 n. 3 (9th Cir.1985)).

/ / /

/ / /

19cv1748-GPC-MSB

### 2.    Nature of Injury

The Ninth Circuit has explained this first factor requires that "the alleged injury be related to anticompetitive behavior," which in turn requires that "the injured party be a participant in the same market as the alleged malefactors."  *Bhan v. NME Hospitals, Inc.,* 772 F.2d 1467, 1470 (9th Cir.1985) (citing *Associated General Contractors,* 459 U.S. at 538, 539).  This factor is of "tremendous importance" in determining antitrust standing.  *Amarel*, 102 F.3d at 1507.

In support of his position on antitrust standing, Plaintiff relies on *Roman v. Cessna Aircraft Co*., 55 F.3d 542 (10th Cir. 1995).  In *Roman*, the plaintiff applied for a position at Cessna while working at Boeing as a contracted engineer.  He was told by Cessna that he was not offered a position solely because of an agreement between Cessna and Boeing that they would not hire engineers away from each other.  *Id*. at 543.  Cessna argued that Plaintiff has failed to show that any injury he suffered was "intended to be redressed by the antitrust laws."  *Id*. at 544.  The *Roman* court concluded that plaintiff had established element for antitrust standing since plaintiff's opportunities in the employment market had been impaired by an anticompetitive agreement directed at him as part of a particular segment of employees.

*Roman* can be distinguished on two grounds.  First, in *Roman*, the plaintiff had adequately alleged the existence of a "no-poaching" agreement, whereas here, Fonseca has failed to do so.  Second, the *Roman* plaintiff had applied for a position at Cessna while he was employed by Boeing.  In contrast, Fonseca only applied for a position at 3D Systems when he was no longer a member of the particular segment of employees affected by the no-poaching agreement, *i.e*., a HP employee.

Plaintiff alleges that as part of the no-poach agreement, HP and 3D Systems agreed to cease cold-calling each other's employees, ceased hiring one another's employees, and shared pay scales with one another.  As a result, Plaintiff suffered the following harms:

(1) Plaintiff stopped seeking employment with 3D Systems, and when he did ultimately apply after his employment with HP ended, he was rejected, and (2) his wages were suppressed as a result of HP and 3D Systems' agreement to fix and suppress employee compensation.

Defendant counters that Plaintiff has failed to allege an injury for purposes of antitrust standing since 3D Systems' failure to hire him does not constitute an injury as required since (1) the alleged agreement between HP and 3D Systems only prevented each company from soliciting the hiring of one another's employees, but did not prevent each company from hiring one another's employees; (2) Plaintiff only applied for a job at 3D Systems after his employment with HP had ended and the agreement had no force or effect on former HP employees; and (3) Plaintiff has failed to allege sufficient facts to show that his compensation was suppressed.

Here, Plaintiff has failed to allege sufficient facts to establish HP and 3D Systems were engaged in a no-poach agreement, as described above.  On this basis, Plaintiff cannot show that he has sustained any injury.

## III.    Section 16600

Plaintiff bases his California Business and Professions Code § 16600 ("Section 16600") claim on the alleged "no-poach' or anti-hire agreements" between HP and 3D Systems or, in the alternative, on the WFR plan as an "additional and independent ground."  TAC ¶ 157.

Section 16600 provides that, in absence of a statutory exception, "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void."   Cal. Bus. & Prof. Code § 16600.  Under Section 16600, "an employer cannot by contract restrain a former employee from engaging in his or her profession, trade, or business unless the agreement falls within one of the exceptions to the rule."  *Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937, 946–47 (2008).  For

example, this statute invalidates provisions in employment contracts that prohibit an employee from working for a competitor, unless such provisions are necessary to protect trade secrets. *See Muggill v. Reuben H. Donnelley Corp.*, 62 Cal. 2d 239, 242 (1965). "California courts 'have been clear in their expression that section 16600 represents a strong public policy of the state which should not be diluted by judicial fiat.'" *Edwards,* 44 Cal.4th at 950. Restraints are unlawful whether or not they are "unreasonable" or "overbroad." *Id.* at 951.

On the no-poach or anti-hire agreements, Defendant argues that Plaintiff has failed to allege a violation of Section 16600 since he has failed to adequately allege the existence of any such no-poach agreement. As discussed at length in the preceding sections, Plaintiff has failed to sufficiently plead allegations regarding the existence of the no-poach agreement; therefore, insofar as the Section 16600 claim is premised on the existence of the no-poach agreement by HP and 3D Systems, Plaintiff's sixth cause of action is dismissed**.**

In the alternative, Plaintiff asserts that the WFR plan provides an "additional and independent ground" for finding a violation of Section 16600. Plaintiff argues that HP violated Section 16600 by denying employees Cash Severance Pay in the event that an employee accepted a position with a competitor during the WFR Redeployment Period, *i.e.*, the two-week period during which HP permitted employees who were subject to the WFR plan to find another job at HP. TAC ¶ 157; ECF No. 22-2 at 116. Further, Plaintiff posits that the WFR plan violates Section 16600 based on the recitation of the HP Rehire Policy which reportedly aims "to protect the investments made in workforce reductions and to keep its commitment to current employees to invest in their careers." ECF 22-2 at 118.

Defendant argues that this claim fails because (1) Section 16600 does not provide a private right of action; (2) Plaintiff does not have standing to assert this claim; (3) the

1   WFR plan does not qualify as a contract under Section 16600; (4) the Rehire Policy is not

2   incorporated as part of the WFR plan; and (5) the TAC does not allege a violation of

3   Section 16600.  The Court addresses each in turn.

4       A.       **Private Right of Action**

5       HP argues that Section 16600 simply prevents courts from enforcing certain

6   contracts, but does not itself provide a private right of action, citing *Lu v. Hawaiian*

7   *Gardens Casino, Inc.*, 50 Cal. 4th 592, 598 (2010).  In *Lu*, the California Supreme Court

8   explained that a violation of a state statute does not necessarily give rise to a private right

9   of action, and held that Cal. Labor Code § 351 did not provide a private right of action

10  where historically the statute had served as a "notice statute" and other sections of the

11  Cal. Labor Code provided that any individual who violated Section 351 would be guilty

12  of a misdemeanor subject to a fine and that the Department of Industrial Relations was

13  charged with enforcing these provisions.  *Lu*, 50 Cal. 4th at 502.  Further, HP cites

14  Cal. Bus. & Prof. Code §§ 16750 and 17203 which, by comparison, explicitly confer

15  private rights of actions.

16      Plaintiff counters that California courts have permitted private causes of action

17  under Section 16600, citing *Muggill v. Reuben H. Donnelley Corp.*, 62 Cal. 2d 239

18  (1965).[6]  The *Muggill* court held that a provision forfeiting the plaintiff's pension rights if

19  he began working for a competitor was void.  *See also Chamberlain v. Augustine*, 172

20  Cal. 285, 288 (1916) (declaring void an agreement that restrained trade under Civil Code

21  § 1673, the predecessor to Section 16600).  More recently, in *Blank v. Kirwan*, the

22  California Supreme Court found on the merits that since plaintiff failed to allege that the

---

[6] Plaintiff erroneously cites the Fourth Circuit's case, *Schwartz v. Rent A Wreck of Am., Inc.*, 603 F. App'x 142 (4th Cir. 2015), as a California court case permitting a private cause of action under Section 16600; while the *Schwartz* court applied California law, the Fourth Circuit decision originated in the District Court for the District of Maryland.

contract at issue "restrict[ed] his activity in the marketplace in any way," he "does not and cannot state a cause of action under section 16600." 39 Cal. 3d 311, 329 (1985). *Blank* further supports the conclusion that Section 16600 provides for a private cause of action so long as the allegations state a claim. Accordingly, the Court finds that Section 16600 does provide a private right of action.

## B.   Standing

HP argues that Plaintiff, as a former employee, lacks standing since he is not currently suffering from "suppressed compensation" or "below-market rates" (ECF No. 18-1 at 29), such that declaratory and injunctive relief would not benefit Plaintiff in any way. *Id.* Plaintiff counters that he will benefit from an order declaring the no-poaching agreement void because the Plaintiff and class members continue to be harmed by Defendant's unlawful restraint of trade. ECF No. 22 at 26-27. Given that the Court has previously found the "no-poaching" allegations insufficient, this part of his claim lacks merit and the standing issue is moot.

HP next argues that Plaintiff is not entitled to any relief based on the WFR plan because it only applied during a two-week deployment period prior to Plaintiff's termination and Plaintiff never signed the release agreement associated with the WFR plan, under which he would have been denied a severance payment if he accepted a position with a competitor. ECF No. 18-1 at 29-31. The Court agrees and finds that Plaintiff lacks standing to challenge the provisions of the WFR plan associated with severance pay since he never signed the related release agreement. Accordingly, to the extent that Plaintiff has standing to bring any claim, it is only with respect to challenging the terms of the Rehire Policy—*i.e.*, that the WFR plan is illegal and unenforceable based on its terms providing that "employees who left the company, in May 2012 or later, through a workforce reduction program are ineligible for hire or to be engaged as an agency contractor." ECF No. 22-2 at 118. However, in order to decide this claim, the

Court must first consider two questions: (1) whether the WFR plan constitutes a "contract" as defined by Section 16600; and (2) whether the Rehire Policy is incorporated into the WFR Plan.

### 1.    WFR Plan Qualifies As A Contract Under Section 16600

Courts have previously found that Section 16600 invalidated certain employment contracts.  *See generally AMN Healthcare, Inc. v. Aya Healthcare Services, Inc*. 239 Cal.Rptr.3d 577 (Cal. App. 2018) (employer's confidentiality and non-disclosure agreement signed by employees void under Section 16600); *Fillpoint, LLC v. Maas*, 146 Cal.Rptr.3d 194 (Cal. App. 2012) (non-solicitation covenants void under Section 16600). HP argues that the WFR plan does not qualify as a contract under Section 16600 because it is, instead, a unilateral statement by HP describing how the company would effectuate a particular workforce reduction, and there was no agreement reached between HP and Plaintiff.  ECF No. 29 at 6.  Plaintiff counters that the WFR plan and the WFR SPD qualify as an "unilateral implied-in-fact" contract, and that Plaintiff's continued performance as an HP employee constituted both acceptance and consideration of the contract.  ECF No. 32 at 6-7.

In *Chinn v. China Nat. Aviation Corp*., 138 Cal. App. 2d 98, 99 (1955), the court found a "unilateral implied-in-fact" contract that was premised upon inducements offered for an employee's continued employment.  In *Chinn*, the plaintiff notified his employer of his intention to quit immediately.  In response, the employer notified the employee of additional benefits—including, additional severance pay benefits based on time served as an employee.  *Id.*  Upon learning of these additional benefits, the plaintiff decided not to quit and continued instead as an employee. *See id.* at 99.  In finding a contract was formed, the *Chinn* court found that the additional benefits "very definitely [were] an inducement to the employee to remain on."  *Id.* at 103.  The *Chinn* court reasoned that such additional benefits "make the employees more content and happier in their jobs,

cause the employees to forego their rights to seek other employment, assist in avoiding labor turnover, and are considered of advantage to both the employer and the employees." *Id.* at 100.

The *Chinn* court relied on a number of cases where an employee's continued employment, after the employer's modifications to the employee's benefit plan, constituted the creation and acceptance of a contract. One such case is *Hercules Powder Co. v. Brookfield*, 189 Va. 531, S.E.2d 804 (1949) where an employer circulated among its employees a handbook containing a section entitled "Dismissal Wages and Salaries," which provided dismissal pay to any employee who was terminated because of reduction in forces or plant shutdown. The *Hercules* plaintiff continued to work for the employer after the handbook's circulation and, on this basis, the court held:

> "Through and by compliance with the terms of the offer, plaintiff necessarily had to and did forego his right to seek and accept other employment and affirmatively met all conditions imposed by rendering service to the defendant for the period and until the specified time . . . [a]mple authority sustains the view that such a promise amounts to an offer, which, if accepted by performance of the service, fulfills the legal requirements of a contract."

*Id.* at 808. Here, Plaintiff was notified on May 8, 2017 that he was being terminated pursuant to the WFR plan and that his date of termination would be May 19, 2017. TAC ¶ 44. The WFR SPD provides that the "purpose of the [WFR] Plan is to provide certain benefits to designated employees who experience an involuntary termination of their HP employment." ECF No. 22-2 at 114. Further, the WFR SPD provides, "During [the WFR Redeployment period], you will generally continue working in your current job and transition your assignments according to direction from your manager. If . . . you terminate employment before your designated termination date, your participation in the Plan will end and you will not be eligible for any other benefit of the plan." *Id.* By complying with the terms of the WFR plan, Plaintiff forewent his right to seek and accept other employment and met the other conditions of the WFR plan. His continued

employment at HP after receiving notice of the WFR plan, albeit for a short 11-day time period, constitutes acceptance and consideration.

### 2.    The WFR Plan Does Not Incorporate the Rehire Policy

HP argues that even if the WFR plan were to qualify as a contract, the Rehire Policy is (1) a separate and distinct document and was not incorporated into the WFR plan, and (2) the Rehire Policy only applies after an employee has been laid-off from HP, *i.e.*, is no longer a participant in the WFR plan.  So, even if the WFR plan were to qualify as a contract under Section 16600, this contract would have expired before the Rehire Policy took effect.  ECF No. 29 at 8.  Moreover, HP argues that the Rehire Policy does not constitute a contract since it was a unilateral statement made by HP.  ECF No. 29 at 8-9.

"A contract may validly include the provisions of a document not physically a part of the basic contract . . . the parties may incorporate by reference into their contract the terms of some other document.  But each case must turn on its facts."  *Shaw v. Regents of Univ. of California*, 58 Cal. App. 4th 44, 54 (1997).  "The contract need not recite that it incorporates another document, so long as it guides the reader to the incorporated document."  *Id.* (internal citations and quotation marks omitted).  "For the terms of another document to be incorporated into the document executed by the parties the reference must be *clear and unequivocal*, the reference must be called to the attention of the other party and he must consent thereto, and the terms of the incorporated document must be known or easily available to the contracting parties."  *Id*. (citing cases) (emphasis added).

Here, the WFR plan is a nine-page document established by HP in order to "provide income replacement benefits to certain employees who incur an involuntary termination of employment."  ECF No. 22-2 at 124.  The WFR plan was first established in 2003, and was amended and restated in several instances, most recently "for

notifications occurring on and after May 23, 2012." *Id.* The WFR plan's most recent amendment was adopted and made effective as of November 20, 2012. *Id.* at 134. The WFR plan discusses the terms of the career transition period (*i.e.*, the period between the date the employee was placed into the workforce reduction program and the employee's termination date), payments following the employee's termination, career transition counseling, cash severance payments, procedures for appealing benefit provisions or denials, and other general provisions. *Id.* at 125-131.

The Workforce Reduction Plan Summary Plan Description ("WFR SPD") is a separate seven-page document that was revised in March 2017 and acts as a "summary of the terms" of the WFR plan. ECF No. 22-2 at 114. The WFR SPD refers to the WFR plan's terms and outlines the WFR plan's benefits. *Id.* Unlike the WFR plan, the WFR SPD appears to be tailored to a lay reader by highlighting, for example, how the WFR plan's benefits may apply to a typical employee:

> **Example:** John is a Plan Participant. His monthly pay is $5,200 and he has qualifying service . . . If John signs and does not revoke the HP release of claims, then John will receive a Cash Severance Payment of $8,914.32, determined as follows:
>
> (Weekly Base Pay x Years of Qualifying service) – (60-day pay) = Cash
>
> . . .
>
> John's 60-day pay is $10,285.68, and his Cash Severance Payment is $8,914.32, totally $19,200 in severance benefits paid under this Plan.

*Id.* at 115 (emphasis in original). The WFR SPD includes a section entitled "Other Information You Should Know," which includes the following:

> **HP Rehire Policy**: It is important for HP to protect the investments made in workforce reductions and to keep its commitment to current employees to invest in their careers by creating opportunities for growth and promotion. As a result, under current HP policy, former employees who left the company, in May 2012 or later, through a workforce reduction program are ineligible for rehire or to be engaged as an agency contractor. These policies may change from time to time.

ECF No. 22-2 at 118.  The WFR SPD explains that this Rehire Policy applies after the sixty-day Preferential Rehire Period[7] elapses, *see id.* at 114, and provides that in the event of any conflict between the WFR SPD and the WFR plan itself, the WFR plan controls: "Because it is a summary, it does not describe every term of the [WFR plan].  In case of any conflict between the [WFR plan] document and this summary plan description, the terms of the [WFR plan] will control."  *Id.* at 119.

Plaintiff argues that the WFR plan incorporates the Rehire Policy since the WFR plan states that "HP may provide Participants such other benefits as HP determines from time to time," "Participants will be informed of such other benefits in the information provided with respect to each offering of benefits made under this Plan," and that the 60-day Preferential Rehiring Period was listed as one of the "Benefits of the Plan" in the WFR SPD.  ECF No. 32 at 8.  Plaintiff argues that this discussion of the hiring period shows that HP "clearly intended" the Rehire Policy to be part of the WFR plan.

First, the Court notes that Plaintiff's Section 16600 claim is rooted in HP's restriction preventing employees from being rehired as an agency contractor, which is distinct from the aforementioned 60-day preferential rehiring period.[8]  Further, a comparison to the policy at issue in *Shaw* is instructive.  In *Shaw*, the employee was required to sign an agreement as a condition of employment.  *Id.* at 48.  The mandatory employment agreement directed the employee signatory to "[p]lease read Patent Policy on reverse side and above" before signing and recited the text of the Patent Policy within

---

[7] The Preferential Rehiring Period is the sixty-day period following an employee's termination date, during which time the terminated employee may apply for jobs within HP by using HP's job search tool and without needing special approval.

[8] Plaintiff also cites in support *Cook Biotech, Inc. v. Acell, Inc.*, 460 F. 3d 1365 (2006).  However, in *Cook*, the Court found that a patent application sufficiently incorporated by reference the definition of a scientific term since it "identif[ied] with detailed particularity what specific material it incorporates and clearly indicate where that material is found in the various documents."  Id. 1376.  Such clear and detailed specification of reference to the Rehire Policy is absent from the WFR Plan.

the agreement itself. *Id.* Unlike the incorporation of the Patent Policy in the agreement in *Shaw*, the discussion of the Rehire Policy in the WFR plan and WFR SPD is not "clear and unequivocal." *Shaw*, 58 Cal. App. 4th at 54. The WFR plan itself does not make any explicit reference to the Rehire Policy, and although the Rehire Policy is described in the WFR SPD, this description is included in a section entitled "Other Information You Should Know," indicating the Rehire Policy's status as a separate document. Further, as discussed above, the WFR SPD explicitly states that if the WFR SPD and the WFR plan conflict, the WFR plan will control.

In sum, while the WFR plan may qualify as a "contract" for purposes of consideration under Section 16600, the Rehire Policy was not incorporated by reference into the WFR plan. Determinations of incorporation-by-reference must be made with careful attention to the factual circumstances unique to each case and although a contract need not explicitly state that it incorporates another document, the incorporation must be "clear and unequivocal." *Shaw*, 58 Cal. App. 4th at 54. Any reference that the WFR plan might make to the Rehire Policy fails to meet this "clear and unequivocal" standard.

## C.    ERISA Preemption

In the alternative, HP argues that Plaintiff's Section 16600 claim should be denied since it is preempted by the Employee Retirement Income Security Act of 1974 ("ERISA"). Plaintiff counters that the Court has previously decided, in response to Plaintiff's earlier motion to remand, that ERISA does not preempt Plaintiff's state claims; the WFR plan is not an ERISA plan; and Plaintiff's claims do not relate to ERISA. Parties presented brief arguments addressing ERISA preemption in their pleadings. ECF No. 18-1 at 30; ECF No. 22 at 29; ECF No. 25 at 13; ECF No. 32 at 9; ECF No. 34 at 4. The Court ordered supplemental briefing on the subject, and both parties filed responsive briefs. ECF Nos. 41, 42, 43.

/ / /

### 1. Legal Standard

Section 514(a) of ERISA provides an express preemption provision—namely, that the provisions of ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan."  29 U.S.C. § 1144(a).  The Ninth Circuit has further articulated this standard, holding that a claim "falls under ERISA's far-reaching preemption clause" when the "underlying theory of the case revolves around the denial of benefits."  *Tingey v. Pixley–Richards West, Inc.,* 953 F.2d 1124, 1131 n. 2 (9th Cir. 1992).  In applying this standard, courts in the Ninth Circuit have consistently held that ERISA preempts common-law contract claims arising from employee benefit plans.  *See, e.g., Kanne v. Conn. Gen. Life Ins. Co.,* 867 F.2d 489, 494 (9th Cir.1988) (finding that ERISA preempted employee's claim against insurer for breach of contract because it was premised on improper processing of benefits claim); *Cantrell v. Great Republic Ins. Co.,* 873 F.2d 1249, 1253 (9th Cir.1989) (holding that ERISA preempted insured's action against insurers for breach of covenant of good faith and fair dealing because it was premised on the rescission of the group insurance policy).

Section 502(a) of ERISA provides a complete preemption provision stating that a civil action may be brought under ERISA in order for the plan beneficiary to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a).  Accordingly, where a litigant brings claims that address the breach of legal duties that are "independent from duties under any benefit plan established under ERISA," the Ninth Circuit has held that such claims are not preempted.  *Marin Gen. Hosp. v. Modesto & Empire Traction Co.,* 581 F.3d 941, 943 (9th Cir. 2009).

/ / /

/ / /

19cv1748-GPC-MSB

### 2.  Prior Order Granting Motion to Remand

As an initial matter regarding the Court's prior order granting Plaintiff's motion to remand, the Court agrees with HP and rejects Plaintiff's characterization of Judge Benitez's order as having resolved the question of ERISA preemption.  Judge Benitez previously granted Plaintiff's motion to remand on the basis that Plaintiff could not have brought his age-discrimination claims pursuant to ERISA § 502(a)(3), and therefore his claims were not preempted by ERISA under the *complete* preemption provision. *Fonseca v. Hewlett-Packard*, 18-cv-00071-BEN-BLM, ECF No. 23 at 5-6 (Sept. 5, 2018).  However, Judge Benitez noted that ERISA preemption may apply when plaintiffs seek to "enforce, enjoin, obtain equitable relief for, or otherwise redress violations of ERISA provisions or ERISA plan terms."  *Id.*

### 3.  ERISA Express Preemption

In its latest briefing, HP argues that *express* preemption precludes this Court's consideration of Plaintiff's Section 16600 claim.  ECF No. 41 at 8.  Plaintiff disagrees. The Court has already found that Plaintiff's Section 16600 claim has failed on the basis that the Rehire Policy is not incorporated into the WFR plan.  However, if the Rehire Policy were incorporated into the WFR plan, ERISA would preempt Plaintiff's Section 16600 claim.  Here, the WFR plan provides:

> "This Plan is intended to be an employee welfare benefit plan within the meaning of ERISA Section 3(1) and Section 2510.3-1 of the regulations issued . . . all payments under the Plan shall be completed within 24 months of the Participant's Termination Date."

ECF No. 22-2 at 130.  The WFR SPD provides:

> **ERISA Rights**: If you are a Participant in the HP Workforce Reduction Plan, you are entitled to certain rights and protections under ERISA. Federal law and regulations require the following description of your rights be given to you.

> . . .

> In addition to creating rights for Plan participants, ERISA imposes duties upon the people who are responsible for the operation of this Plan. The people who operate the Plan, called "fiduciaries" of the Plan, have a duty to do so prudently in the interest of you and other Plan participants and beneficiaries.

ECF No. 22-2 at 120 (emphasis in original).

"ERISA is a comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983). "The statute imposes participation, funding, and vesting requirements on pension plans. It also sets various uniform standards, including rules concerning reporting, disclosure, and fiduciary responsibility, for both pension and welfare plans." *Id.* at 91 (citation omitted). "As part of this closely integrated regulatory system Congress included various safeguards to preclude abuse and 'to completely secure the rights and expectations brought into being by this landmark reform legislation.' " *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 137 (1990). (citing S.Rep. No. 93–127 (1973)). ERISA §§ 514(a) and 502(a) figure prominently as two of these "safeguards." *Id.*

In his latest briefing, Plaintiff argues that the WFR plan does not impose any ongoing obligation or relationship between HP and Plaintiff, and that the benefits that the WFR plan does provide—*i.e.*, the Cash Severance Payment, the Preferential Hiring Period, and the Career Transition Services Program—are only one-time benefits limited in time frame, and therefore ERISA does not govern the WFR plan. ECF No. 42 at 3-4. However, Plaintiff forgets his earlier argument—namely, that his Section 16600 claim is premised on the allegation that the WFR plan restricts him *permanently* from working for HP as an agency contractor. Accordingly, if the Court were to accept Plaintiff's claim that the Rehire Policy is incorporated into the WFR plan, the WFR plan would be considered an "ongoing administrative scheme," *Fort Halifax Packing Co. v. Coyne*, 482

U.S. 1, 12 (1987), and one that has an impact on the plan participants on a "regular and long term basis." *Shaver v. Siemens Corp.*, 670 F.3d 462, 478 (3rd Cir. 2012).

Further, the Court finds *Smith v. CMTA-IAM Pension Tr.*, 654 F.2d 650 (9th Cir. 1981) to be instructive. In *Smith*, the retirement plan in question provided that the retirement benefits of a plan participant will be suspended during any period in which he is employed in either the "metal trades industry" or employed by certain "participating employer[s]" who make contributions to the retirement plan. *Id.* at 654. The *Smith* plaintiff argued that this suspension clause violated Section 16600. The court noted that Section 16600 only applied to the time period prior to ERISA's enactment, but after ERISA's enactment, "federal law, not state law, controls" and Section 16600 is "preempted pursuant to ERISA § 514." *Id.* at 660 n.14.

In sum, the Court finds that because Plaintiff's Section 16600 claim is premised on language that he argues should be considered part of the WFR plan, his cause of action "makes specific reference to, and indeed is premised on" a plan that is otherwise governed by ERISA and would therefore be preempted since "there simply is *no* cause of action if there is no plan." *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 140 (1990) (emphasis on original).

HP also argues that Plaintiff is judicially estopped from bringing this claim. The Court finds that HP has not met the requisite elements of judicial estoppel since Plaintiff has not previously prevailed in a prior phase of this case on this argument. *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001).

Based on the above analysis, the motion to dismiss count six is **GRANTED**.

/ / /

/ / /

/ / /

/ / /

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CONCLUSION

Defendant's motion to dismiss counts five, six, and eight of the third amended complaint is **GRANTED with prejudice**.

**IT IS SO ORDERED.**

Dated:  August 11, 2020

Hon. Gonzalo P. Curiel
United States District Judge

19cv1748-GPC-MSB